**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DBRAND INC., a Canadian Corporation,<br><br>*Plaintiff,*<br><br>v.<br><br>CASETAGRAM LIMITED, a Hong Kong limited liability company, WESTSIDE LAB, INC., a California corporation, and WESTROCK SERVICES (WHOLESALE), INC.<br><br>*Defendants.* | CASE NO. 24-cv-1919<br><br><br>Judge Martha M. Pacold<br><br>Magistrate Judge Maria Valdez |
| CASETAGRAM LIMITED, a Hong Kong limited liability company, and WESTSIDE LAB, INC., a California corporation,<br><br>*Counterclaimants*,<br><br>v.<br><br>DBRAND INC., a Canadian Corporation, | |

## DEFENDANT WESTSIDE LAB, INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO DBRAND INC'S AMENDED COMPLAINT FOR COPYRIGHT MANAGEMENT INFORMATION VIOLATIONS

Defendant WESTSIDE LAB, INC.'S ("Westside" or "Defendant") herein answers DBRAND INC.'s ("dbrand" or "Plaintiff") Amended Complaint for Copyright Management Information Violations and states as follows:

## SUMMARY OF THE ACTION

1

1.    dbrand is a Canadian company that designs, manufactures, and sells premium cases, screen protectors, and other accessories for phones, tablets, laptops, and more. dbrand makes all of its original designs at its facilities in Toronto.

**ANSWER:**

**Westside denies that there are "original designs" as, on information and belief and a reasonable opportunity for discovery will show, dbrand makes unauthorized representational scans of third-party devices without agreement or authorization from the third party and are otherwise not copyrightable under the US Copyright Act, and the US Copyright Office's Compendium.  (*See*, Westside Affirmative Defense No. 2) incorporated herein as if fully restated.)  Westside is without sufficient knowledge or information upon which to admit or deny the remaining allegations, therefore those allegations are denied.**

2.    dbrand also partners with prominent influencers and other reputable brands to market its premium products. Since 2017, dbrand has partnered with the famous YouTube content creator Zack Nelson, who posts videos under the username JerryRigEverything ("JRE"), and who currently has over nine million subscribers. *See* https://youtu.be/IS0SItAzEXg?t=603.

**ANSWER:**

**Westside denies that this paragraph truly, accurately, or completely describes dbrand's or dbrand's CEO's relationship with Zack Nelson ("Nelson").  Westside admits, on information and belief, that dbrand's CEO characterizes his and dbrand's relationship with Nelson/JRE as "generally, somebody who I am aligned with and sharing an objective with," and Nelson/JRE has contractual obligations with and receives money from dbrand to make video posts about dbrand products.**

**Westside admits, on information and belief, that** ███████████████████████████████████████████████████████████████████████ **, but denies that the allegations in this paragraph accurately describe**

2

███████████████████████████████████
███████████████████████████████████
███████████████████████.

**Westside admits on information and belief that Nelson has a number of social media channels, including, but not limited to, YouTube, Twitter, Instagram, Facebook, Reddit, Telegram, and TikTok and that Nelson posts videos and uses the name "JerryRigEverything." Westside is without sufficient knowledge or information to form a belief as to the number of viewers of Nelson at any given time. Westside is without sufficient knowledge or information upon which to admit or deny the allegations about dbrand partnering with prominent influencers and other reputable brands to market its products, or that dbrand's products are premium, therefore those allegations are denied. Except as expressly admitted herein, the remaining allegations are denied.**

3.      In one early dbrand-sponsored video (*see* https://youtu.be/qEWO68Tegf8?t=344), JRE demonstrated how to make the back panel of some phones transparent by exposing the clear glass exterior ("Clear Mods"). This video and others published by JRE covering similar subject matter have received tens of millions of views on YouTube.

**ANSWER:**

**Westside is without sufficient knowledge or information upon which to admit or deny these allegations, therefore the allegations are denied.**

4.      Many viewers have made particular mention of how much they like the aesthetic of the Clear Mods: [image in original]

**ANSWER:**

**Westside is without sufficient knowledge, information or belief regarding the origin, authenticity, completeness or foundation of the image contained in this allegation, and/or**

3

the inadmissible hearsay statements made in the visual, therefore the allegation is denied.

Westside is without sufficient knowledge or information upon which to admit or deny these

allegations, therefore the allegations are denied.

5.     However, as noted by JRE and many of his viewers, creating a Clear Mod voids
the phone's warranty, risks damaging the phone's internals, and makes the phone's rear glass
panel susceptible to shattering into dangerous shards.

**ANSWER:**

Westside is without sufficient knowledge, information or belief regarding the origin,

authenticity, completeness or foundation of and/or the inadmissible hearsay statements

made by Nelson that are referred to in this paragraph, therefore the allegation is denied.

Westside incorporates by reference its answer to dbrand's allegations in paragraph 2

regarding the definition of "JRE" as if fully restated herein.  To the extent not admitted, the

allegation is denied.

6.     Following the success of JRE's Clear Mod videos, dbrand began a partnership
with JRE to design and market a new line of products for phones and other electronics that
achieves the desirable aesthetic of Clear Mods in a consumer-ready format through printed vinyl
decals applied directly to devices or to customizable impact-resistant cases ("Original
Teardowns"): [image in original]

**ANSWER:**

Westside incorporates its answers to paragraphs 2-3 into its answer to this

paragraph as if fully restated herein. Based on dbrand's Responses to Requests to Admit

that Nelson and JRE are not authors or owners of the works at issue in this Amended

Complaint (**Exhibit 1**, dbrand's Responses to Requests to Admit No. 21-27, 32-33), the

allegations of Nelson's involvement in design are denied.

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. Westside admits based on information and belief, that the dbrand website at Exhibit C to the Amended Complaint represents that dbrand scans third party devices, dbrand does so without the authorization of the device manufacturer, and, according to Exhibit C, that the resulting scanned images are "guaranteed to be 99% accurate to the device's internals," but Westside denies that dbrand or Nelson "designs" "Original Teardowns." (Exhibit 2) Westside incorporates the allegations of its Affirmative Defense Nos. 1-2 as if fully restated herein. Since dbrand uses this paragraph to define "Original Teardowns" Westside's answer to this paragraph is incorporated by reference in each paragraph that uses the defined term "Original Teardown" as if fully restated therein.**

**Westside is without sufficient knowledge or information upon which to admit or deny the remaining allegations, therefore the allegations are denied. To the extent not admitted, the allegations are denied.**

7.      dbrand's Original Teardowns comprise hundreds of different models for phones and other electronics from various manufacturers and were an immediate commercial success. In less than 15 hours after launch, dbrand sold over 14,000 Original Teardowns—approximately one purchase every four seconds.

**ANSWER:**

**Westside incorporates its answer to paragraph 6 (Answer to Definition of "Original Teardowns") into this paragraph as if fully restated herein. Westside is without sufficient knowledge or information upon which to admit or deny these allegations, therefore the allegations are denied.**

8.      dbrand's designs in the Original Teardowns are inherently protected by copyright.

5

**ANSWER:**

**Denied. Westside incorporates its answer to paragraph 6 (Answer to Definition of "Original Teardowns") into this paragraph as if fully restated herein. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2 as if fully restated herein.**

9.      After the Original Teardowns had already achieved substantial fame and recognition, Defendant Casetify—a Chinese-based manufacturer of phone cases and related products—began to directly copy dbrand's most popular Original Teardowns to create its own line of cases for phones and other electronics called "Inside Out" (the "Infringing Teardowns"): [image in original]

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph and defined throughout the Amended Complaint as Infringing Teardowns, therefore the allegation is denied in this paragraph and throughout the Amended Complaint where the phrase "Infringing Teardowns" is used. Westside is without sufficient knowledge or information upon which to admit or deny the allegations about Plaintiff's works therefore the allegations are denied. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2 as if fully restated herein. Westside admits that "Casetify" is a brand name affiliated with phone cases and other products. Westside**

6

denies that a brand name is the same as a corporate name. **The remaining allegations are denied.**

10.     Casetify's Infringing Teardowns incorporate direct copies of dbrand's copyright-protected works. Every Infringing Teardown began as an unauthorized copy of one of the Original Teardowns. Casetify then digitally removed and added some elements (including other copyright-protected elements from other Original Teardowns) in an attempt to hide its infringements.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies that there are "dbrand copyright-protected works" (Westside Affirmative Defense Nos. 1-2 is incorporated into its answer to this paragraph as if fully restated herein.)  Westside is without sufficient knowledge or information about the acts of other named Defendants and to the extent this paragraph misuses a brand name to refer to individual Defendant companies, the allegations in this paragraph are denied.  The remaining allegations are denied.**

11.     Evidence of Casetify's blatant copyright theft is apparent upon inspection of the Infringing Teardowns. Indeed, large swathes of the Original Teardowns are still present, unedited, in the Infringing Teardowns.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") and paragraph 44 (Answer to Definition of "Casetify") into the answer of this paragraph as if fully restated herein.  Westside denies**

that there are "dbrand copyright-protected works" (Westside Affirmative Defense Nos. 1-2 is incorporated into its answer to this paragraph as if fully restated herein.)

12. Casetify also left various symbols, messages, logos, and trademarks in the Infringing Teardowns that dbrand added to the Original Teardowns for the dual purposes of increasing engagement with consumers and detecting infringers (collectively, the "Easter Eggs"). A few examples of dbrand's Easter Eggs found on the Infringing Teardowns are shown below, alongside corresponding examples from dbrand's Original Teardowns: [images in original]

**ANSWER:**

Westside incorporates into its answer to this paragraph the following answers to paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. It is denied that any of the pictured symbols referenced in paragraph 12 appear on any product involving Westside to the best of it's recollection. Plaintiff uses "Easter Eggs" in this paragraph and throughout the Amended Complaint, as a defined term, and represents that phrase "Easter Eggs" means "various symbols, messages, logos, and trademarks." In seeking leave to amend the complaint, Plaintiff affirmatively represented in Dkt 105, p. to the Court that:

> "With respect to the Easter Eggs, Casetify also maintains that dbrand "is alleging that various Easter Egg symbols . . . constitute trademarks" and must therefore "plead in each count and ultimately prove the existence of a protectable trademark." Opposition [ECF No. 102] at 18. This is untrue. The only trademark that dbrand mentioned in the Original and Amended Complaints is dbrand's "db" logo. *See* [ECF No. 81-2] ¶¶ 72, 97." Dkt 105, p. 11-12.

**Based on this Plaintiff's representation at Dkt 105, p. 11-12, Westside denies that any of the "Easter Eggs" referenced in this Amended Complaint and in this Paragraph 12 are trademarks or logos. Westside is without sufficient knowledge or information about other "various symbols, messages" therefore denies the same. Westside denies that such various symbols, messages, logos or trademarks are protected by Copyright or constitute Copyright Management Information ("CMI"). See Allegations in Affirmative Defense No. 1 as if fully restated herein. Except as unconditionally admitted, the allegations are denied.**

13. Although Casetify *unintentionally* left a trail of infringement by failing to identify and eliminate all of dbrand's Easter Eggs, it *intentionally* tried to cover its tracks by removing and altering dbrand's copyright management information ("CMI") from the Original Teardowns and by adding its own false CMI to the Infringing Teardowns, including the QR codes shown below: [images in original]

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), Paragraph 12 (Answer to Definition of "Easter Eggs") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside is without sufficient knowledge or information about the foundation, authenticity completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. Denied to the extent Westside is part of the definition of "Casetify." Westside is without sufficient knowledge or information to form a belief as to the acts of the other Defendants, therefore the allegations are denied. To the extent an answer is required it is denied. See also allegations of Affirmative Defense Nos. 1-2 incorporated by reference as if fully restated herein.**

14. Casetify has sold the Infringing Teardowns across the United States at least through its own website and through the third-party retailer Best Buy.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), and paragraph 44 (Answer to Definition of "Casetify") into the answer of this paragraph as if fully restated herein. Westside admits that it has sold thousands of products bearing a Casetify Brand name, including many that are not at issue in this case, on Amazon but denies that they are infringing. (Casetagram Affirmative Defense Nos. 1-2 are incorporated into its answer to this paragraph as if fully restated herein.) Westside is without sufficient knowledge or information to form a belief as to the acts of the other Defendants, therefore the allegations are denied. To the extent an answer is required it is denied.**

15. Casetify's egregious and intentional misconduct constitutes copyright infringement and CMI violations pursuant to the United States Copyright Act. Among other relief, dbrand seeks a permanent injunction preventing Casetify from further infringing dbrand's copyrighted works, as well as actual and statutory damages.

**ANSWER:**

**Denied, and denied that dbrand is entitled to the relief it seeks. Plaintiff dbrand voluntarily dismissed its copyright infringement claims and thus has no pending claim for the relief sought in this paragraph. (Westside Affirmative Defense Nos. 1-2 are incorporated into its answer to this paragraph as if fully restated herein.)**

4912-5164-1674, v. 3

## PARTIES

16.     Plaintiff dbrand inc. is a Canadian corporation with a principal business address at 500 King Street West, 3rd Floor, Toronto, ON M5V 1L9, Canada.

**ANSWER:**

**Westside is without sufficient knowledge or information to form a belief as to the truth of this allegation, therefore it is denied.**

17.     Defendant Casetagram is a Hong Kong limited company with a principal business address at 18/F NEO 123 Hoi Bun Rd, Kwun Tong, Hong Kong. Casetagram advertises that it can be contacted "anytime" by email at hello@casetify.com, that "[y]ou can also contact us on Instagram, Facebook or Twitter," and further provides a contact form on its website. *See* https://www.casetify.com/faq/contact. Casetagram's executive team can also be contacted directly at legal.comsec@casetagram.com, owner@casetagram.com, wes@casetagram.com, ron@casetagram.com, mike@casetagram.com, and sharon.lam@casetagram.com. Casetagram can also be contacted by phone at 1 (908) 295-5831 and at 00852-34640488.

**ANSWER:**

**On information and belief, admitted.**

18.     Defendant Westside is a California corporation with a registered business address at 3705 W Pico Blvd #2637, Los Angeles, CA 90019 and a 1505 registered corporate agent—Northwest Registered Agent, Inc.—at 2108 N Street, Ste N, Sacramento, CA 95816.

**ANSWER:**

**Admitted.**

19.     Defendant Westrock Services (Wholesale), Inc. is a Wyoming corporation with a registered business address at 30 N Gould St, #31324, Sheridan, WY 82801.

**ANSWER:**

**On information and belief, admitted.**

11

20.     On information and belief, Defendants Casetagram, Westside, and Westrock are, for the purpose of the misconduct alleged herein, alter egos of each other and effectively a single entity.

**ANSWER:**

**Denied.**

21.     The only two executives identified in Westside's state business filings are Mike Jia (CEO, Secretary, and Director) and Sharon Lam (CFO). The only executive identified in Westrock's public business filings is Ronald Yeung.

**ANSWER:**

**Denied as to Westside. Admit, on information and belief, Ronald Yeung is reflected in the public filings of Westrock.**

22.     On information and belief, Mike Jia is the Head of Growth at Casetagram and is physically based out of Casetagram's corporate office in Hong Kong:  [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied.  This paragraph refers to other defendants and not Westside and thus no answer is required.  To the extent an answer is required, on information and belief, denied as alleged.**

23.     On information and belief, Sharon Lam is the CFO at Casetagram and is physically based out of Casetagram's corporate office in Hong Kong:  [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown or link provided in this paragraph, therefore the allegation is denied. This paragraph refers to other defendants and not Westside and thus no answer is required. To the extent an answer is required, on information and belief, Westside admits that Sharon Lam is a Chief Financial Officer. Except as admitted the allegations are denied.**

24.    On information and belief, Ronald Yeung—the co-founder and Managing Director of Casetify—is also physically based out of Casetagram's corporate office in Hong Kong: [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph or link contained in this paragraph, therefore the allegation is denied. Westside admits that Ron Yeung is an individual believed at times to be residing in Hong Kong. Westside admits that upon information and belief, Mr. Yeung is a Co-Founder of Casetagram and on information and belief, at times has held the title of Managing Director. Westside is without sufficient knowledge or information to form a belief as to positions of Ronald Yeung in other companies. The remaining allegations are denied.**

25.    Wesley Ng—co-founder and CEO of Casetagram—admitted in another infringement lawsuit filed against Casetagram in this District that in addition to Casetagram, he also owns Westside. *Uncommon LLC v. Casetagram Limited*, No. 1:16-CV-04691, Dkt. No. 16 (N.D. Ill., June 23, 2016) (the "Ng Decl.") ¶ 5. On information and belief, Wesley Ng—co-founder and CEO of Casetagram—is physically based out of Casetagram's corporate office in Hong Kong: [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph or the link in this paragraph or the referenced document. This paragraph refers to other defendants and not Westside and thus no answer is required. To the extent an answer is required, on information and belief denied as alleged.**

**Westside has no personal knowledge of the referenced document to form a belief as to allegations about it, therefore said allegations are denied. Westside admits that Mr. Ng is publicly represented as a Co-Founder of Casetagram in the image. Westside admits, on information and belief Mr. Ng is located in Hong Kong. Westside is without sufficient knowledge or information about the allegations of paragraph 25 and therefore denies the same. Westside is without sufficient knowledge or information to form a belief as to positions of Mr. Ng in other companies over the years and therefore cannot admit or deny these allegations. All remaining allegations are denied.**

26. On information and belief, most full-time employees of Casetify, including all corporate decision-makers and those who exercise control over Westside and Westrock, are based in Hong Kong. As admitted by Wesley Ng, "All decisions about [management responsibilities for Casetify and . . . authority or control over Casetify's agreements with other companies] are made by Casetify personnel in Hong Kong." Ng. Decl. ¶ 7.

**ANSWER:**

**Westside is without sufficient knowledge or information to form a belief as to positions or locations of employees of other companies over the years and therefore cannot admit or deny these allegations. Westside has no personal knowledge of the referenced document or whether things stated in 2016 are different in 2023-2025. All remaining allegations are denied.**

27.     On information and belief, executives for Casetagram including at least Wesley Ng, Mike Jia, Sharon Lam, and/or Ronald Yeung exercise exclusive and total control over Westside and Westrock, including over all of their hiring decisions, substantive business decisions, and over the importation, marketing, distribution, and sale of all products, including the Infringing Teardowns.

**ANSWER:**

**Denied.**

28.     On its website, social media, and elsewhere Casetagram lists a Los Angeles office:

[image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph or the link in this paragraph, therefore the allegations are denied. Westside was not involved in the preparation of the referenced information in this paragraph and is without sufficient knowledge or information to form to admit or deny this allegation. To the extent an answer is necessary, the allegation is denied.**

29.     On information and belief, Casetagram is not registered to do business in the state of California or the city of Los Angeles, and this office advertised by Casetagram refers, in fact, to Westside's business address.

**ANSWER:**

**Westside is without sufficient knowledge or information about the allegation as it relates to Casetagram, therefore the allegation is denied. Westside admits it has an office in Los Angeles. To the extent an answer from Westside is necessary, the allegation is denied.**

30.     On information and belief, Casetagram has imported products into the United States, including the Infringing Teardowns.

15

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"). This allegation relates to a different defendant and not Westside therefore an answer is not required. To the extent an answer is required, denied as alleged.**

31.    Also, on information and belief, Casetagram has imported and/or distributed at least some of its products in the United States, including at least some of the Infringing Teardowns, through Westside and Westrock.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"). Denied as alleged. Westside admits that "Casetify" branded products are sold by Westside on Amazon in the United States, but denies such products are what dbrand has alleged to be at issue in this case. Westside is without knowledge or information about the other companies therefore said allegations are denied. To the extent not admitted, the allegations are denied.**

32.    Also on information and belief, Casetagram has imported at least some of its products, including at least some of the Infringing Teardowns, through Westrock, and further controls Westrock through common executives (including at least Ronald Yeung), management (including at least Athena Chan and Harvey Mok), employees (including at least Amro Louis), business structure, supply chains, customers (including at least Best Buy), intellectual property (including at least the Casetify name and logo), web domains (including at least casetify.com and casetagram.com), domain servers, and other digital and physical assets.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"). Denied as alleged.**

16

33.     Also, on information and belief, Westrock has imported, distributed, and/or sold tens of thousands of products for Casetagram, including tens of thousands of the Infringing Teardowns, in the United States and including in Illinois.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"). Denied as alleged.**

34.     On information and belief, in the past year Casetagram has imported at least 10 shipments of phone cases and related products into the United States, totaling nearly 150,000 pounds of freight and including the Infringing Teardowns. *See* Exhibit I. On information and belief, Casetify's cases (including packaging) weigh approximately 0.2 pounds.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"). Denied as alleged. Westside is without knowledge, information or belief as to the authenticity, foundation, completeness, accuracy of Exhibit I.**

35.     In user manuals for Casetagram's products, Westside is identified as the "Responsible Party" and lists a Casetagram email address: [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness, or accuracy of the images shown in this paragraph or the link in the paragraph, therefore the allegations are denied. Westside admits it is listed as the responsible party in a "Casetify" branded wireless charging base product PowerThru tm Power Bank MagSafe Compatible, Model No. CTF-T-ATE-232039FREBLK, but denies such product is accused in this case.**

36.     Casetagram is the owner of the registered trademark CASETIFY. *See* Reg. No. 4,707,090. On Amazon.com and elsewhere, Westside operates under the CASETIFY mark,

17

including to sell products in the United States, and including the Infringing Teardowns:  [image in original]

**ANSWER:**

**Westside admits that Casetagram owns a number of registered trademarks, including for the mark "Casetify," and that the US trademark office records show US Trademark Registration No. 4,707,090 as owned by Casetagram. Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, or the link in the paragraph therefore the allegations are denied. Westside admits that it has sold products bearing the "Casetify" mark on Amazon and is listed as a Seller for "Casetify" branded products on Amazon.**

37.    On information and belief, Westside is the primary seller permitted by Casetagram to sell products bearing the CASETIFY mark on Amazon and Westrock is the primary distributor of products bearing the CASETIFY mark sold to Best Buy. On information and belief, a substantial portion of Casetagram's sales in the United States occur through its Amazon listings operated by Westside and its Best Buy listings fulfilled by Westrock. Also, on information and belief, Westside and Westrock distribute exclusively Casetify products.

**ANSWER:**

**Westside admits that it has sold products bearing the "Casetify" mark on Amazon. Westside is without sufficient knowledge or information about the business operations of other companies and thus is without sufficient knowledge or information to admit or deny this allegation as it relates to Casetagram or Westrock.  To the extent an answer is necessary, the allegations in this paragraph are denied as alleged.  Except as admitted, the allegations are denied.**

38.    On information and belief, Casetagram, Westside, and Westrock commingle their assets, including their executives, management, employees, physical products, intellectual property, business property, supply chain, sales revenue, and more.

**ANSWER:**

**Denied.**

39.     On information and belief, Westside and Westrock are sham corporations, are Casetagram's corporate alter-egos, and were created by Casetagram and its executives, including at least Wesley Ng, Sharon Lam, Mike Jia, and Ronald Yeung, in a fraudulent attempt to avoid direct liability for illegal misconduct in the United States, including the intentional and egregious infringements and CMI violations alleged herein.

**ANSWER:**

**Denied.**

## JURISDICTION AND VENUE

40.     Pursuant to 28 U.S.C. §§ 1331 and 1338, this Court has original jurisdiction over dbrand's claims for copyright management information violations, which arise under of the Copyright Act of the United States, 17 U.S.C. § 1202.

**ANSWER:**

**This allegation contains a legal conclusion and not an allegation of fact to which an answer is required.  To the extent an answer is deemed necessary, Westside admits that dbrand's claims in this lawsuit are alleged under 17 USC § 1202, a federal statute, and thus this Court has original jurisdiction over the claims pled by dbrand. Westside denies that there have been CMI violations by Westside.**

41.     Venue in a copyright case is governed by 28 U.S.C. § 1400(a), under which a claim "may be instituted in the district in which the defendant or his agent resides or may be found." For purposes of the statute, "[a] defendant 'may be found' in any district in which he is subject to personal jurisdiction." *Store Decor Div. of Jas Int'l, Inc. v. Stylex Worldwide Indus., Ltd*., 767 F.Supp. 181, 185 (N.D. Ill. 1991). "Thus, if a court has personal jurisdiction over the defendants in a copyright infringement action, venue in that court's district is proper." *Id.*

**ANSWER:**

This allegation contains a legal conclusion and not an allegation of fact to which an answer is required. To the extent an answer is deemed necessary, Westside responds, Plaintiff has voluntarily dismissed its copyright claims so venue based on a copyright infringement action is inapplicable and, therefore, denied. Additionally, the case citation in this paragraph is from 1991 which is before the enactment of the DMCA statute at issue in the present claims, therefore its applicability to the claims in this case are denied.

Westside admits that 28 USC § 1400(a) states:

> "Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found."

42.     In a copyright case, this Court has personal jurisdiction over defendants who market infringing products to a nationwide audience on their own website and stand "ready and willing to do business with Illinois residents." *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010). Similarly, this Court has personal jurisdiction over copyright defendants who market or sell infringing products through third-party online retailers to "residents of all fifty states, including Illinois." *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 906 (N.D. Ill. 2015). The same applies for infringing products sold through Illinois brick-and-mortar stores. *Id.* at 908. This is true regardless of whether a defendant sends infringing products directly into Illinois, or merely "move[s] them along a stream of commerce destined for retail sale throughout the United States." *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1126 (7th Cir. 1983). This is also true even if a defendant's infringing "sales in Illinois are very minimal in comparison to overall sales," or even if a defendant merely advertised infringing products in Illinois and "no [actual] sale was made to an Illinois resident." *Valtech, LLC v. 18th Ave. Toys Ltd.*, No. 14-CV-134, 2015 WL 603854, at *4 (N.D. Ill. Feb. 12, 2015); *Monster Energy*, 136 F. Supp. 3d at 906. Indeed, "the commission of a single tortious act in Illinois brings a defendant within the scope of [personal jurisdiction] even if the defendant has no other contact with Illinois and has never been to Illinois." *Store Decor Div. of Jas Int'l, Inc. v. Stylex Worldwide Indus.*, Ltd., 767 F. Supp. 181, 184 (N.D. Ill. 1991).

**ANSWER:**

Plaintiff has voluntarily dismissed its copyright infringement claims. This paragraph contains a legal conclusion and not an allegation of fact to which an answer is required. To the extent an answer is deemed necessary, the allegations are denied.

43.    As described in more detail below, this Court has personal jurisdiction over Casetagram, Westside, and Westrock at least because they have each marketed, sold, imported, and/or distributed a substantial number of products to Illinois consumers—including a substantial number of the Infringing Teardowns—through their interactive website, through third-party online retailers, and through Illinois brick-and-mortar stores.

**ANSWER:**

**This paragraph contains a legal conclusion and not allegations of fact to which an answer is required. To the extent an answer is deemed necessary, the allegations are denied. Westside admits it has sold products bearing the "Casetify" mark on Amazon to Illinois consumers but denies that they are infringing. Westside is without sufficient information or belief as to the acts of other Defendants and therefore denies the same.**

44.    As used herein, "Casetify" refers to Casetagram, Westside, and Westrock.

**ANSWER:**

**Westside denies that "Casetify" refers to Westside or Westrock as "Casetify" is a registered trademark of Casetagram. Westside acknowledges that Plaintiff has defined in its Amended Complaint a trademark of one company as a reference to three separate entities but denies that it is proper to do so. To the extent "Casetify" is used as a defined term throughout the Amended Complaint, Westside's answer to this paragraph is incorporated by reference as if fully restated therein. Westside's answers to the Amended Complaint are solely on behalf of Westside and should not be interpreted to be on behalf of any other Defendant.**

45.    Some of Casetify's products, including some of the Infringing Teardowns, have been marketed and sold by Casetagram on its interactive website (www.casetify.com) directly to consumers, including in Illinois.

21

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: Paragraph 8-9 (Answer to Definition of "Infringing Teardowns"), and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside admits it has sold products bearing the Casetify mark on Amazon to Illinois consumers but denies that they are infringing or even accused. Westside is without sufficient information or belief as to the acts of other Defendants and therefore denies the same. Westside admits that www.casetify.com is a website of Casetagram. All remaining allegations are denied.**

46.     Some of Casetify's products, including some of the Infringing Teardowns, have been marketed and sold by Casetagram through third-party online retailers, including in Illinois.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers: Paragraph 8-9 (Answer to Definition of "Infringing Teardowns"), and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This paragraph relates to a different defendant and not Westside and thus no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. Westside admits it has sold products bearing the "Casetify" mark on Amazon but denies they are infringing or even accused.**

47.     On information and belief, some of Casetify's products, including some of the Infringing Teardowns, have been marketed and sold by Casetagram through brick-and-mortar retailers in Illinois, including at 45+ Illinois Best Buy stores:  [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, or the link**

22

in the paragraph. Therefore, the allegation is denied. To the extent this paragraph relates to a different defendant and/or a third Party Best Buy, not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied.

Westside admits, on information and belief, that the link **https://www.bestbuy.com/** is a hyperlink which when clicked on links to a website owned and operated by a company that is not Westside. Westside admits that the website that is linked to the hyperlink at the time of this answer shows images of many assorted products not at issue in this case, with different images not at issue in this case. The image in the paragraph is not currently present when the link is accessed, therefore the allegations are denied.

To the extent not admitted, any remaining allegations are denied.

48.     On information and belief, Casetify has also sold some of its products at 235+ Illinois Verizon stores.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. Westside denies that it has sold products at issue in this case to Illinois Verizon stores.

49.     Indeed, when Casetify first started selling its products through brick-and-mortar stores in the United States in 2017, it selected a location "in the heart of Chicago." *See* journal.casetify.com/online-to-offline-casetify-pops-up-in-at-t-flagship-stores-3079cee870b7.

**ANSWER:**

**Westside incorporates its answer to this paragraph with the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") into the answer of this paragraph as if fully restated herein.  Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the link shown in this paragraph, therefore the allegations are denied.  To the extent this paragraph relates to a different defendant and not Westside, no answer is required.  To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied.**

50.     Casetify also sells products specifically targeting Illinois consumers. For example, Casetify has one product line called "Heart Map Chicago," which features a map of Chicago, one called "Chicago, Illinois" which features the Chicago skyline, and another called "Pangram Chicago" which features a recreation of a plane ticket from the O'Hare Airport—and each of which comprises dozens of variations for different phone models:  [image in original]

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  To the extent this paragraph relates to a different defendant and not Westside, no answer is required.  To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. Westside is without sufficient knowledge**

24

or information about the business operations of other companies, therefore the answer is denied. Westside admits, on information and belief, that the link https://www.casetify.com is a hyperlink which when clicked on links to a website owned and operated by a company that is not Westside.

Westside admits, on information and belief, various "Casetify" branded physical cases having no images on them and/or various images on them on hyperlink https://www.casetify.com with a rim around the camera lens bearing the wordmark "Casetify" evidencing that such branding is not specific to any image let alone images at issue in this case and not CMI for any specific image therefore not understood by Westside to be an indicator of any CMI nor notice of copyright rights.

51. Casetify also has product lines for famous Illinois sports teams like the Chicago Bulls, the Chicago Blackhawks, and the Chicago White Sox—comprising hundreds of different models of phone cases, headphone cases, wireless chargers, and more: [image in original]

**ANSWER:**

Westside incorporates into its answer to this paragraph with the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") into the answer of this paragraph as if fully restated herein. Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied.

25

Westside admits, on information and belief, that the link https://www.casetify.com is a hyperlink which when clicked on links to a website owned and operated by a company that is not Westside. Westside admits, on information and belief, various "Casetify" branded physical cases having no images on them and/or various images on them at hyperlink https://www.casetify.com with a rim around the camera lens bearing the mark "Casetify Casetify" evidencing that such branding is not specific to any image let alone images at issue in this case and not Copyright Management Information (CMI) for any specific image therefore not understood by Westside to be an indicator of any CMI nor notice of copyright rights.

52.     On information and belief, products sold by Casetagram on its interactive website, including the Infringing Teardowns, are shipped directly to consumers, including in Illinois.

**ANSWER:**

To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. Westside admits, on information and belief, that "Casetify" branded products ordered through the www.casetify.com website can be shipped directly to consumers, including in Illinois but Westside does not have control over the Casetagram website.

53.     On information and belief, some products sold by Casetagram through online third-party retailers are shipped directly to consumers, including in Illinois, while others are first distributed to third-party warehouses, including in Illinois.

**ANSWER:**

To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without

26

sufficient knowledge or information to provide an answer, therefore the allegations are denied.

54. On information and belief, Casetagram has at least some of its products shipped from at least four warehouses across the United States located at 120 E 8th Street, Los Angeles, CA 90014; 9860 40th Ave S, Unit B, Seattle, WA 98118; 1541 S 92nd Pl, Ste A, Seattle, WA 98108; and 2a Corn Road, Dayton, NJ 08810, including directly to Illinois consumers.

**ANSWER:**

**To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegations are denied.**

55. On information and belief, all Casetify products, including all of the Infringing Teardowns, were and/or currently are advertised and marketed to Illinois consumers by Casetagram through its interactive website, through social media, through online retailers, and through brick-and-mortar stores.

**ANSWER:**

**Westside incorporates into its answer to this paragraph its answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. The remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied.**

56. On information and belief, all Casetify products, including all of the Infringing Teardowns, were and/or currently are available for purchase in Illinois through Casetagram's interactive website, third-party online retailers, and brick-and-mortar stores.

27

**ANSWER:**

**Westside incorporates into its answer to this paragraph its answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. The remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied.**

57. On information and belief, Casetify has marketed and sold a substantial number of products, including a substantial number of Infringing Teardowns, to consumers in Illinois through Casetagram's interactive website, third-party online retailers, and brick-and-mortar stores.

**ANSWER:**

**Westside incorporates into its answer to this paragraph its answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. The remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied. Westside admits selling "Casetify" branded products on Amazon, but deny they are accused in this case.**

58. On information and belief, Westside and Westrock have imported, distributed, marketed, and sold a substantial number of Casetify products, including at least through Amazon.com and/or Best Buy, and including in Illinois.

28

**ANSWER:**

**Westside incorporates into its answer to this paragraph its answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegations are denied. Westside admits that it has sold products bearing the "Casetify" mark on Amazon. The remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied.**

59. On information and belief, Westside and Westrock have received shipments of a substantial number of Infringing Products from Casetagram and have distributed a substantial number of Infringing Products in the United States, including to Best Buy locations in Illinois.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers: Paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. Westside denies that it has received or imported products at issue or that such products were distributed by Westside. The remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied.**

60. For the foregoing reasons, Casetagram, Westside, and Westside each have substantial contacts in Illinois, have purposefully availed themselves to the benefits and

29

protections of this forum, have committed substantial misconduct in Illinois giving rise to the claims asserted herein, and are subject to personal jurisdiction in Illinois.

**ANSWER:**

**Westside denies committing misconduct in Illinois or elsewhere. Westside is without sufficient knowledge or information to form a belief as to what is meant by "the foregoing reasons" but to the extent it is referring to allegations in the preceding paragraphs of this Amended Complaint, Westside incorporates its answers to the preceding paragraphs as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. The remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied.**

## BACKGROUND

61. dbrand is an innovative company located in Toronto, Canada that creates premium skins, cases, screen protectors, and other accessories for phones, tablets, laptops, and more. dbrand makes all of its original designs at its proprietary facilities in Toronto. dbrand's products are known for their unique aesthetics, quality, and durability.

**ANSWER:**

**Westside incorporates its answer to paragraph 1 herein as if fully restated herein. Westside is without sufficient knowledge or information to provide an answer, therefore the allegations are denied.**

62. Casetify is a Chinese-based manufacturer of phone cases and related products. Casetify manufactures its products in China and imports them into the United States for sale across the country through its own website and through third-party retailers.

**ANSWER:**

Westside incorporates into its answer to this paragraph Westside's answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegation is denied. Remaining allegations are denied by Westside or Westside lacks sufficient knowledge or information to admit or deny the allegations, therefore the allegations are denied.

63. When asked about Casetify's valuation in 2021, Casetify CEO Wesley Ng stated that it is "close to a billion" dollars. *See* https://www.cnbc.com/2022/11/28/ceo-of-casetify-shares-his-no-1-super-underrated-business-tip.html. He also stated that Casetify was "on track to bring in $300 million in revenue" in that year and that it had already sold "more than 15 million phone cases worldwide." *Id.* In the three years since, Casetify has grown even larger. *See* https://www.modernretail.co/operations/casetify-ramps-up-global-expansion-launches-new-retail-concept-in-osaka/.

**ANSWER:**

Westside incorporates into its answer to this paragraph Westside's answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the hearsay in the 2021 link shown in this paragraph, therefore the allegations are denied. Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the hearsay in the second link shown in this paragraph, therefore the allegations are denied. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an

answer is deemed necessary, **Westside is without sufficient knowledge or information to provide an answer, therefore the allegations are denied.**

64.     Despite Casetify's apparent deep pockets, it consistently seeks to cut corners by stealing the protected designs of others. Indeed, Casetify is a serial intellectual property thief that has had several lawsuits filed against it in the United States and elsewhere around the world for patent and copyright infringement. Recently, for example, Casetify was permanently enjoined from selling one of its products accused of infringing the design of a small company based in Georgia. *See Case-Mate Inc. v. Casetagram Limited*, No. 1:17-CV-01074-MHC, Dkt No. 25 (N.D. Ga. Sep. 6, 2017).

**ANSWER:**

**Westside incorporates into its answer to this paragraph Westside's answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations in this paragraph as it relates to Westside and asserts that the allegation has been made knowingly without basis in law or fact against Westside. The cited case is not for copyright or DMCA. Based on the referenced case docket the allegations were denied by the parties involved in that case, the patent was challenged as invalid, and the case was resolved as part of a confidential settlement agreement (not adjudicated) and the referenced injunction was part of a settlement agreement consent injunction. To the extent this paragraph relates to a different defendant and not Westside, no answer is required. To the extent an answer is deemed necessary, Westside is without sufficient knowledge or information to provide an answer, therefore the allegations are denied.**

65.     Starting in 2019, dbrand created a new product line featuring the Original Teardowns. In addition to dbrand's own advertising, the Original Teardowns were promoted through a collaboration with the famous YouTube content creator JRE.

**ANSWER:**

**Westside incorporates into its answer to this paragraph its answers to prior paragraph 2 (Answer to Definition of "JRE"), and paragraph 6 (Answer to Definition of "Original Teardowns"), as if fully restated herein. Westside does not have sufficient**

knowledge or information from which to admit or deny this allegation.  To the extent an

answer is required, the allegations are denied.

66.     To create the Original Teardowns, dbrand starts by removing the back panel of various electronic devices, deconstructing the assembled internal components, and taking photographs of the individual layers. dbrand's photographers make significant creative choices concerning placement, orientation, background, exposure, and more to take these photographs. Next, dbrand's team of graphic designers make thousands of creative choices concerning every aspect of the resulting photographs, including to digitally enhance them for color, hue, reflectiveness, alignment, shadowing, brightness, contrast, and more. dbrand's graphic designers further create new digital artwork from scratch to cover certain components, including to recreate visually appealing elements that are hidden by comparably unappealing elements in the original photographs and to repair other elements damaged by the deconstruction process. dbrand's graphic designers also add various creative Easter Eggs to the works. dbrand's graphic designers ultimately modify every surface of the photographs, such that by the end of the process, no original surface—indeed not a single pixel—from the original photograph remains.

**ANSWER:**

**Westside incorporates into its answer to this paragraph its answers to preceding paragraph 6 (Answer to Definition of "Original Teardowns"), and paragraph 12 (Answer to Definition of "Easter Eggs") as if fully restated herein.  Westside does not have sufficient knowledge or information from which to admit or deny these allegations. To the extent an answer is required the allegation is denied because dbrand's counsel represented to the Court in 2024 that the images are "not photographs," dbrand's website (made as Exhibit C to the Amended Complaint) states the "Process is: Picture the most advanced scanner in the world (Exhibit 2).  We use that one. It ended up producing internal scans that were literally too detailed for general use – which is exactly how we wanted them. The result? Every Single Teardown skin is guaranteed to be a 99% accurate representation of your device internals," and dbrand and JRE publicly represent: "We first scan the phone in ultra-high 2400 dpi resolution, giving us an image up to about 41 thousand pixels wide by 30 thousand pixels tall — enough detail to print out on a billboard. Then it takes about ten hours' worth of**

**editing a first draft in Photoshop before producing prototypes, making adjustments, and getting it ready for mass production." Westside incorporates by reference paragraphs in Affirmative Defenses Nos. 1-2, and 11-12 as if fully restated herein. The remaining allegations are denied.**

67. The result is a final image that is an original, creative, and visually appealing work of two-dimensional art (the "Original Teardown Image"): [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations and the definition of "Original Teardown Image" are denied. Westside denies the remaining allegations.**

68. Creating an Original Teardown Image requires many dozens, sometimes hundreds, of hours of work by dbrand photographers, graphic designers, and other creators. dbrand has created Original Teardown Images for over 100 unique devices, representing tens of thousands of hours of work by dbrand's employees.

**ANSWER:**

**Westside's answer to paragraphs 66-67 (Definition of "Original Teardown Image") are incorporated herein as if fully restated herein. Westside does not have sufficient knowledge or information from which to admit or deny this allegation. To the extent an answer is required the allegation is denied because dbrand's counsel represented to the Court in 2024 that the images are "not photographs", dbrand's website (made as Exhibit C to the Amended Complaint) states the "Process is: Picture the most advanced scanner in the world (Exhibit 2). We use that one. It ended up producing internal scans that were literally too detailed for general use – which is exactly how we wanted them. The result? Every Single**

34

**Teardown skin is guaranteed to be a 99% accurate representation of your device internals,"**

**and dbrand and JRE publicly represent: "We first scan the phone in ultra-high 2400 dpi**

**resolution, giving us an image up to about 41 thousand pixels wide by 30 thousand pixels**

**tall — enough detail to print out on a billboard. Then it takes about ten hours' worth of**

**editing a first draft in Photoshop before producing prototypes, making adjustments, and**

**getting it ready for mass production." The remaining allegations are denied.**

69.    An Original Teardown is completed by printing the Original Teardown Image and permanently affixing the Original Teardown Image to an adhesive-backed decal through a printing and lamination process, which can then be applied directly to a device or impact-resistant case. "Original Teardowns" and "Original Teardown Images" are collectively referred to herein as "Original Teardown Artworks." Original Teardown Images are also used to promote the Original Teardowns on dbrand's website, social media, and elsewhere:  [image in original]

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to**

**paragraphs: 6 (Answer to Definition of "Original Teardowns"), and answers to paragraphs**

**66-67 (Definition of "Original Teardown Image") into the answer of this paragraph as if**

**fully restated herein.  Westside is without sufficient knowledge or information about the**

**foundation, authenticity, completeness or accuracy of the images shown in this paragraph,**

**therefore the allegations are denied. Westside is without sufficient knowledge or**

**information to admit or deny the remaining allegations, therefore the allegations are denied.**

70.    Every Original Teardown Artwork also contains multiple Easter Eggs. dbrand adds these Easter Eggs because consumers use them to identify dbrand's products and confirm that they are genuine. The dbrand Easter Eggs also increase engagement with consumers who feel a sense of loyalty and affiliation to dbrand and the YouTube content creator JRE who promotes the Original Teardowns. The dbrand Easter Eggs were also created as a digital fingerprint to detect infringers of dbrand's copyright-protected Original Teardown Artworks.

35

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 2 (Definition of "JRE"), paragraph 6 (Answer to Definition of "Original Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs") and paragraph 69 (Answer to Definition of "Original Teardown Artworks") into the answer of this paragraph as if fully restated herein. Westside is without sufficient knowledge or information about alleged Easter Eggs or the allegations, therefore they are denied.**

71. Examples of the dbrand Easter Eggs include the following (*see also* Exhibit A): [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. Westside incorporates its answer to this paragraph the following answers to paragraphs: Paragraph 12 (Answer to Definition of "Easter Eggs") into the answer of this paragraph as if fully restated herein. Westside is without knowledge or information to form a belief as to this allegation; therefore the allegations are denied.**

72. The "db" and corresponding "db" logo Easter Eggs refer directly to dbrand. The "db" logo is dbrand's trademark-protected logo that it has used in interstate commerce in the United States and around the world for over a decade. The abbreviation "db" is also used by dbrand, including as a URL for its website (www.db.io) and in other advertising. dbrand has heavily promoted these marks and consumers recognize them as source-identifiers for dbrand. These marks identify dbrand as the owner of the designs in the Original Teardown Artworks.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs") and paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein. Westside is without knowledge or information to form a belief as to this allegation; therefore the allegations are denied.**

73. The dbrand QR code Easter Eggs are digital signatures that embed information concerning the source of the Original Teardown Artworks. Consumers scan the QR codes using a modern cell phone or similar device and are immediately redirected to the dbrand website (www.db.io) and other promotional materials for the Original Teardowns. The general consuming public uses QR codes as a source identifier for a broad range of goods and services, including food products, consumer goods, medical devices, industrial equipment, pharmaceuticals, and more. Consumers use dbrand's QR codes to identify dbrand as the owner of the designs in the Original Teardown Artworks.

**ANSWER:**

**Denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), and paragraph 69 (Answer to Definition of "Original Teardown Artworks") as if fully restated herein.**

74. The "2011mAh/11.11Wh" and "11 - 11 - 11" Easter Eggs each refer to the founding date of dbrand (November 11, 2011). This date constitutes a significant aspect of dbrand's advertising and is recognized by consumers as a source identifier for dbrand. Consumers use these Easter Eggs to identify dbrand as the owner of the designs in the Original Teardown Artworks.

**ANSWER:**

**Westside admits the first sentence of paragraph 74 states: The "2011mAh/11.11Wh" and "11 - 11 - 11" Easter Eggs each refer to the founding date of dbrand (November 11,**

**2011). The remaining allegations of paragraph 74 are denied. Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 12 (Answer to Definition of "Easter Eggs"), and paragraph 69 (Answer to Definition of "Original Teardown Artworks") as if fully restated herein.**

75.     The "JRE," "SUBSCRIBE," and "Glass is Glass and Glass Breaks" Easter Eggs refer to the famous YouTube content creator Zack Nelson and his affiliation with dbrand. Mr. Nelson uploads his videos under the username JerryRigEverything and also uses the abbreviation "JRE." In every video, JRE encourages his viewers to "subscribe" to his channel. JRE has also coined the phrase "Glass is Glass and Glass Breaks" in his videos, including to promote dbrand's products and including the Original Teardowns. JRE currently has over nine million subscribers and dbrand's collaboration with JRE is its most successful form of advertising to date. Consumers recognize and look for these JRE identifiers and use them to identify dbrand's original products.

**ANSWER:**

**Westside admits, based on Plaintiff's representation, that "JRE," "SUBSCRIBE," and "Glass is Glass and Glass Breaks" are references to Zack Nelson, an individual that Plaintiff also admits is not an author or owner of any copyright rights. See, Exhibit 1 dbrand's Responses to Requests to Admit No. 21-27, 32-33. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 2 (Definition of "JRE") and paragraph 12 (Answer to Definition of "Easter Eggs") as if fully restated herein. Other than specifically admitted, Westside is without sufficient knowledge or information to admit or deny the remaining allegations and therefore they are denied.**

76.     The "All Seeing Eye" Easter Eggs are incorporated across many of dbrand's products, including the Original Teardowns. dbrand uses this mark on its products, packaging, website, social media, and other marketing materials, including for the Original Teardown Artworks. Consumers recognize that the "All Seeing Eye" symbol refers to dbrand and its products, including the Original Teardown Artworks.

**ANSWER:**

**Denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), and paragraph 69 (Answer to Definition of "Original Teardown Artworks") into the answer of this paragraph as if fully restated herein.**

77.    The "R0807" (i.e. "ROBOT") Easter Eggs refer to dbrand's "robot" persona that constitutes a significant aspect of dbrand's advertising. For example, dbrand uses the Twitter/X handle "@robot," uses the email address robot@dbrand.com for its customer support, uses the moniker "robot" to refer to all of its employees, and further uses the term across its advertising. The R0807 mark is recognized by consumers as a source identifier for dbrand and consumers use the R0807 mark to identify dbrand as the owner of the designs in the Original Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs") and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

78.    Every Original Teardown Artwork includes multiple of the above Easter Eggs, including at least the dbrand QR Codes. *See* Exhibit A.

**ANSWER:**

**Denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 12 (Answer to Definition of "Easter Eggs") and paragraph 69 (Answer to Definition of "Original Teardown Artwork") into the answer of**

39

this paragraph as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.

79. The Easter Eggs present in the Infringing Teardowns evidence that Casetify uses unauthorized copies of the Original Teardown Images to make the Infringing Teardowns.

**ANSWER:**

**Denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

80. dbrand has registered its copyrights in each of its Original Teardown Images in Canada with the Canadian Intellectual Property Office (collectively, the "Canadian Teardown Copyrights"). *See* Exhibit B.

**ANSWER:**

**Westside denies that the images are protectable or original. Westside incorporates by reference its Affirmative Defense Nos. 1-2 and 11-12 in response to these allegations as if fully restated herein. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 67 (Answer to Definition of "Original Teardowns Images"), Paragraph 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without knowledge information or belief about the foundation, accuracy, completeness, admissibility or hearsay within the items in Exhibit B, therefore they are**

40

**denied. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

81.     Every Original Teardown Artwork is a creative piece of copyright-protected art. Indeed, every portion of every surface of every Original Teardown Image was created by dbrand's experienced team of artists.

**ANSWER:**

**Denied. Westside denies that the images are protectable or original. Westside incorporates by reference its Affirmative Defenses Nos. 1-2, and 11-12 in response to these allegations as if fully restated herein. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 67 (Definition of "Original Teardown Image"), and paragraph 69 (Definition of "Original Teardown Artwork") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

82.     Every Original Teardown Artwork includes protectible elements under the copyright laws of the United States, including, for example, the All Seeing Eye Easter Eggs designed by dbrand's artists, the original expression in magnetic charging coils created by dbrand's artists, the original expression in ribbon cables created by dbrand's artists, the original expression in the circuitry created by dbrand's artists, the original expression in electrical components portrayed in the works that were created by dbrand's artists, the combination of some or all of these and other original elements in a single expressive work by dbrand's artists, and the overall look and feel of each Original Teardown Artwork due to the creative choices of dbrand's artists.

**ANSWER:**

**Denied. Westside denies that the images are protectable or original. Westside incorporates by reference its Affirmative Defenses No. 1-2, and 11-12 in response to these allegations as if fully restated herein. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 12 (Answer to Definition of "Easter Eggs"), and paragraph 69 (Definition of "Original Teardown Artwork") as if fully**

41

restated herein. **Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

83.     The "original expression" in the foregoing exemplary protectible elements includes, for example, the original creative decisions by dbrand's artists concerning the shape of the elements, the size of the elements, the placement and orientation of the elements, the color, reflectiveness, lighting, hue, shadowing, brightness, saturation, and contrast of the elements, and the determination of which elements appear in a given Original Teardown Artwork.

**ANSWER:**

**Denied. Westside denies that the images are protectable or original works.  Westside incorporates by reference its Affirmative Defenses Nos. 1-2, and 11-12 in response to these allegations as if fully restated herein.    Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 69 (Definition of "Original Teardown Artwork") as if fully restated herein.  Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

84.     For each of these exemplary protectible elements, the original creative decisions of dbrand's artists were made to make the Original Teardown Artworks more visually pleasing. The Original Teardown Artworks are purely aesthetic and have no intrinsic utilitarian function.

**ANSWER:**

**Denied. Westside denies that the images are protectable or original works.  Westside incorporates by reference its Affirmative Defenses Nos. 1-2, and 11-12 in response to these allegations as if fully restated herein.   Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 69 (Definition of "Original Teardown Artworks") as if fully restated herein.  Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

85.     The original creative decisions of dbrand's artists render each of these exemplary protectible elements aesthetically different than any similar elements in other works. For example, the unique expressions of the magnetic charging coils created by dbrand's artists for its Pixel and iPhone series incorporate significant creative decisions and are substantially different and more

42

visually appealing than the magnetic charging coils from the corresponding physical devices: [image in original]

To create each of its Infringing Teardown Images, Casetify did not engage in a creative process like dbrand's artists. Casetify did not take a creative photograph, generating a unique expression of a device's internals. Casetify did not create new and creative elements from scratch to make its works more unique and visually appealing. Casetify did not create its own expression of device internals. Instead, Casetify tried to circumvent the creative process and all the associated time, effort, and expense, by **directly copying *dbrand's* original expression** of a device internals.

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, completeness or accuracy of the images shown in this paragraph, therefore the allegations are denied. Westside denies that the images are protectable or original works. Westside incorporates by reference its Affirmative Defenses Nos. 1-2, and 11-12 in response to these allegations as if fully restated herein. Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.**

86. Every phone case, tablet case, and computer case in Casetify's Inside Out line incorporates direct, unauthorized copies of dbrand's Original Teardown Artworks and is included in the definition of Infringing Teardowns. *See* Exhibits G and H.

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy or completeness of Exhibits G and H or the images shown therein,**

therefore the allegations are denied. Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.

87.     On information and belief, Casetify created the Infringing Teardowns by first downloading and/or creating "screenshots" of original, unedited copies of the Original Teardown Images from the dbrand website. Casetify's copying and use of the Original Teardown Images to create the Infringing Teardowns is unauthorized and therefore infringing.

**ANSWER:**

Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.

88.     On information and belief, Casetify next digitally adds components to, and/or removes components from, its infringing copies of the Original Teardown Images to create the final Infringing Teardowns. Each unauthorized copy of the Original Teardown Images and each copy of the Infringing Teardowns constitutes a separate instance of copyright infringement.

**ANSWER:**

Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied. To the extent not expressly admitted the remaining allegations are denied.

89. Casetify's infringement is evident upon inspection of the Infringing Teardowns, which reveals that many of dbrand's Easter Eggs are found on the infringing copies: [image in original]

**ANSWER:**

Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy or completeness of the images shown in this paragraph, therefore the allegations are denied. Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 6 (Answer to Definition of "Original Teardowns"), paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied. To the extent not expressly admitted the remaining allegations are denied.

45

90.     In addition to unintentionally copying many of dbrand's Easter Eggs, Casetify also left other evidence of its blatant copyright theft in the Infringing Teardowns. In one instance, for example, the unauthorized copy of the Original Teardown Image used by Casetify incorporates camera lens graphics that were created by dbrand's team of artists. These original graphics are found *only* in dbrand's Original Teardown Image. The fact that Casetify's Infringing Teardown incorporates a feature that is *only present* in dbrand's Original Teardown Image further proves that Casetify incorporates direct, unauthorized copies of dbrand's Original Teardown Images to create the Infringing Teardowns: [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, or completeness of the images shown in this paragraph, therefore the allegations are denied. Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 12 (Answer to Definition of "Easter Eggs"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied. To the extent not expressly admitted the remaining allegations are denied.**

91.     In addition to directly copying the Original Teardown Images from the dbrand website and using them to create the Infringing Teardowns, Casetify uses digital copies of the images underlying the Infringing Teardowns on its website, social media, and in other advertising to promote its products (the "Infringing Teardown Images"). The Infringing Teardown Images and the Infringing Teardowns are collectively referred to herein as the "Infringing Teardown Copies."

**ANSWER:**

Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied. To the extent not expressly admitted the remaining allegations are denied.

92.    Casetify's Infringing Teardowns identified by SKUs 16000206, 16000086, and 16000092, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing iPhone 11 Series") and SKUs 16003471, 16004743, 16005988, 16004742, 16004399,

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 16004400, | 16004724, | 16004725, | 16004726, | 16004727, | 16004732, | 16004733, | 16004734, |
| 16004735, | 16004740, | 16004741, | 16003438, | 16003460, | 16005967, | 16003536, | 16003537, |
| 16003538, | 16003539, | 16003767, | 16003768, | 16003769, | 16003770, | 16004397, | 16004398, |
| 16001566, | 16001655, | 16001659, | 16001663, | 16001667, | 16002699, | 16002700, | 16002701, |
| 16002702, | 16003262, 16003282, | 16004749, | 16004750, | 16004751, | 16004760, | | 16004761 |
| 16004762, | 16004763, 16004772, | 16004773, | 16004774, | 16004775, | 16004812, | | 16004813 |
| 16004814, | 16004815, 16005140, | 16005141, | 16005142, | 16005143, | 16005144, | | 16005145 |
| 16005964, | 16005970, 16005973, | 16005976, | 16005979, | 16005982, | 16005985, | | 16005986 |
| 16005987, | 16005989, 16005992, | 16005995, | 16005996, | 16005999, | 16006002, | | 16006005 |
| 16006008, | 16006152, 16006153, 16005961, and 16005924 (collectively, the "Infringing | | | | | | |

12, 13, and 14 Series") incorporate direct copies of dbrand's Original Teardown Image shown in Exhibit A at p. 2 (the "Original iPhone Teardown Artwork"); Casetify's Infringing Teardowns identified by SKUs 16004965 and 16006201, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing Z Flip Series") incorporate direct copies of dbrand's Original Teardown Image shown in Exhibit A at pp. 17-19 (collectively, the "Original Z Flip Teardown Artwork"); Casetify's Infringing Teardowns identified by SKUs 16006209 and 16004967, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing Z Fold Series") incorporate direct copies of dbrand's Original Teardown Image shown in Exhibit A at pp. 17 and 19 (collectively, the "Original Z Fold Teardown Artwork"); Casetify's Infringing Teardowns identified by SKUs 16005659, 16005661, and 16005660, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing S23 Series"), incorporate direct copies of dbrand's Original Teardown Image shown in Exhibit A at p. 16 and 17 (collectively, the "Original S23 Teardown Artwork"); Casetify's Infringing Teardowns identified by SKUs 16004158, 16005646, 16005647, 16004159, 280200, 280300, 284000, 2812400, 16001831, 16004535, and 16005427, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing MacBook Series") incorporate direct copies of at least dbrand's Original Teardown Image shown in Exhibit A at p. 14 (the "Original MacBook Teardown Artwork"); Casetify's Infringing Teardowns identified by SKUs 16005645, 16002092, 16005425, 16005643, 16005644, 16001237, and 16005429, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing iPad Series") incorporate direct copies of at least dbrand's Original Teardown Image shown in Exhibit A at p. 31 (the "Original iPad Teardown Artwork"); Casetify's Infringing Teardowns identified by SKUs 16004959, 16004960, 16005838, and 16005839, and all copies of the underlying Infringing Teardown Images (collectively, the "Infringing Pixel Series") incorporate direct copies of at least dbrand's Original Teardown Image shown in Exhibit A at pp. 29 and 30 (collectively, the "Original Pixel Teardown Artwork").[1]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, or completeness of the images shown in or referenced in Exhibit A, therefore the allegations are denied. Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns"), paragraph 44 (Answer to Definition of "Casetify"), paragraph 67 (Answer to Definition of "Original**

---

[1] dbrand's investigation into Casetify's infringement, including which portions of which Original Teardown Images were copied by Casetify to create the corresponding Infringing Teardown Copies, is ongoing.

Teardown Image"), paragraph 69 (Answer to Definition of Original Teardown Artworks"), and paragraph 91 (Answer to Definition of "Infringing Teardown Images") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations (including footnote 1) and therefore they are denied. To the extent not expressly admitted the remaining allegations are denied.

93. Below are examples showing the portions of Casetify's Infringing Teardown Copies taken from dbrand's Original Teardown Images. The elements copied by Casetify are shown in green:

**ANSWER:**

Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, completeness or admissibility of the images shown in or referenced in this allegation, therefore the allegations are denied. To the extent the allegations in this paragraph are attempting to do some type of comparison, Westside denies that the allegation complies with the required ordinary observer test which considers only protectable expression. *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* **18 F.3d 502, 508–09 (7th Cir. 1994) (quoting** *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* **672 F.2d 607, 614 (7th Cir. 1982). Westside seeks to exclude or strike the images in this paragraph. See also Affirmative Defense Nos. 1, 2, 11, and 12. Unprotectible elements in a work are available for use by any party.**

Westside did not create any image accused in this case, therefore to the extent "Casetify" is defined to include Westside, the allegation is denied. Westside incorporates

49

into its answer to this paragraph the following answers to paragraphs: paragraph 67 (Answer to Definition of "Original Teardown Image"), paragraph 91 (Answer to Definition of "Infringing Teardown Copies"), and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied.

94. In addition to infringing dbrand's copyrights in the Original Teardown Artworks by copying, selling, displaying, distributing, and advertising the Infringing Teardown Copies and unauthorized copies of the Original Teardown Images, Casetify has removed, altered, and falsified copyright management information ("CMI") used in connection with these works.

**ANSWER:**

Westside denies that there is CMI on any product it has been accused of and denies that Westside has removed, altered, and falsified copyright management information ("CMI"). Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 69 (Answer to Definition of "Original Teardown Artwork"), paragraphs 91 (Answer to Definition of "Infringing Teardown Copies"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") as if fully restated herein. To the extent this paragraph refers to other defendants, Westside is not obligated to answer. To the extent an answer is required, Westside is without sufficient knowledge or information to admit or deny the allegations and therefore they are denied. All remaining allegations are denied.

95. As defined by statute, "'copyright management information' means, [*inter alia*], any of the following information conveyed in connection with copies . . . of a work . . . or displays of a work, including in digital form":

(1) The title and other information identifying the work, including the information set forth on a notice of copyright.

(3)     The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

(7)     Identifying numbers or symbols referring to such information or links to such information.

17 U.S.C. § 1202(c).

**ANSWER:**

**This allegation contains a legal conclusion and not an allegation of fact to which an answer is deemed necessary.  To the extent an answer is required, Westside admits that 17 USC § 1203(c) recites the statute definition section.  Westside denies this allegation because it does not accurately or completely provide the language of 17 USC § 1202(c).**

96.     "[A] complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000." 17 U.S.C. § 1203(c)(3)(B). "[T]he removal of copyright management information and the addition of false copyright management information [are] two separate violative acts." *Notte, v. New Sushi LLC*, No. 22-CV-6394, 2024 WL 706783, at *4 (D.N.J. Feb. 20, 2024). "Moreover, each time the work is wrongfully distributed constitutes its own discrete violative act, *i.e.*, wrongfully distributing a work ten times amounts to ten violative acts." *Id.* at *3; *see also Design Basics, LLC v. Drexel Bldg. Supply, Inc.*, No. 13-C-560, 2016 WL 5794746, at *3 (E.D. Wis. Oct. 4,

2016) ("if the Defendants shared the same image *multiple times,* that would be multiple acts in violation of the DMCA") (emphasis in original).

**ANSWER:**

**This allegation contains a legal conclusion and not an allegation of fact to which an answer is deemed necessary.  To the extent an answer is required, Westside denies this allegation because it is not a complete statement of the statute or the law and materially omits the language at 17 USC § 1203(b)(3) which gives the Court discretion to award or not award any damages in section c of the statute as well as other provisions that allow the court to reduce or remit any award. To the extent an answer is deemed necessary, the allegation is denied.**

51

97.     As alleged herein, many of the dbrand Easter Eggs constitute CMI, including the references to dbrand's founding date and the use of dbrand's ROBOT persona, because they are "identifying information about the copyright owner of the work." The "db" mark and corresponding "db" logo are also CMI, because they are trademark-protected marks used in commerce as shorthand for dbrand. The dbrand QR codes (i.e. "symbols referring to [identifying] information or links to [identifying] information") are used by consumers to identify the source of dbrand's products and are also CMI. Indeed, the general consuming public uses QR codes to identify products in nearly every class of goods.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 12 (Answer to Definition of "Easter Eggs"). Denied. Westside specifically denies that items described in the Amended Complaint as Easter Eggs constitute CMI. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2, and 9-10 as if fully restated herein. As for the remaining allegations, Westside is without knowledge, information and belief about the allegations of this paragraph, therefore denies same.**

98.     Additional CMI for the Original Teardown Images on dbrand's webpages includes:

● The titles of the works (i.e. "Teardowns");

● The file names for the Original Teardown Images (*e.g.* "teardown-gloss_0.jpg");

● dbrand's name and logos used on the webpages for the Original Teardown Images;

● dbrand's URLs for the webpages for the Original Teardown Images;

● dbrand's use of the copyright registration symbol "©" on the webpages for the Original Teardown Images;

*See* Exhibits C-E. dbrand's CMI is collectively referred to herein as the "Original CMI."

**ANSWER:**

**Denied. Westside is without knowledge, information or belief as to the authenticity, accuracy, completeness or admissibility of Ex C-E. Westside specifically denies that items described as Easter Eggs on the iPhone device constitute CMI. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2, and 9-10 as if fully restated herein. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 66-67 (Answer to Definition of "Original Teardown Image"). Westside is without knowledge, information and belief about the remaining allegations of this paragraph, therefore denies same.**

99.     For every Infringing Teardown Copy, Casetify removed or altered dbrand's Original CMI. Casetify removed most of dbrand's Easter Eggs, many of which serve as source-identifiers for dbrand and its products. For all of the Easter Eggs that Casetify failed to remove, the Easter Eggs were substantially altered through the poor image quality of the Infringing Teardown Copies, such that they are barely recognizable.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 91 (Answer to Definition of "Infringing Teardown Copy"), paragraph 12 (Answer to Definition of "Easter Eggs"), and paragraph 44 (Answer to Definition of "Casetify") into the answer of this paragraph as if fully restated herein.**

**Westside denies the allegations with respect to Westside. Westside denies that items described as Easter Eggs constitute CMI and denies that it removed or altered anything described in this paragraph as CMI or that it constitutes CMI. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2, and 9-10 as if fully restated herein. Westside is without knowledge, information and belief about the remaining allegations of this paragraph, therefore denies the same.**

4912-5164-1674, v. 3

100.    Casetify similarly altered dbrand's trademark-protected logo, which directly identifies dbrand:

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, or completeness of the images shown in this paragraph, therefore the allegations are denied. Westside incorporates its answer to this paragraph the following answers: paragraph 44 (Answer to Definition of "Casetify") nto the answer of this paragraph as if fully restated herein. Westside denies that items described as Easter Eggs on the iPhone device are reflected in the images of this paragraph or constitute CMI and Westside denies that it removed or altered anything described in this paragraph as CMI or that it constitutes CMI. Westside incorporates by reference the allegations of Affirmative Defense No. 10 and 11 as if fully restated herein. To the extent not admitted, the allegations are denied.**

101.Casetify also removed dbrand's QR codes, which are digital signatures used to identify dbrand's products, including the Original Teardown Artworks:   [image in original]

**ANSWER:**

**Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, completeness of the images shown in this paragraph, therefore the allegations are denied. Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 69 (Definition of "Original Teardown Artworks") into the answer of this paragraph as if fully restated herein. Westside denies that items described as Easter Eggs on the iPhone device are reflected in the images of this paragraph or constitute CMI and Westside denies that it removed or altered anything described in this paragraph as CMI or that it constitutes**

54

**CMI. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2, and 9-10 as if fully restated herein. To the extent not admitted, the allegations are denied. Westside admits that dbrand calls its QR code in this paragraph a "digital signature used to identify dbrand products" which is not Copyright Management Information as defined under 17 USC 1202(c).**

102.    For the unauthorized copies of the Original Teardown Images that it stole from dbrand's website, Casetify also removed dbrand's name, logos, file names, titles, URLs, and use of the copyright registration symbol "©" that dbrand uses in connection with the original works.

**ANSWER:**

**Westside denies the allegation as to Westside. Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein. Westside is not required to answer on behalf of other Defendants. To the extent an answer is deemed necessary, Westside is without knowledge, information and belief about the remaining allegations of this paragraph, therefore denies the same. To the extent not admitted the remaining allegations are denied.**

103.    In addition to removing and altering dbrand's Original CMI, Casetify also added false CMI used in connection with its unauthorized copies of the Original Teardown Artworks ("False CMI"). For example, Casetify replaced dbrand's QR codes with QR codes for Casetify:  [image in original]

**ANSWER:**

Westside denies the allegation as it pertains to Westside. Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, completeness of the images shown in this paragraph, therefore the allegations are denied. Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 69 (Definition of "Original Teardown Artworks") into the answer of this paragraph as if fully restated herein. Westside denies that items described as Easter Eggs on the iPhone device are reflected in the images of this paragraph or constitute CMI and Westside denies that it removed or altered anything described in this paragraph as CMI or that it constitutes CMI. Westside incorporates by reference the allegations of Affirmative Defense Nos. 1-2, and 9-10 as if fully restated herein. Westside is not required to answer this paragraph on behalf of other Defendants. Unless admitted the remaining allegations are denied.

104. Indeed, on every Infringing Teardown Copy, Casetify includes its full name, and in most instances also includes an abbreviated form of its name, in multiple locations. Every Infringing Teardown Copy also contains one of two QR codes for Casetify, which direct users to either https://www.qrfy.com/IT2a43524dQR or https://www.qrfy.com/Fpy-pZDpiJ. These links are currently deactivated, but before dbrand notified Casetify that it had uncovered Casetify's copyright theft, these links redirected to Casetify's website. [image in original]

*See also* Exhibit F.

**ANSWER:**

Westside denies the allegation as it pertains to Westside. Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy, completeness of the images shown in this paragraph and Exhibit F, therefore the allegations are denied. Westside admits that the rim of the device shown has the wordmark "Casetify

56

Casetify" or CTFY on it but denies that the same is used as Copyright Management Information or Westside's full name or the full name of any other Defendant. Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 91 (Answer to Definition of "Infringing Teardown Copies") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside is not required to answer on behalf of other Defendants. To the extent an answer is required, Westside is without sufficient knowledge or information to form a belief as to the allegations in this paragraph therefore the allegations are denied.

105. Every Infringing Teardown comes from Casetify with a verification label physically connected to it. As shown below, one side of this verification label includes the text: "CASETIFY - AUTHENTIC - VERIFIED." The reverse side of the verification label includes a QR code (which redirects to Casetify's website) and encourages consumers to "SCAN TO VERIFY" that the Infringing Teardown is an authentic "CASETIFY" product: [image in original]

**ANSWER:**

Westside is without sufficient knowledge or information about the foundation, authenticity, accuracy or completeness of the images shown in this paragraph, therefore the allegations are denied. Westside incorporates into its answer to this paragraph the following answers to paragraphs: Paragraph 8-9 (Answer to Definition of "Infringing Teardowns"), and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside admits that some, but not all, Casetagram "Casetify" branded physical case products use certain items as branding, but the branding is not specific to an image nor CMI, thus Westside denies the allegations of this paragraph. Westside is not required to answer this allegation on behalf of other defendants. To the extent an answer is required, Westside is without sufficient knowledge or information to form a belief as to the allegations

57

in this paragraph therefore the allegations are denied. Unless expressly admitted the remaining allegations are denied.

106. For the Infringing Teardown Images that Casetify displays on its website, social media, and other promotional materials, Casetify's False CMI also includes Casetify's name, logos, file names, titles (i.e. "Inside Out"), URLs, and use of the copyright registration symbol "©" that Casetify uses in connection with the Infringing Teardown Images. *See* Exhibits G-H.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 91 (Answer to Definition of "Infringing Teardown Images"), paragraph 103 (Answer to Definition of "False CMI") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation with respect to Westside. Westside is not required to answer the allegation with respect to other Defendants. To the extent an answer is required, Westside is without sufficient knowledge, information and belief to admit or deny the allegations as alleged, therefore the allegations are denied.**

107. It was expensive and time consuming for dbrand to create the Original Teardown Artworks—comprising tens of thousands of hours of labor from dbrand's professional photographers, artists, and other creators.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: 69 (Answer to Definition of "Original Teardown Artworks"), as if fully restated herein. Based on information and belief the allegations are denied. Additionally sweat of the brow doctrine has been rejected by the United States Supreme Court in Feist Publications v. Rural Telephone Service Co. 499 US 340 (1991) and recognized as not creating originality, a statutory requirement under the Copyright Act. Westside seeks to strike this paragraph.**

108.    On information and belief, executives for Casetify, including executives for both Casetagram, Westside, and Westrock, and including at least Wesley Ng, knowingly sought to bypass this expense while still deriving the financial benefits of the Original Teardown Artworks by willfully infringing dbrand's copyrights in the Original Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 69 (Definition of "Original Teardown Artworks") as if fully restated herein. Westside is without sufficient knowledge or information to form a belief as to other individuals or Defendant companies therefore the allegations are denied.**

109.    On information and belief, at least Wesley Ng and the designers of the Infringing Teardown Copies had full knowledge of Casetify's infringements of dbrand's copyrights in the Original Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 69 (Answer to Definition of "Original Teardown Artwork"), paragraph 44 (Answer to Definition of "Casetify") and paragraph 91 (Answer to Definition of "Infringing Teardown Copies") as if fully restated herein. Westside is without sufficient knowledge or information to form a belief as to other individuals or other companies therefore the allegations are denied. Westside denies the allegations on behalf of Westside.**

110.    On information and belief, at least Wesley Ng purposefully directed Casetify employees to use unauthorized copies of the Original Teardown Images from the dbrand website, dbrand social media, and dbrand sponsored advertisements, and to use these unauthorized copies to create the Infringing Teardown Copies.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify"), paragraph 67 (Definition of "Original Teardown Image"), and paragraph 91 (Answer to Definition of "Infringing Teardown Copies") as if fully restated herein. Westside is without sufficient knowledge or information to form a belief as to other individuals or other companies therefore the allegations are denied. Westside denies the allegations on behalf of Westside.**

111.     On information and belief, at least Wesley Ng and the designers of the Infringing Teardown Copies knew that Casetify could not get away with such a massive scale of infringement and other misconduct if dbrand's CMI was used in connection with the Infringing Teardown Copies, and so Wesley Ng and the designers of the Infringing Teardown Copies purposefully and intentionally caused the CMI associated with the Infringing Teardown Copies to be removed, altered, and falsified with the fraudulent intent to conceal Casetify's infringements from dbrand, Casetify's own customers, and other third parties.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 91 (Answer to Definition of "Infringing Teardown Copies") as if fully restated herein. Westside is without sufficient knowledge or information to form a belief as to other individuals or other companies therefore the allegations are denied. Westside denies the allegations on behalf of Westside.**

112.     On information and belief, at least Wesley Ng and the designers of the Infringing Teardown Copies knowingly and intentionally caused the image quality of commercial copies of the Infringing Teardown Copies to be lowered to make it more difficult for dbrand, Casetify's own customers, and other third parties to discover that every Infringing Teardown Copy incorporates an identical, unauthorized copy of an Original Teardown Image, and to further conceal any remaining Original CMI that Casetify failed to remove from the Infringing Teardown Copies.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify"), paragraph 67 (Answer to Definition of "Original Teardown Image"), and paragraph 91 (Answer to Definition of "Infringing Teardown Copies") as if fully restated herein. Westside is without sufficient knowledge or information to form a belief as to other individuals or other companies therefore the allegations are denied. Westside denies the allegations on behalf of Westside.**

113.    dbrand has been harmed by Casetify's infringements and other misconduct as alleged herein in the form of lost sales, lost market share, decreased goodwill, and a decreased ability to distinguish itself from Casetify and other competitors. Casetify, on the other hand, has been unjustly enriched through infringing sales and the promotion and legitimization of its business associated with its use of the Infringing Teardown Copies.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify"), and paragraph 91 (Answer to Definition of "Infringing Teardown Copies") as if fully restated herein. Westside is without sufficient knowledge or information to form a belief as to other individuals or Defendant companies therefore the allegations are denied.**

114.    On information and belief, Casetify imports its products into the United States, including digital and physical copies of the Infringing Teardown Copies, and including through Casetagram, Westrock, and Westside.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs 44 (Answer to Definition of "Casetify"), and paragraph 91 (Answer to Definition of "Infringing Teardown Copies") as if fully restated herein. Westside denies this allegation as stated on behalf of Westside. Westside is without sufficient knowledge, and information**

to form a belief as to the other companies mentioned in this paragraph and therefore denies the allegations.

115.    On information and belief, Westrock and Westside are U.S. entities created, incorporated, owned, and controlled by Casetify and/or executives for Casetify, including at least Ronald Yeung (Casetify's co-founder, managing director, and corporate secretary) and Wesley Ng (Casetify's co-founder and CEO).

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify").  Westside admits it is a US entity.  Westside admits to the extent that it is part of the definition of "Casetify" that it is owned and controlled by its own executives and at times Ronald Yeung has been an executive.  Westside denies that it is owned and controlled by defendant Casetagram or defendant Westrock.  Westside admits that Westside is owned and controlled by a parent company that is not a party  to this litigation.  Westside admits that Wes Ng has at times been an executive. Westside is without sufficient knowledge or information to form a belief as to the remaining allegations and therefore they are denied.

116.    On information and belief, for Infringing Teardowns sold on the Casetify website, Casetify imports these products into the United States and then directly distributes them to purchasing consumers.

**ANSWER:**

Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside is without sufficient knowledge or information to admit or deny the allegations with respect

**to other Defendants, therefore the allegations are denied. Westside denies the allegations as pled as it relates to Westside.**

117.    On information and belief, for Infringing Teardowns sold to third-party Best Buy, Casetify imports these products into the United States and then distributes them to Best Buy locations nationwide via Westrock and Westside. On information and belief, Best Buy further distributes some these products, including to other Best Buy locations nationwide and directly to purchasing consumers.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraphs 8-9 (Answer to Definition of "Infringing Teardowns") and paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as pled as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny the allegations with respect to other Defendants and third parties, therefore the allegations are denied. To the extent not admitted, the allegations are denied.**

### FIRST CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Direct Liability
### Infringing MacBook Series

#### *Against Defendants Casetagram, Westside, and Westrock*

118.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

119.    dbrand owns all copyrights in the Original Teardown Artworks, including the Original MacBook Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

63

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraph 69 (Answer to Definition of "Original Teardown Artwork") and paragraph 92 (Answer to Definition of "Original MacBook Teardown Artwork") as if fully restated herein. Denied.**

120. To create the Infringing MacBook Series, Casetify copied constituent elements from the Original MacBook Teardown Artwork that are original to dbrand. Indeed, underlying every infringing MacBook Series is an original, unauthorized copy of one of dbrand's Original MacBook Teardown Artworks.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 92 (Answer to Definitions of "Original MacBook Teardown Artwork" and "Infringing MacBook Series") into the answer of this paragraph as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied.**

121. Each of the Infringing MacBook Series is virtually identical to the Original MacBook Teardown Artwork.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 92 (Answer to Definitions of "Original MacBook Teardown Artwork" and "Infringing MacBook Series"). Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny**

64

allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied.

122. In creating each of the Infringing MacBook Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original MacBook Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original MacBook Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 92 (Answer to Definitions of "Original MacBook Series" and "Original MacBook Teardown Artwork"), and paragraph 44 (Answer to Definition of "Casetify") into the answer of this paragraph as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand MacBook image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

123. On information and belief, Casetify imported copies of the Infringing MacBook Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") and paragraph 92 (Answer to Definition of "Infringing MacBook Series") into the answer of this paragraph as if fully**

65

restated herein. **Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand MacBook image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

124.    Casetify further distributed copies of the Infringing MacBook Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraph 44 (Answer to Definition of "Casetify") and paragraph 92 (Answer to Definition of "Infringing MacBook Series") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand MacBook image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

125.    Every copy of the Infringing MacBook Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

Westside incorporates into its answer to this paragraph the following answers to paragraph 44 (Answer to Definition of "Casetify") and paragraph 92 (Answer to Definition of "Infringing MacBook Series") as if fully restated herein. Denied.

### SECOND CLAIM FOR RELIEF
17 U.S.C. § 1202(b) – Secondary Liability
Infringing MacBook Series

*Against Defendant Casetagram*

126.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-125 as if fully set forth herein.

**ANSWER:**

This Count has not been brought against Westside, therefore no answer is required by Westside.

127.     Casetagram has caused others to distribute copies of the Infringing MacBook Series within the United States, including Westside and Westrock.

**ANSWER:**

This Count has not been brought against Westside, therefore no answer is required by Westside.

128.     On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing MacBook Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

This Count has not been brought against Westside, therefore no answer is required by Westside.

67

129. On information and belief, Casetify had the power to prevent Westside and Westrock from distributing copies of the Infringing MacBook Series in the United States but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside and Westrock to distribute copies of the Infringing MacBook Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

130. On information and belief, Casetagram derived direct financial benefit from each distribution by Westside and Westrock as those distributions were necessary to deliver the Infringing MacBook Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing MacBook Series that was distributed by Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

131. For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing MacBook Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**THIRD CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Direct Liability**
**Infringing MacBook Series**

*Against Defendants Casetagram, Westside, and Westrock*

132. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-125 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-125 as if fully set forth herein.**

133.   Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing MacBook Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original MacBook Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations are denied.**

134.   Casetify also imported copies of the Infringing MacBook Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations are denied.**

135.   Casetify also distributed copies of the Infringing MacBook Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations are denied.**

136. Every copy of the Infringing MacBook Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation is a legal conclusion and not an allegation of fact to which an answer is required. To the extent an answer is deemed necessary Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations are denied.**

### FOURTH CLAIM FOR RELIEF
**17 U.S.C. § 1202(a) – Secondary Liability**
**Infringing MacBook Series**
*Against Defendant Casetagram*

137. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-136 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

70

138. On information and belief, Casetagram has caused others to distribute copies of the Infringing MacBook Series within the United States, knowing that those copies of the Infringing MacBook Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

139. For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing MacBook Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**FIFTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(b) – Direct Liability**
**Infringing Z Flip Series**

*Against Defendants Casetagram, Westside, and Westrock*

140. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

141. dbrand owns all copyrights in the Original Teardown Artworks, including the Original Z Flip Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 69 (Answer to Definition of "Original Teardown Artwork") and paragraph 92 (Definition of "Original Z Flip Teardown Artwork") into the answer of this paragraph as if fully restated herein. All other remaining allegations are denied.**

142. To create the Infringing Z Flip Series, Casetify copied constituent elements from the Original Z Flip Teardown Artwork that are original to dbrand. Indeed, underlying every infringing Z Flip Series is an original, unauthorized copy of one of dbrand's Original Z Flip Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

143. Each of the Infringing Z Flip Series is virtually identical to the Original Z Flip Teardown Artwork.

**ANSWER:**

**Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

144. In creating each of the Infringing Z Flip Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original Z Flip Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original Z Flip Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand original CMI" is with respect to any alleged dbrand Z Flip image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

145. On information and belief, Casetify imported copies of the Infringing Z Flip Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Z Flip image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

4912-5164-1674, v. 3

146.    Casetify further distributed copies of the Infringing Z Flip Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Z Flip image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

147.    Every copy of the Infringing Z Flip Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary.  To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand Z Flip image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied.  All other remaining allegations are denied.**

## SIXTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Secondary Liability
### Infringing Z Flip Series

### *Against Defendant Casetagram*

148.    dbrand incorporates preceding paragraphs 1-15, 19-39, 44-117, and 140-147 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

149.    Casetagram has caused others to distribute copies of the Infringing Z Flip Series within the United States, including Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

150.    On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing Z Flip Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

151.    On information and belief, Casetify had the power to prevent Westside and Westrock from distributing copies of the Infringing Z Flip Series in the United States but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside and Westrock to distribute copies of the Infringing Z Flip Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

152.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside and Westrock as those distributions were necessary to deliver the Infringing Z Flip Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing Z Flip Series that was distributed by Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

153.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Z Flip Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**SEVENTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Direct Liability**
**Infringing Z Flip Series**

***Against Defendants Casetagram, Westside, and Westrock***

154.    dbrand incorporates preceding paragraphs 1-15, 19-39, 44-117, and 140-147 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 140-147 as if fully set forth herein.**

76

155. Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing Z Flip Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original Z Flip Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

156. Casetify also imported copies of the Infringing Z Flip Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

157. Casetify also distributed copies of the Infringing Z Flip Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or**

information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

158.    Every copy of the Infringing Z Flip Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations are denied.**

**EIGHTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Secondary Liability**
**Infringing Z Flip Series**

***Against Defendant Casetagram***

159.    dbrand incorporates preceding paragraphs 1-15, 19-39, 44-117, 140-158 as if fully
set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

160. On information and belief, Casetagram has caused others to distribute copies of the Infringing Z Flip Series within the United States, knowing that those copies of the Infringing Z Flip Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

78

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

161.     For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Z Flip Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**NINTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(b) – Direct Liability**
**Infringing Z Fold Series**

***Against Defendants Casetagram, Westside, and Westrock***

162.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**
**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.**

163.     dbrand owns all copyrights in the Original Teardown Artworks, including the Original Z Fold Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: paragraph 69 (Answer to Definition of "Original Teardown Artworks"), and paragraph 92 (Answer to Definition of "Original Z Fold Teardown Artwork") into the**

79

**answer of this paragraph as if fully restated herein. All other remaining allegations are denied.**

164. To create the Infringing Z Fold Series, Casetify copied constituent elements from the Original Z Fold Teardown Artwork that are original to dbrand. Indeed, underlying every infringing Z Fold Series is an original, unauthorized copy of one of dbrand's Original Z Fold Teardown Artworks.

    **ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are denied.**

165. Each of the Infringing Z Fold Series is virtually identical to the Original Z Fold Teardown Artwork.

    **ANSWER:**

**Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

166. In creating each of the Infringing Z Fold Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original Z Fold Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original Z Fold Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand original CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

167. On information and belief, Casetify imported copies of the Infringing Z Fold Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

168. Casetify further distributed copies of the Infringing Z Fold Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

169.    Every copy of the Infringing Z Fold Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

## TENTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Secondary Liability
### Infringing Z Fold Series

### *Against Defendant Casetagram*

170.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 162-169 as
if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

171.     Casetagram has caused others to distribute copies of the Infringing Z Fold Series within the United States, including Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

172.     On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing Z Fold Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

173.     On information and belief, Casetify had the power to prevent Westside and Westrock from distributing copies of the Infringing Z Fold Series in the United States, but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside and Westrock to distribute copies of the Infringing Z Fold Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

83

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

174.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside and Westrock as those distributions were necessary to deliver the Infringing Z Fold Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing Z Fold Series that was distributed by Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

175.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Z Fold Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**ELEVENTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Direct Liability**
**Infringing Z Fold Series**

*Against Defendants Casetagram, Westside, and Westrock*

176.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 162-169 as if fully set forth herein.

**ANSWER:**

84

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 162-169 as if fully set forth herein.**

177.     Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing Z Fold Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original Z Fold Teardown Artwork in the United States.

**<u>ANSWER:</u>**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

178.     Casetify also imported copies of the Infringing Z Fold Series, bearing Casetify's false CMI, into the United States.

**<u>ANSWER:</u>**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

179.     Casetify also distributed copies of the Infringing Z Fold Series, bearing Casetify's false CMI, in the United States.

**<u>ANSWER:</u>**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the**

**allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

180.    Every copy of the Infringing Z Fold Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

<u>**TWELFTH CLAIM FOR RELIEF**</u>
**17 U.S.C. § 1202(a) – Secondary Liability**
**Infringing Z Fold Series**

*Against Defendant Casetagram*

181.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 162-180 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

86

182.    On information and belief, Casetagram has caused others to distribute copies of the Infringing Z Fold Series within the United States, knowing that those copies of the Infringing Z Fold Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

183.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Z Fold Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

### THIRTEENTH CLAIM FOR RELIEF
**17 U.S.C. § 1202(b) – Direct Liability**
**Infringing Z Fold Series**

***Against Defendants Casetagram, Westside, and Westrock***

184.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

185.    dbrand owns all copyrights in the Original Teardown Artworks, including the Original Z Fold Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: 6 (Answer to Definition of "Original Teardowns"), and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein. All other remaining allegations are, on information and belief, denied.**

186. To create the Infringing Z Fold Series, Casetify copied constituent elements from the Original Z Fold Teardown Artwork that are original to dbrand. Indeed, underlying every infringing Z Fold Series is an original, unauthorized copy of one of dbrand's Original Z Fold Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

187. Each of the Infringing Z Fold Series is virtually identical to the Original Z Fold Teardown Artwork.

**ANSWER:**

**Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

88

188. In creating each of the Infringing Z Fold Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original Z Fold Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original Z Fold Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand original CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

189. On information and belief, Casetify imported copies of the Infringing Z Fold Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

89

190.    Casetify further distributed copies of the Infringing Z Fold Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

191.    Every copy of the Infringing Z Fold Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand Z Fold image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an**

90

**answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

## FOURTEENTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Secondary Liability
### Infringing Z Fold Series

### *Against Defendant Casetagram*

192.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 184-191 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

193.     Casetagram has caused others to distribute copies of the Infringing Z Fold Series within the United States, including Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

194.     On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing Z Fold Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

195.     On information and belief, Casetify had the power to prevent Westside and Westrock from distributing copies of the Infringing Z Fold Series in the United States, but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside and Westrock to distribute copies of the Infringing Z Fold Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

91

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

196.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside and Westrock as those distributions were necessary to deliver the Infringing Z Fold Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing Z Fold Series that was distributed by Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

197.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Z Fold Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**FIFTEENTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Direct Liability**
**Infringing Z Fold Series**

*Against Defendants Casetagram, Westside, and Westrock*

198.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 184-191 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 184-191 as if fully set forth herein.**

92

199. Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing Z Fold Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original Z Fold Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

200. Casetify also imported copies of the Infringing Z Fold Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

201. Casetify also distributed copies of the Infringing Z Fold Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or**

**information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

202.    Every copy of the Infringing Z Fold Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

### SIXTEENTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(a) – Secondary Liability
### Infringing Z Fold Series

### *Against Defendant Casetagram*

203.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 184-202 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

204.    On information and belief, Casetagram has caused others to distribute copies of the Infringing Z Fold Series within the United States, knowing that those copies of the Infringing Z Fold Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

205. For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Z Fold Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**SEVENTEENTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(b) – Direct Liability**
**Infringing iPad Series**

***Against Defendants Casetagram, Westside, and Westrock***

206. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

207. dbrand owns all copyrights in the Original Teardown Artworks, including the Original iPad Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: 6 (Answer to Definition of "Original Teardowns"), and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein. All other remaining allegations are, on information and belief, denied.**

95

208.    To create the Infringing iPad Series, Casetify copied constituent elements from the Original iPad Teardown Artwork that are original to dbrand. Indeed, underlying every infringing iPad Series is an original, unauthorized copy of one of dbrand's Original iPad Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied.  All other remaining allegations are, on information and belief, denied.**

209.    Each of the Infringing iPad Series is virtually identical to the Original iPad Teardown Artwork.

**ANSWER:**

**Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

210.    In creating each of the Infringing iPad Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original iPad Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original iPad Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or**

**information as to what "dbrand original CMI" is with respect to any alleged dbrand iPad image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

211. On information and belief, Casetify imported copies of the Infringing iPad Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand iPad image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

212. Casetify further distributed copies of the Infringing iPad Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand iPad image at issue,**

**therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

213.    Every copy of the Infringing iPad Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand iPad image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

## EIGHTEENTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Secondary Liability
### Infringing iPad Series

#### *Against Defendant Casetagram*

214.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 206-213 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

215.    Casetagram has caused others to distribute copies of the Infringing iPad Series within the United States, including Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

216.    On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing iPad Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

217.    On information and belief, Casetify had the power to prevent Westside and Westrock from distributing copies of the Infringing iPad Series in the United States, but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside and Westrock to distribute copies of the Infringing iPad Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

218.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside and Westrock as those distributions were necessary to deliver the Infringing iPad Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing iPad Series that was distributed by Westside Westrock.

4912-5164-1674, v. 3

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

219.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing iPad Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**NINETEENTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Direct Liability**
**Infringing iPad Series**

***Against Defendants Casetagram, Westside, and Westrock***

220.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 206-213 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 206-213 as if fully set forth herein.**

221.    Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing iPad Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original iPad Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or**

information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

222.    Casetify also imported copies of the Infringing iPad Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

223.    Casetify also distributed copies of the Infringing iPad Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

224.    Every copy of the Infringing iPad Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

### TWENTIETH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(a) – Secondary Liability
### Infringing iPad Series
### *Against Defendant Casetagram*

225. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 206-224 as if fully set forth herein.

**ANSWER:**

This Count has not been brought against Westside, therefore no answer is required by Westside.

226. On information and belief, Casetagram has caused others to distribute copies of the Infringing iPad Series within the United States, knowing that those copies of the Infringing iPad Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

This Count has not been brought against Westside, therefore no answer is required by Westside.

227. For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing iPad Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

### TWENTY-FIRST CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Direct Liability
### Infringing Pixel Series

*Against Defendants Casetagram, Westside, and Westrock*

228.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

229.    dbrand owns all copyrights in the Original Teardown Artworks, including the Original Pixel Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: 6 (Answer to Definition of "Original Teardowns"), and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein. All other remaining allegations are, on information and belief, denied.**

230.    To create the Infringing Pixel Series, Casetify copied constituent elements from the Original Pixel Teardown Artwork that are original to dbrand. Indeed, underlying every infringing Pixel Series is an original, unauthorized copy of one of dbrand's Original Pixel Teardown Artworks.

4912-5164-1674, v. 3

**ANSWER:**

Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

231. Each of the Infringing Pixel Series is virtually identical to the Original Pixel Teardown Artwork.

**ANSWER:**

Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

232. In creating each of the Infringing Pixel Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original Pixel Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original Pixel Teardown Artwork in the United States.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Pixel image at

issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

233. On information and belief, Casetify imported copies of the Infringing Pixel Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Pixel image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

234. Casetify further distributed copies of the Infringing Pixel Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand Pixel image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information

**to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

235.     Every copy of the Infringing Pixel Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand Pixel image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

### TWENTY-SECOND CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Secondary Liability
### Infringing Pixel Series

#### *Against Defendant Casetagram*

236.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 228-235 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

237.    Casetagram has caused others to distribute copies of the Infringing Pixel Series within the United States, including Westside and Westrock.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

238.    On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing Pixel Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

239.    On information and belief, Casetify had the power to prevent Westside and Westrock from distributing copies of the Infringing Pixel Series in the United States, but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside and Westrock to distribute copies of the Infringing Pixel Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

240.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside and Westrock as those distributions were necessary to deliver the Infringing Pixel Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing Pixel Series that was distributed by Westside and Westrock.

107

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

241.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside and Westrock, for causing them to distribute copies of the Infringing Pixel Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**TWENTY-THIRD CLAIM FOR RELIEF**
**17 U.S.C. § 1202(a) – Direct Liability**
**Infringing Pixel Series**

***Against Defendants Casetagram, Westside, and Westrock***

242.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 228-235 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 228-235 as if fully set forth herein.**

243.    Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing Pixel Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original Pixel Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or**

108

information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

244.     Casetify also imported copies of the Infringing Pixel Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

245.     Casetify also distributed copies of the Infringing Pixel Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

246.     Every copy of the Infringing Pixel Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  This allegation contains a

109

legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

## TWENTY-FOURTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(a) – Secondary Liability
### Infringing Pixel Series

### *Against Defendant Casetagram*

247. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 228-246 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

248. On information and belief, Casetagram has caused others to distribute copies of the Infringing Pixel Series within the United States, knowing that those copies of the Infringing Pixel Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

249. For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside and Westrock for causing them to distribute copies of the Infringing Pixel Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**TWENTY-FIFTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(b) – Direct Liability**
**Infringing iPhone 11 Series**

***Against Defendants Casetagram, Westside, and Westrock***

250.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

251.    dbrand owns all copyrights in the Original Teardown Artworks, including the Original iPhone 11 Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

**ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: 6 (Answer to Definition of "Original Teardowns"), and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein.  All other remaining allegations are, on information and belief, denied.**

252.    To create the Infringing iPhone 11 Series, Casetify copied constituent elements from the Original iPhone 11 Teardown Artwork that are original to dbrand. Indeed, underlying every infringing iPhone 11 Series is an original, unauthorized copy of one of dbrand's Original iPhone 11 Teardown Artworks.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as**

alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

253. Each of the Infringing iPhone 11 Series is virtually identical to the Original iPhone 11 Teardown Artwork.

**ANSWER:**

**Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

254. In creating each of the Infringing iPhone 11 Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original iPhone 11 Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original iPhone 11 Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand original CMI" is with respect to any alleged dbrand iPhone 11 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

255. On information and belief, Casetify imported copies of the Infringing iPhone 11 Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand iPhone 11 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied.  All other remaining allegations are, on information and belief, denied.

256.    Casetify further distributed copies of the Infringing iPhone 11 Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand iPhone 11 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied.  All other remaining allegations are, on information and belief, denied.

257.     Every copy of the Infringing iPhone 11 Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand iPhone 11 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

**TWENTY-SIXTH CLAIM FOR RELIEF**
**17 U.S.C. § 1202(b) – Secondary Liability**
**Infringing iPhone 11 Series**

***Against Defendant Casetagram***

258.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 250-257 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

259.     Casetagram has caused others to distribute copies of the Infringing iPhone 11 Series within the United States, including Westside, Westrock and third-party Best Buy.

114

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

260.    On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing iPhone 11 Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

261    On information and belief, Casetify had the power to prevent Westside, Westrock, and Best Buy from distributing copies of the Infringing iPhone 11 Series in the United States, but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside, Westrock, and Best Buy to distribute copies of the Infringing iPhone 11 Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

262.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside, Westrock, and Best Buy as those distributions were necessary to deliver the Infringing iPhone 11 Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing iPhone 11 Series that was distributed by Westside, Westrock, and Best Buy.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

263.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside, Westrock, and Best Buy, for causing them to distribute copies of the Infringing iPhone 11 Series in the United States.

115

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

## TWENTY-SEVENTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(a) – Direct Liability
### Infringing iPhone 11 Series

### *Against Defendants Casetagram, Westside, and Westrock*

264.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 250-257 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 250-257 as if fully set forth herein.**

265.    Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing iPhone 11 Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original iPhone 11 Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegations as they relate to Westside.  Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

266.    Casetify also imported copies of the Infringing iPhone 11 Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

267. Casetify also distributed copies of the Infringing iPhone 11 Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

268. Every copy of the Infringing iPhone 11 Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on**

behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

## TWENTY-EIGHTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(a) – Secondary Liability
### Infringing iPhone 11 Series

### *Against Defendant Casetagram*

269. dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 250-268 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

270. On information and belief, Casetagram has caused others to distribute copies of the Infringing iPhone 11 Series within the United States, knowing that those copies of the Infringing iPhone 11 Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

271. For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside, Westrock, and Best Buy, for causing them to distribute copies of the Infringing iPhone 11 Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

## TWENTY-NINTH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Direct Liability
### Infringing iPhone 12, 13, and 14 Series

### *Against Defendants Casetagram, Westside, and Westrock*

118

272.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117 as if fully set forth herein.

 **ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, as if fully set forth herein.**

273.     dbrand owns all copyrights in the Original Teardown Artworks, including the Original iPhone 12, 13, and 14 Teardown Artwork, which are creative works of original authorship and inherently entitled to copyright protection.

 **ANSWER:**

**Westside incorporates its answer to this paragraph the following answers to paragraphs: 6 (Answer to Definition of "Original Teardowns"), and paragraph 67 (Definition of "Original Teardown Image") into the answer of this paragraph as if fully restated herein.  All other remaining allegations are, on information and belief, denied.**

274.     To create the Infringing iPhone 12, 13, and 14 Series, Casetify copied constituent elements from the Original iPhone 12, 13, and 14 Teardown Artwork that are original to dbrand. Indeed, underlying every infringing iPhone 12, 13, and 14 Series is an original, unauthorized copy of one of dbrand's Original iPhone 12, 13, and 14 Teardown Artworks.

 **ANSWER:**

**Westside incorporates into its answer to this paragraph the answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied.  All other remaining allegations are, on information and belief, denied.**

275.     Each of the Infringing iPhone 12, 13, and 14 Series is virtually identical to the Original iPhone 12, 13, and 14 Teardown Artwork.

**ANSWER:**

**Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

276.     In creating each of the Infringing iPhone 12, 13, and 14 Series, Casetify knowingly removed and altered dbrand's original CMI used on and in connection with the Original iPhone 12, 13, and 14 Teardown Artwork. On information and belief, Casetify did so with the intent to induce, enable, facilitate, and conceal its infringements of the Original iPhone 12, 13, and 14 Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the answer to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information as to what "dbrand original CMI" is with respect to any alleged dbrand iPhone 12, 13, and 14 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.**

277.     On information and belief, Casetify imported copies of the Infringing iPhone 12, 13, and 14 Series into the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand iPhone 12, 13, and 14 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

278. Casetify further distributed copies of the Infringing iPhone 12, 13, and 14 Series within the United States, knowing that dbrand's CMI had been removed and altered without authorization.

**ANSWER:**

Westside incorporates into its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegation as it relates to Westside. Westside is without sufficient knowledge or information as to what "dbrand CMI" is with respect to any alleged dbrand iPhone 12, 13, and 14 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged. To the extent an answer is deemed necessary, the allegation is denied. All other remaining allegations are, on information and belief, denied.

279.     Every copy of the Infringing iPhone 12, 13, and 14 Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(b) for the removal and alteration of CMI.

**ANSWER:**

**Westside incorporates into its answer to this paragraph the following answers to paragraphs: paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary.  To the extent an answer is required by Westside, Westside denies the allegation as it relates to Westside.  Westside is without sufficient knowledge or information as to what "CMI" is with respect to any alleged dbrand iPhone 12, 13, and 14 image at issue, therefore the allegation is denied. Westside is without sufficient knowledge or information to admit or deny allegations regarding other Defendants in this paragraph as alleged.  To the extent an answer is deemed necessary, the allegation is denied.  All other remaining allegations are, on information and belief, denied.**

### THIRTIETH CLAIM FOR RELIEF
### 17 U.S.C. § 1202(b) – Secondary Liability
### Infringing iPhone 12, 13, and 14 Series

#### *Against Defendant Casetagram*

280.     dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 272-279 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

122

281.    Casetagram has caused others to distribute copies of the Infringing iPhone 12, 13, and 14 Series within the United States, including Westside, Westrock, and third-party Best Buy.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

282.    On information and belief, Casetify had supervision and control over Westside's and Westrock's distribution of copies of the Infringing iPhone 12, 13, and 14 Series, including through its top executives Ronald Yeung, Wesley Ng, Sharon Lam, and Mike Jia.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

283.    On information and belief, Casetify had the power to prevent Westside, Westrock, and Best Buy from distributing copies of the Infringing iPhone 12, 13, and 14 Series in the United States, but failed to do so. To the contrary, on information and belief, Casetagram actively encouraged Westside, Westrock, and Best Buy to distribute copies of the Infringing iPhone 12, 13, and 14 Series in the United States, including by providing them with copies thereof and, at least for Westrock, directing them on where they should be distributed.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

284.    On information and belief, Casetagram derived direct financial benefit from each distribution by Westside, Westrock, and Best Buy as those distributions were necessary to deliver the Infringing iPhone 12, 13, and 14 Series products to purchasers and to complete the transactions initiated by Casetagram, and because Casetagram received payment for each copy of the Infringing iPhone 12, 13, and 14 Series that was distributed by Westside, Westrock, and Best Buy.

4912-5164-1674, v. 3

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

285.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(b) for vicarious liability on behalf of Westside and Westrock, and contributory liability on behalf of Westside, Westrock, and Best Buy, for causing them to distribute copies of the Infringing iPhone 12, 13, and 14 Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

### THIRTY-FIRST CLAIM FOR RELIEF
### 17 U.S.C. § 1202(a) – Direct Liability
### Infringing iPhone 12, 13, and 14 Series

#### *Against Defendants Casetagram, Westside, and Westrock*

286.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 272-279 as if fully set forth herein.

**ANSWER:**

**Westside incorporates its answers to preceding paragraphs 1-15, 19-39, and 44-117, and 272-279 as if fully set forth herein.**

287.    Casetify provided false Casetify CMI on and in connection with each of its Infringing Teardown Copies, including the Infringing iPhone 12, 13, and 14 Series. On information and belief, Casetify did so knowingly and with the intent to induce, enable, facilitate, and conceal its infringements of the Original iPhone 12, 13, and 14 Teardown Artwork in the United States.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein.  Westside denies the**

124

allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

288. Casetify also imported copies of the Infringing iPhone 12, 13, and 14 Series, bearing Casetify's false CMI, into the United States.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

289. Casetify also distributed copies of the Infringing iPhone 12, 13, and 14 Series, bearing Casetify's false CMI, in the United States.

**ANSWER:**

Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.

290. Every copy of the Infringing iPhone 12, 13, and 14 Series that was imported and/or distributed into the United States by or on behalf of Casetify constitutes a separate violation of 17 U.S.C. § 1202(a) for the falsification of CMI.

**ANSWER:**

**Westside incorporates in its answer to this paragraph the answer to paragraph 44 (Answer to Definition of "Casetify") as if fully restated herein. This allegation contains a legal conclusion and not an allegation of fact to which an answer is necessary. To the extent an answer is required by Westside, Westside denies the allegations as they relate to Westside. Westside is without sufficient knowledge or information to admit or deny on behalf of other Defendants. To the extent an answer is required, the allegations on information and belief are denied.**

### THIRTY-SECOND CLAIM FOR RELIEF
**17 U.S.C. § 1202(a) – Secondary Liability**
**Infringing iPhone 12, 13, and 14 Series**

*Against Defendant Casetagram*

291.    dbrand incorporates preceding paragraphs 1-15, 19-39, and 44-117, and 272-290 as if fully set forth herein.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

292.    On information and belief, Casetagram has caused others to distribute copies of the Infringing iPhone 12, 13, and 14 Series within the United States, knowing that those copies of the Infringing iPhone 12, 13, and 14 Series bear false Casetify CMI in violation of 17 U.S.C. § 1202(a).

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

126

293.    For the foregoing reasons, Casetagram is secondarily liable under 17 U.S.C. § 1202(a) for vicarious liability on behalf of Westside and Westrock and contributory liability on behalf of Westside, Westrock, and Best Buy, for causing them to distribute copies of the Infringing iPhone 12, 13, and 14 Series in the United States.

**ANSWER:**

**This Count has not been brought against Westside, therefore no answer is required by Westside.**

**Wherefore Westside requests that this Court deny all relief requested by dbrand and enter Judgment in favor of Westside and against dbrand and award Westside its attorneys fees and costs under 17 USC 505 (as the prevailing party under all copyright claims previously voluntarily dismissed by dbrand) and under 17 USC 1203 (as the prevailing party under each Count of the 32 counts herein) that have been brought against Westside, and for any and all relief that this Court deemed just.**

## WESTSIDE AFFIRMATIVE DEFENSES

For its Affirmative Defenses, Westside alleges as follows:

**Affirmative Defense No. 1: Applicable to all counts**
**Unprotectable elements in a Work may lawfully be copied and cannot form the basis for a DMCA claim.**

1. A DMCA accuser like dbrand must proactively consider that the similarities in materials are unprotectable.

2. Unprotectable elements in a Work are available "under the law" for copying. *Feist Publications v. Rural Telephone Service Co*, 499 U.S. 340 (1991).

3. dbrand's asserted works in Counts 1-32 are unprotectible to dbrand under Copyright law and thus cannot form the basis for a claim under the DMCA, any dbrand claimed identifying information on unprotectable works cannot constitute Copyright Management Information as defined under 17 USC §1202(c).

### Merger

4. Copyright never extends to an idea, procedure, principle, or concept 17 USC § 102(b), which, codifies the merger of idea–expression dichotomy .

5. Copyright protects only expression; patent law is the proper instrument for protecting functionality. *See Eldred v. Ashcroft*, 537 U.S. 186, 217 (2003).

6. Merger doctrine prevents the use of copyright to protect an idea or procedure. If an idea or procedure can be expressed in only a few ways, it is easy to copyright every form in which the idea can be expressed, indirectly protecting the idea itself. 4 NIMMER ON

128

COPYRIGHT § 13.03[B][3]; *see also Morrissey v. Procter & Gamble Co.,* 379 F.2d 675, 678–79 (1st Cir. 1967).

7. To guard against this kind of overprotection, when an idea can be expressed in only limited ways, courts say that the expression "merges" into the idea and cannot receive copyright protection. *Lexington Homes*, 858 F.3d at 1102.

8. The concept of a teardown image is not protectable because it is an "idea." 17 U. S. C. Section 102(b); *see, Golan v. Holder*, 565 U.S. 302, 328 (2012) (discussing the "idea/ expression dichotomy") and to the extent dbrand's designs mimic the interiors of phones, they have "merged with the idea itself" and cannot be protected without effectively protecting the idea. *Computer Associates Intern, Inc. v. Altai*, Inc., 982 F. 2d 693, 708 (2d Cir. 1992); *see also, Design Basics*, 994 F. 3d at 889 (discussing the merger doctrine).

**Scenes a Faire**

9. There is no copyright protection for standard common elements.

10. Standard elements in a genre, scènes à faire, get no copyright protection. *Scènes à faire* are "so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another." *Bucklew v. Hawkins, Ash, Baptie & Co*., 329 F.3d 923, 929 (7th Cir. 2003).

11. If standard elements received copyright protection, then the creation of a single work in a genre would prevent others from contributing to that genre because the copyright owner would have exclusive rights in all of the genre's basic elements.

4912-5164-1674, v. 3

12. In this case the dbrand scans at issue are scans claiming to be 99% accurate replications of the interior of cell phones and devices which are rudimentary, commonplace, standard, or unavoidable. **Exhibit 2.**

13. Scanned images showing the arrangements of the interior of a cell phone or iPad or Macbook device are also dictated by functionality. The size, shape and location of items like interior parts and lenses are not covered by copyright.

### Dbrand's Representational Scans are not Protectable Under Copyright Law

14. dbrand does not have a US copyright registration for the scans it is asserting against Defendant Westside.

15. dbrand has the sole burden to prove what are the protectable aspects of the scans.

16. "To establish infringement, two elements must be proven by dbrand: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991).

17. Under the law unprotectable elements in a work are available for use by any party and cannot form the basis for a claim of infringement. Feist @ 361.

### dbrand's Unauthorized Representational Scans of Devices are not Protectable (using iPhone device as an example but allegations are deemed applicable to each of the works asserted in Counts 1-32).

18. The Apple iPhone (and other) device and the internal elements of the Apple iPhone (and other) device were not created by dbrand. Both were created by a third party - someone other than dbrand.

19. The color, size, shape, layout, or organization of the internals of the third-party iPhone (and other) device are not original to dbrand.

20. To the extent there is any artistic work product it is the third parties' artistic work product of the interior of the Apple iPhone (and other) device which pre-existed the dbrand work and dbrand copied it from the third party's device.

21. 17 USC §103 of the US Copyright Act provides that use of a third party's pre-existing material in a derivative work, a compilation, or a collective work is not copyrightable.

22. dbrand's use of the third parties' pre-existing works is not copyrightable to dbrand and gives dbrand no protectable copyright rights.

23. dbrand used a high-powered scanner to scan the third parties' pre-existing work product internals of the third-party device. **Exhibit 2**.

24. dbrand's Complaint Ex C, website, affirmatively represents that a scanner was used to make the teardown images. **Exhibit 2**.

25. dbrand's Complaint Ex C, website, admits that the resulting image is "guaranteed to be a 99% accurate" depiction of the third-party device. **Exhibit 2**.

26. dbrand did not obtain any permission from the third party to make a representational scan of the internal elements of a third-party iPhone or other device.

27. dbrand's CEO testified under oath and under the penalties of perjury that he did not obtain authorization to make a representational scan of the iPhone (other) internal elements of the device.

**Time Spent Does Not Equate To Originality**

28. Amount of time spent by dbrand to scan the devices does not equate to originality.

29. The Sweat of the Brow Doctrine has long since been rejected. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 361 (1991).

**Copyright Office Compendium**

30.    The US Copyright Office publishes its position on copyrightable subject matter in the Copyright Office Compendium.

31.    The Copyright Office Compendium at 313.6(B), provides that dbrand's unauthorized use of a third-parties' pre-existing material in a derivative work, a compilation or collective work cannot be registered with the US Copyright Office. 17 USC § 103. Compendium 313.4(A), 313.6(B). *See also*, Compendium 313.4(A). (A work that is a mere copy of another work of authorship is not copyrightable).

32.    dbrand's Amended Complaint admits that it has made a mere copy of the internals of the third-party iPhone (and other) device without authority of the device manufacturer, in the form of a representational scan, using a machine, a high-powered scanner. *See, e.g.* Exhibit 2.

33.    Even if one assumes for argument purposes only that dbrand places its own "digital signatures" on the unprotectible work because it is on an unprotectable scanned work the "digital signatures" cannot constitute CMI as defined because the underlying work is not protectable.

**dbrand cannot identify protectable aspects of the works (again use of iPhone is by example but defense is applicable to all counts 1-32)**

34.    Under 17 USC § 411 dbrand holds the sole burden to show what aspects of its work are protectable.

35.    Under the Copyright Act, an applicant for registration of a work with the Copyright Office must comply with disclosures required by 17 USC § 409.

36. One of the requirements under Section 409(9) provides "in the case of a compilation or derivative work, a copyright applicant **must make an identification of any preexisting work or works that it is based on or incorporates, and a brief, general statement of the additional material covered by the copyright claim being registered**" (emphasis added).

37. Neither a compilation or derivative work makes the underlying unprotectable elements copyrightable to dbrand.

38. dbrand has not identified any protectable material for the iPhone (or other ) scans asserted in this case against Westside that is an original protectable work of dbrand.

39. dbrand's Amended Complaint does not provide specific allegations in Count 29-32 about the specific additional material for the Plaintiff's **iPhone** image at issue in Counts 29-32 that is allegedly covered by copyright that they would be required to provide as part of the statutory requirements under 17 USC §409. dbrand provides no specificity for each of the other devices in Counts 1-28.

40. With the admission that the image is 99% accurate to the third-party device Plaintiff, at best, concedes it made a 1% or a *de minimus* contribution. *See*, Plaintiff's website Exhibit C image is "guaranteed to be 99% accurate" depiction of the third-party device. **Exhibit 2.**

**De Minimis Changes and/or mere Variation in Coloring are not Copyrightable.**

41. The alleged 1% contribution dbrand claims to have contributed to the dbrand scanned iPhone (or other) scans are *de minimus* and not copyrightable. *See* Compendium 314(B).

42. In the Amended Complaint dbrand generically alleges that it engaged in touching up of the representational scan and dbrand's advertising states that computer program is called Photoshop.

133

43.    Mere variations of coloring are not copyrightable and "The Office cannot register mere variations in coloring, regardless of whether the variations are made by hand, by Computer or by other processes, 37 CFR 202.1(a). ("If the author merely added or changed a few colors that appear in a pre-existing work of authorship or merely added, changed or combined expected or familiar sets or pairs of colors, the Office may communicate with the applicant or may refuse to register the claim.") *See*, Compendium 313.4(K).

**"Easter Eggs" on iPhone (or other) representational scan are not protectable**

44.    dbrand alleges that it added "JRE" a three-letter reference to Jerry Rig Everything on the dbrand scanned iPhone.

45.    Words and short Phrases are not copyrightable. *See*, Compendium 313.4(C) (Words and short phrases are not copyrightable).

46.    "Catchwords, catch phrase, mottos, slogans, or other short expressions" are not copyrightable. *See*, Compendium 313.4(C).

47.    The addition of the three letter "JRE" is not copyrightable subject matter, and the other "Easter Eggs" at issue in Counts 1-32 are not copyrightable.

48.    Paragraph 74 of the Plaintiff's Amended Complaint admits that "The "2011mAh/11.11Wh" and "11 - 11 - 11" Easter Eggs each refer to the founding date of dbrand (November 11, 2011)".

49.    Facts are not copyrightable. 17 USC § 102. *Feist Publications v. Rural Telephone Service Co.* 499 US 340 (1991). (Facts are not copyrightable).

50.    Numbers are not copyrightable. Familiar symbols and designs (such as numbers (i.e. the number 11) are not copyrightable. *See*, Compendium 313.4(J).

134

51.   A name of a business organization, name of a product or service, ***domain name or URL*** are not copyrightable. *See*, Compendium 313.4(C). (emphasis added).

52.   dbrand's CEO testified that dbrand used a ███████████████ to make its URL into a QR code.  Thus, the QR code is not an original creation of dbrand, but instead that of a ████████████.

53.   The QR code is not copyrightable.

54.   dbrand holds no protectable originality in the Apple iPhone (or other device) scan.

55.   Without protectable copyright rights, dbrand cannot meet the essential elements of a claim under 17 USC § 1202(a) or 17 USC § 1202(b) with respect to the Apple iPhone scans or other device scans at issue in the Amended Complaint.

**Affirmative Defense No. 2 (a-f) Applicable to all Counts**

**Dbrand Holds no Protectable Copyright Rights in the Works**

56.   Westside incorporates the above allegations from its Affirmative Defense No. 1 as if fully restated herein and applicable to each of the Counts 1-28 to establish that there are no protectable Copyright rights held by dbrand.

   a.   No protectible elements of Counts 1-4 device, and unprotectable elements may be copied under the law.

   b.   No protectible elements of Counts 5-9 device, and unprotectable elements may be copied under the law.

   c.   No protectible elements of Counts 10-14 device and unprotectable elements may be copied under the law.

   d.   No protectible elements of Counts 15-19 device and unprotectable elements may be copied under the law.

   e.   No protectible elements of Counts 20-24 device and unprotectable elements may be copied under the law.

      f.      No protectible elements of Counts 25-28 device and unprotectable elements may be copied under the law.

      g.     No protectible elements of Counts 29-32 device and unprotectable elements may be copied under the law.

57.     Without protectable copyright rights, dbrand cannot meet the essential elements of a claim under 17 USC § 1202(a) or 17 USC § 1202(b) with respect to the Apple iPhone scans or other device scans.

**Affirmative Defense No. 3 Applicable to All Counts**

**First Amendment Violation**

1.     The DMCA, as interpreted and applied by dbrand's claims violates the First Amendment of the United States Constitution.

2.     Copyright laws do not prohibit copying unprotectible aspects of a work. Unprotectible elements in a work are available for use by any party. Affirmative Defenses No. 1 – 2 are incorporated herein by reference.

3.     It is axiomatic that the DMCA thus authorizes copying of the unprotectible aspects while at the same time allowing not copying of the alleged protectible aspects.

4.     CMI constitutes factual information that is not copyrightable under 17 USC § 102(b) of the United States Copyright Act. *Feist Publications v. Rural Telephone Service Co.* 499 US 340 (1991). (Facts are not copyrightable). See also, Affirmative Defense No. 1 incorporated herein by reference.

5.     Interpreting the DMCA as posited by dbrand is thus both over inclusive and under inclusive because it has a chilling effect on protected speech while not adequately solving the purported problem Congress sought to address in the DMCA. dbrand's interpretation also is more extensive than necessary because the Copyright Act itself provides a thorough

136

statutory framework for the protection of copyrightable content, and dbrand's interpretation of the DMCA is unnecessary and restricts more speech than is contemplated by the Copyright Act. As such, the DMCA – as interpreted by dbrand - does not serve a "substantial" government interest, nor does it directly and materially advance any such interest.

**Affirmative Defense No. 4 Void for Vagueness Applicable to All Counts**

1. The DMCA violates the Fifth and Fourteenth Amendments to the United States Constitution under the void-for-vagueness doctrine, as applied.

2. dbrand contends that certain visual elements it added to the representational scan (*i.e.*, Easter Eggs) serve as protectable content in order to argue for copyrightability, and in order to advance a DMCA removal claim. dbrand contends the visual elements simultaneously serve as Copyright Management Information under the vague and open ended sections of the definition of Copyright Management Information in 17 USC § 1202(c).

3. As interpreted and applied by dbrand, the theory that ***not copying*** protectible aspects of a work constitutes a "removal" of CMI is contrary to the plain language of the statute and impermissibly reads out of the statute the "authorized … under the law" language of § 1202(b). As such, dbrand's definition of "removal" is ambiguous, the open-ended definition of theCMI section is ambiguous and permits selective enforcement, and fails to give adequate warning of the conduct the DMCA proscribes.

**Affirmative Defense No. 5 Due Process Violation Applicable to All Counts**

1. The DMCA's damages provisions, as applied by dbrand, violates the Due Process Clauses of the Fifth and Fourteenth Amendment of the United States Constitution.

2.  dbrand opines that the DMCA provides for statutory damages of $2,500 to $25,000 for each violation of the law.

3.  dbrand did not suffer any damages under the DMCA and, even if dbrand had suffered some injury, the statutory damages provision as interpreted and applied by dbrand is grossly disproportionate to any actual harm.

**Affirmative Defense No. 6 Excessive Fines Applicable to all Counts**

1.  For the reasons stated in the Affirmative Defenses Nos. 3-5, the DMCA as interpreted and applied by dbrand also violates the Excessive Fines Clause of the Eighth Amendment of the United States Constitution.

**Affirmative Defense No. 7 Applicable to All Counts**

**Plaintiff's Counts directed to claims under 17 USC § 1202(a) fail as a matter of law because they are not based on Copyright Management Information or False Copyright Management Information as defined by 17 USC § 1202(c). Applicable to all counts alleging a § 1202(a) claim.**

1.  dbrand has brought a claim against Westside under 17 USC §1202(a) in Count 3 (MacBook), Count 7 (Z Flip), Count 11 (Z Fold), Count 15 (Z Fold) Count 19 (iPad), Count 23 Pixel, Count 27 (iPhone 11), Count 31 (iPhone 12-15).

2.  dbrand has brought a claim against Casetagram seeking to hold Casetagram secondarily liable for acts of Westside under § 1202(a) in Count 4 (MacBook), Count 8 (Z Flip), Count 12 (Z Fold), Count 16 (Z Fold) Count 20 (iPad), Count 24 (Pixel), Count 28 (iPhone 11), Count 32 (iPhone 12-15).

3.  The accused products at issue in these counts against Westside are physical device cover accessory products of Casetagram, although not carried by Westside.

4.  Casetagram is a separately named defendant in this case. Casetagram was incorporated on November 1, 2011.

5.     dbrand was aware of the Casetagram website [www.casetify.com](http://www.casetify.com) prior to commencing the claim against Westside.

6.     Long before the accused time period (which is July 2023 to November 2023), Casetagram had been in the business of providing physical cell phone and device cases of high quality. Casetagram's physical cases provide enumerable benefits to the consumer beyond the image chosen for the external façade of the case.

7.     The physical cases shown on the Casetify website [www.casetify.com](http://www.casetify.com) are shown by example in the images below.

     

8.     Each physical case shown has no image on it.

9.     Each of the physical cases shown has a rim around the lens with the wordmark "Casetify." (Casetify Rim).

10.     The Casetify Rim is not CMI as defined in 17 USC § 1202(c) as it is not used to notify a viewer of copyright rights.

11.     The Casetify Rim is not false CMI as defined in 17 USC § 1202(c). It is not used to notify a viewer of copyright rights and it is not false with respect to the brand name for the physical case.

12.     dbrand's Amended Complaint asserting a § 1202(a) claim includes the following pictures:



13.  Casetagram Physical cases, irrespective of an image thereon or with no image thereon, have the items reflected in the image above on the physical cases (Casetify Hang Tag).

14.  The Casetify Hang Tag is not CMI as defined in 17 USC § 1202(c).

15.  The Casetify Hang Tag is not False CMI as defined in 17 USC § 1202(c).

16.  dbrand's Amended Complaint asserting a 1202(a) claim references a now disabled QR code.

17.  The referenced QR code is alleged by dbrand to link to a general Casetagram webpage.

18.  The referenced QR code does not link to CMI as defined in 17 USC § 1202(a).

19.  The referenced QR code is not CMI as defined in 17 USC § 1202(c).

20.  The referenced QR code is not false CMI as defined in 17 USC § 1202(c).

21.  The alleged CMI items in the § 1202(a) claims against Westside by dbrand are not known by Westside to be CMI.

22.  dbrand's claim of § 1202(a) violations against Westside fail as a matter of law because they are not CMI as defined in 17 USC §1202(c).

23.  dbrand's claim of § 1202(a) violations against Westside fail as a matter of law because they are not false CMI.

24.  dbrand's claim of § 1202(a) violations against other Defendants fail as a matter of law because they are not CMI as defined in 17 USC § 1202(c).

25.  dbrand's claim of § 1202(a) violations against other Defendants fail as a matter of law because they are not false CMI.

4912-5164-1674, v. 3

26. Westside is not liable for acts of other Defendants in dbrand's § 1202(a) claims because they are not based on CMI or false CMI.

27. Use of Casetify branding on a case where unprotectible subject matter is later printed thereon is not a violation under 17 USC § 1202(a).

28. Affirmative Defense No. 1 is incorporated herein as if fully restated herein.

**<u>Affirmative Defense No. 8 Void for Vagueness Applicable to All Counts</u>**

1. Westside incorporates by reference the allegations in Affirmative Defense No. 1-2, 7 as if fully incorporated herein.

2. The DMCA violates the Fifth and Fourteenth Amendments to the United States Constitution under the Void For Vagueness Doctrine, as applied.

3. dbrand contends without factual basis that Casetagram general branding for its cases irrespective of any image applied on a physical case serves as CMI of Westside, Westrock, or Casetagram under 17 USC § 1202(c) for the specific devices in dbrand's Counts 1-32.

4. As interpreted and applied by dbrand, the theory that general branding of a company not specific to any copyrighted work constitutes CMI and/or false CMI under the definition of CMI are ambiguous and permits selective enforcement, and fails to give adequate warning of the conduct the DMCA proscribes.

5. As interpreted and applied by dbrand, the theory that general branding of a company not specific to any copyrighted work constitutes CMI and/or false CMI in and of itself, and/or when used on an image printed thereon, copies unprotectable elements of dbrand's scans makes the definition of CMI under § 1202(c) ambiguous and permits selective enforcement, and fails to give persons adequate warning of the conduct the DMCA proscribes.

141

**Affirmative Defense No. 9 Plaintiff's Counts 29-32 Relating to dbrand iPhone Image Fail as a Matter of Law Because it is not Based on dbrand CMI.**

1.    Affirmative Defense Nos. 1-2 are incorporated herein as if fully restated herein.

2.    JRE is not Copyright Management Information as defined under 17 USC §1202.

3.    JRE refers to Jerry Rig Everything, a pseudonym for Nelson.

4.    Nelson is not an author or owner of any asserted copyright right in this case. *See* **Exhibit 1, dbrand's Responses to Requests to Admit No. 21-27, 32-33.**

5.    Jerry Rig Everything is not an author or owner of any asserted copyright right in this case. *See* Exhibit 1**, dbrand's Responses to Requests to Admit No. 21-27, 32-33.**

6.    Plaintiff's briefing on the Motion for Leave to Amend affirmatively represents that JRE is not a trademark of Plaintiff because they affirmatively represent at Dkt. 105 that dbrand is not contending this as a trademark of dbrand. dbrand's Reply in Support of its Motion for Leave to Amend the Complaint (ECF No. 105) at pp. 11-12.

7.    JRE or any alleged removal of JRE cannot support a claim under 17 USC § 1202(b).

**Dbrand's incorporation date 11.11.11**

8.    November 11, 2011 is alleged to be dbrand's date of incorporation.

9.    dbrand's Amended Complaint alleges that the "2011mAh/11.11Wh" and "11 - 11 - 11" Easter Eggs each refer to the founding date of dbrand (November 11, 2011).

10.    dbrand's date of incorporation or founding date is not CMI as defined under 17 USC § 1202.

11.    None of the works at issue in this case were created on the founding date or date of incorporation of dbrand.

12.    None of the works at issue in this case were registered on November 11, 2011.

13.     dbrand's briefing on the Motion for Leave to Amend confirmed the date of incorporation is not a trademark of Plaintiff because dbrand affirmatively represented this in dbrand's Reply in Support of its Motion for Leave to Amend the Complaint (ECF No. 105) at pp. 11-12.

14.     dbrand's incorporation date, or any alleged removal of Plaintiff's incorporation date cannot support a claim under 17 USC § 1202(b).

### QR Code

15.     In deciding the *GC2 v. IGT*, 391 F. Supp. 3d 828 (N.D. Ill. 2019) case, the court held that a link to "Terms of Use" on a work was not CMI.

16.     "The point of CMI is to inform the public that something is copyrighted and to prevent infringement." *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 928 (N.D. Ill. 2013) (citation omitted).

17.     dbrand alleges that the QR code is a link to dbrand's general website page that is attached as Exhibit C to the Amended Complaint (Exhibit 2).

18.     The website page shown in Exhibit C does not show the dbrand iPhone image at all, does not provide the title for any registered version of the dbrand iPhone image nor does it discuss anywhere that this iPhone image is copyrighted or who may or may not be the owner, and the page refers to Nelson who dbrand admits is not an author or owner (Exhibit 2).

19.     Courts have declined to find CMI when the information provided differed from information in the copyright registration. *See, e.g.*, *Pers. Keepsakes*, 975 F. Supp. 2d at 928 (poem titles were not CMI because they did not match the titles of the works on the copyright registrations).

20.   The website page shown in Exhibit C is a general purpose webpage that does not contain *any* of the alleged image specific CMI for the specific iPhone images at issue in Counts 29-32 (**Exhibit 2**).

21.   The website page shown in Exhibit C provides no statement specific about the iPhone image at issue in Counts 29-32 being copyrighted (Exhibit 2).

22.   To hold that Plaintiff's QR code on the iPhone image is CMI as defined under the definition of CMI under 17 USC § 1202 would make the allocation of the DMCA statute in this case unconstitutionally vague and a violation of due process.

**Affirmative Defense No. 10 Void for Vagueness Applicable to All Counts**

1.   Westside incorporates by reference the allegations in Affirmative Defenses Nos. 1-2, 7, 9 as if fully incorporated herein.

2.   The DMCA violates the Fifth and Fourteenth Amendments to the United States Constitution under the Void For Vagueness Doctrine, as applied.

3.   dbrand contends that JRE, 11.11.11, and a QR code on an unprotectable iPhone scan constitutes CMI notwithstanding its admissions that each do not fall within the definition of § 1202(c) and the work they are applied to is not protectible.

4.   As interpreted and applied by dbrand, the definition of CMI sections are ambiguous and permits selective enforcement, and fails to give persons adequate warning of the conduct the DMCA proscribes.

**Affirmative Defense No. 11 No Infringement of the iPhone Image (pled in the alternative)**

1.   Affirmative Defense No. 1 is incorporated herein as if fully stated herein.

2.   Copyright law strikes a practical balance between the intellectual property rights of authors and the public interest in preserving the free flow of ideas and information and

encouraging creative expression, all in furtherance of the constitutional purpose to "promote the progress of science and useful arts." U.S. CONST. Art. 1, § 8, cl. 8.

3. "Not all copying … is copyright infringement," *Feist*, 499 U.S. at 361, so the plaintiff must also prove that the defendant's copying was wrongful – i.e., that the defendant took enough of his protected expression (as opposed to unprotectable ideas, concepts, facts, etc.) to constitute unlawful appropriation of his expressive work. *Rentmeester v. Nike, Inc.*, 883 F.3d at 1111, 1117 (9th Cir. 2018); *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 100–01 (2d Cir. 2014).

4. As the Supreme Court has recognized, "the mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist*, 499 U.S. at 348.

5. With respect to the element of "copying of constituent elements of the work that are original" dbrand has the sole burden to prove what aspects of its work are original.

6. When an original work contains many unprotected elements, a close similarity between it and another work may not be "wrongful copying." *Zalewski*, 754 F.3d at 101. *See*, *Feist*, (copying unprotectable aspects of a work is not infringement).

7. The Circuit where this case is pending, like most others, uses the "ordinary observer" test for unlawful appropriation: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated *the plaintiff's protect[a]ble expression* by taking material of substance and value." *Wildlife Express Corp. v. Carol Wright Sales, Inc.,* 18 F.3d 502, 508–09 (7th Cir. 1994) (quoting *Atari*, 672 F.2d at 614) (emphasis added).

8. The "ordinary observer" test analysis requires only consideration of protectable aspects and may not be based on unprotectable aspects of the works.

145

9. dbrand has not identified any aspects of the iPhone scan that are original to it and it has instead touted its works as essentially an exact 99% duplicate of a third-party's physical item.

10. In this case dbrand attempts to argue for "thin" copyright protection by the addition of the QR Code, JRE, and 11.11.11. As discussed in Affirmative Defense No. 1, none of these elements are copyrightable and would not provide dbrand with any copyright protection.

11. Assuming, *arguendo*, dbrand's argument that these three "Easter Egg" items are the protectable aspects of the work that make its iPhone image copyrightable, dbrand's own pleadings admit that the accused iPhone Image **did not copy those items** and thus dbrand has admitted the dbrand iPhone scan is not infringed.

12. As required under the law, a virtually identical image is not present with respect to the accused iPhone image. *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007, 1013–14 (7th Cir. 2005).

## Affirmative Defense No. 12 No infringement – Devices at issue in Counts 1-27

1. Each respective accused image in Counts 1-28 are not virtually identical to protectable aspects of dbrand's alleged works.

2. Affirmative Defense No. 11 is incorporated herein by reference as if fully restated herein.

## Affirmative Defense No. 13 Applicable to all Counts Asserted Against Westside

As a work that is not copyrightable to dbrand, or is a copy of a third-party device, dbrand has no standing under 17 USC § 1203 to bring a claim for damages as dbrand does not meet the injury requirement of the statute.

**Affirmative Defense No. 14 Applicable to all § 1202(b) Removal Counts Asserted Against Westside)**

1.    Dbrand has brought a claim against Westside under 1202(b) in Count 1 (MacBook), Count 5 (Z Flip), Count 9 (Z Fold), Count 13 (Z Fold) Count 17 (iPad), Count 21 Pixel, Count 25 (iPhone 11), Count 29 (iPhone 12-15).

2.    Dbrand has brought a claim against Casetagram seeking to hold Casetagram secondarily liable for acts of Westside under § 1202(b) in Count 2 (MacBook), Count 6 (Z Flip), Count 10 (Z Fold), Count 14 (Z Fold) Count 18 (iPad), Count 22 (Pixel), Count 26 (iPhone 11), Count 30 (iPhone 12-15).

3.    Not copying alleged protectable aspects of a work is authorized "under the law" and is not actionable as a § 1202(b) removal claim by the plain language of the statute.

4.    Under the governing law, all copying is not wrongful copying.

5.    **Not copying** alleged protectable aspects of a work cannot be actionable under 17 USC § 1202(b) because:

   A)    it is authorized under the law not to copy alleged protectible aspects.

          and

   B)    it does not induce, enable, facilitate, or conceal an infringement of any right under this title.

6.    Copying unprotectible aspects of dbrand's alleged works does not show intent to induce, enable, facilitate, or conceal an infringement of any right under this title and is also authorized under the law.

**Affirmative Defense No. 15 dbrand Holds No Exclusive Rights To Exclude Others From Making Derivative Works Under Canadian Copyright Law.**

1.    Ownership determinations (on a work-by-work basis) are not only who owns those rights but what rights are owned by the person/entity claiming those rights.

2.      dbrand alleges that it is a Canadian Company claiming it (or its Canadian based employees) created the works in Canada and has alleged it hold rights afforded it under Canadian law.

3.       dbrand represents in marketing and on the website that Nelson designed the works.  This is contrary to the Canadian registration.  As such the Canadian registrations are invalid.

4.      The Court will apply Canadian law to determine the ownership and rights held on a work-by-work basis.

5.      Canadian Copyright right holders do not include exclusive rights to make derivative works. Canadian law does not give dbrand the right to exclude others from making derivative works because

## Affirmative Defense No. 16 Innocent § 1203(c)(5)-1202(a) counts 1-32 (device series) (Applicable To All Counts)

1.      Affirmative Defenses No. 1-15 are incorporated herein by reference.

2.      Westside had no knowledge or reason to believe that ordinary branding by Casetagram not tied to specific images and used even if the cover has no image on it that could possibly be considered CMI under 17 USC § 1202 (c).

3.      To the extent there was any importation or distribution of product with the general branding not considered CMI, and dbrand contends Westside had some involvement. Westside would have done so without knowing, or, with respect to civil remedies under 17 USC § 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

4.      The Court should reduce or remit any damages against Westside.

4912-5164-1674, v. 3

**Affirmative Defense No. 17 Innocent § 1203(c)(5)-1202(b) counts 29-32 (iPhone device series)**

1.      Affirmative Defenses No. 1-16 are incorporated herein by reference.

2.      The Court should reduce or remit any damages against Westside.

3.      To the extent that there was any removal, importation or distribution by others that plaintiff is attempting to impute onto Westside under its litigation-induced legal theories, the Court should find that the same was done without knowing, or, with respect to civil remedies under 17 USC § 1203, having reasonable grounds to know, that it would induce, enable, facilitate, or conceal an infringement of any right under this title.

**Affirmative Defense No. 18 Innocent 1203(c)(5)-1202(b) counts 1-28 (device series)**

1.      Affirmative Defense No. 1-17 are incorporated herein by reference.

2.      The Court should reduce or remit any damages against Westside.

3.      To the extent that there was any removal, importation or distribution by others that plaintiff is attempting to impute onto Westside under its litigation-induced legal theories, the Court should find that the same was done without knowing, or, with respect to civil remedies under 17 USC § 1203, having reasonable grounds to know, that it would induce, enable, facilitate, or conceal an infringement of any right under this title.

**Affirmative Defense No. 19 Copyright Misuse (Applicable To All Counts)**

1.      The Court should disallow all of dbrand's claim for damages including statutory damages in accordance with its discretionary powers under 17 US § 1203(b)(3) because dbrand has engaged in misconduct, copyright misuse in connection with the works at issue.

2.      The allegations of Affirmative Defense No. 22 are incorporated herein by reference as if fully restated herein.

149

**Affirmative Defense No. 20 Unclean Hands (Applicable To All Counts)**

1. The Court should disallow all of dbrand's claim for damages including statutory damages in accordance with its discretionary powers under 17 US § 1203(b)(3) because dbrand has engaged in unclean hands in connection with the works at issue.

2. The allegations of Affirmative Defense No. 22 are incorporated herein by reference as if fully restated herein.

3. All relief should be denied in accordance with the court's discretionary powers pursuant to 17 US § 1203(b)(3).

**Affirmative Defense No. 21 Setoff (Applicable To All Counts)**

1. The Court should setoff any award under Counts 1-32 with any and all losses dbrand due to the acts set forth in Affirmative Defense No. 22 in accordance with its discretionary powers under 17 USC § 1203(b)(3) because dbrand has engaged in unlawful acts in violation of federal and state laws in connection with the works at issue and for which they owe damages.

2. The allegations of Affirmative Defense No. 22 are incorporated herein by reference as if fully restated.

**Affirmative Defense No. 22 Discretion Should be Exercised under 17 USC § 1203(b)(3) not to Award any Relief under 17 USC § 1203(c) (Applicable To All Counts)**

1. dbrand and those acting in concert therewith have engaged in misconduct and unlawful acts in violation of Federal and State and common law which justify this Court's exercise of discretion under 17 US § 1203(b)(3), not to award relief under 17 US § 1203 (c).

**Casetagram, Owner of Protected Computers**

2. Casetagram Limited, is a Hong Kong limited Liability Company.  Herein after, ("Casetagram").  Casetagram was founded on November 1, 2011 or 11-1-11.

3. Casetagram owns several US trademarks, including the trademarks "Casetify" and "CTFY," as well as common law trademark rights.  The "Casetify" trademark is a registered trademark and is incontestable and holds significant good will and value to Casetagram.

4. Casetagram's business can be described in part as a global lifestyle brand specializing in customizable tech accessories, primarily phone cases and electronic accessories. Casetify's success is anchored in its ability to blend technology, fashion, and self-expression, making it one of the leading accessory brands globally and a go-to destination for personalized tech protection and creative design.

5. Casetagram initially gained attention by allowing customers to create personalized phone cases using their Instagram photos, leveraging social media integration for a unique customization experience.

6. Over time, Casetagram expanded its product range under the "Casetify" mark to include a wide variety of tech accessories, offering thousands of designs and extensive personalization options, as well as other products.

7. Casetagram's business model under the Casetify mark centers on:

   • Customization: Customers can design their own cases using personal images from Instagram, Facebook, or direct uploads, and add custom text, making each product unique.

- Artist Collaborations: The company partners with artists, galleries, and cultural institutions to offer exclusive collections, sharing profits with creators and supporting a vibrant artist marketplace.

- Brand Partnerships: Casetify collaborates with major brands and pop culture icons, including The Louvre, The Met, Pokémon, Pixar, BTS, and Coca-Cola, to produce limited-edition accessories that appeal to diverse audiences.

- Trend-Driven Design: The brand positions its products as both functional and fashionable, transforming phone cases into style statements and leveraging influencer marketing to reach a global, trend-conscious customer base.

8. Casetagram serves a worldwide market and operates both online and through select overseas brick-and-mortar locations.

9. Casetagram owns and operates protected computers and protected internet-enabled systems for its website at www.casetify.com as defined under 18 USC §1030 of the Computer Fraud and Abuse Act. (Hereinafter "Casetagram Protected Computers" or "Protected Computers.")

10. Examples of the physical cell phone cases shown on Casetagram's website www.casetify.com, are shown in the images below.

     

11. Each of the physical cases shown have no images on them.

12. Each of the physical cases shown have a rim around the lens with the terms "Casetify Casetify" (the "Casetify Camera Rim") evidencing that the presence of "Casetify Casetify" in its curved form is branding and not copyright management information for any particular image.

13. Casetagram has a registered trademark for the "Casetify Casetify" around the rim, and other registrations for "Casetify" that are incontestable. There is a substantial amount of goodwill associated with the marks.

14. Casetagram physical cases, irrespective of whether they have an image or no image thereon, are branded with a Casetify trademark.

15. If a customer chooses an image to include on their selected case, it may or may not be an image created by Casetagram.

16. The Casetify trademark in and of itself is not used as copyright management information as that term is defined by 17 USC §1202 (c) on the products at issue in dbrand's Amended Complaint. The allegations of Affirmative Defenses Nos. 7-8 are incorporated herein as if fully restated.

17. The Casetagram website and Protected Computers offer significantly and substantially more products than just the small handful of products claimed to be at issue by dbrand.

**Intentional Deliberate Hacking Incident in the form of a deliberate Distributed Denial of Service Attack (DDoS) on Casetagram Computers**

4912-5164-1674, v. 3

18. On November 23, 2023 Casetagram's website www.Casetify.com, protected computers and protected internet enabled systems, suffered a deliberate intentional hacking incident in the form of a deliberate Distributed Denial of Service Attack (DDoS).

19. Hacking attacks against commercial and government systems come in a myriad of forms.

20. One form of attack is a Distributed Denial of Service (DDoS) cyber-attack.

21. A DDoS attack seeks to disrupt the target's website, network, or service, denying legitimate users access.

22. One type of DDoS attack is a Volume-Based Attack.

23. Volume based attacks aim to consume the available bandwidth or system resources of the target by overwhelming it with a massive volume of traffic.

24. The goal is to saturate the network or exhaust the target's resources, rendering it unable to handle legitimate requests.

25. DDOS attacks against websites typically send large volumes of access requests to the website, overwhelming the website servers, causing them to deny access or shut down all together. See https://www.cisa.gov/resources-tools/resources/understanding-and-responding-distributed-denial-service-attacks

26. Cisa provides the following visual to illustrate a volumetric based attack at.

    https://www.cisa.gov/sites/default/files/2024-03/understanding-and-responding-to-distributed-denial-of-service-attacks_508c.pdf

154



*Figure 3: Volumetric-Based Attack Example*

27. This is the type of malicious attack Casetagram suffered on November 23, 2023.

28. Although DDoS attacks are mainly carried out with bots (defined below), the initiators and coordinators of the attacks are humans.

29. DDoS attacks initiated and designed by humans rely upon compromised computers on the internet that have been previously infected by hackers which allows those hackers to coopt the processing power of those machines in a directed fashion against a victim.

30. A DDoS attack of the scale and magnitude such as which Casetagram experienced required that it be attacked by tens of thousands of computers simultaneously. These computers are referred to as a Bot Net, which means robotic network.

31. These Bot Nets are accessed and controlled by hacking groups and other malicious bad actors on the internet, generally without the knowledge of the owners of the actual computers because the processes that the hackers initiate on those computers are running in the background.

155

32. Security researchers have undertaken efforts to identify and track the IP addresses of these bot nets around the globe in order to blacklist them which prevents their connection to legitimate sites such as Casetagram. Unfortunately, new bot nets spring up everyday and it is impossible to blacklist all of the associated malicious ip addresses.

33. While hackers and hacking collectives use these bot nets for their own nefarious purposes many of them also make these bot nets available to third parties who wish to cause damage or mayhem to a particular target. Therefore, one can literally rent a bot net from a criminal hacking group for a period of minutes, hours or days.

34. Evidencing knowledge, motive and intent, Dbrand, its owners (Adam Ijaz and Svatek), its website hosting provider Pantheon, and co-conspirator Zack Nelson conspired to intentionally wreak mayhem on Casetagram through a multi-pronged coordinated specifically timed attack embargoed to be executed simultaneously on Black Friday November 23, 2023. See, e.g. ¶¶ 4-310.

**Weaponization Of DDOS Attacks To Impact Commercial Interests**

35. DDoS hacking attacks are used for multiple reasons, including gaining advantage over competitors in the marketplace.

36. One cyber security company, Stormwall, published the reason attackers use DDoS, and one of those reasons is for:

> "Damaging competitors — until recently, this motivation of attackers was perhaps the most common in our practice: in an effort to gain at least some competitive advantage, some unscrupulous market players launched attacks on their competitors in order to damage them and force their customers to switch to other websites. Such attacks are particularly strong and painful during periods when traffic seasonally spikes, such as the pre-Christmas shopping season."

https://stormwall.network/resources/blog/why-do-ddos-attacks-happen.  (emphasis added).

37. The attack on Casetagram protected computers was on Black Friday 2023, one of the busiest shopping days of the holiday season.

38. As described in detail below, November 23, 2023 was the purposefully chosen, selected, coordinated, and agreed upon as the "launch day" by Co-conspirators Nelson, Ijaz, and dbrand, for their multi-pronged attack on Casetagram. (See e.g. ¶¶ 262-310).  Each co-conspirator financially benefitted from the DDoS and other prongs of the multi-pronged attack.

39. Cyber Security company, Stormwall, additionally notes, "according to our observations, attackers who launch DDoS attacks almost always want to insure that their efforts have been successful and that the availability of the resources they are targeting has decreased significantly for some time. The subsequent reaction may vary, many attackers are ecstatic when they discover the DDOS attack was successful…"

https://stormwall.network/resources/blog/why-do-ddos-attacks-happen.

40. As addressed in the allegations below, dbrand, Ijaz, Pantheon and Nelson all provided social media posts celebrating each aspect of the multi-pronged attack's accomplishments, including the DDoS attack, thus exhibiting classic reactions and behaviors of initiators and coordinators of DDoS attacks.  (See, e.g. ¶¶  75, 106, 299-300, 302-303).

**Log Files and Forensic Evidence**

157

41. In the Counterclaims and Third Party Claims references server log files. As used herein, server log files refer to log files that capture detailed records of all incoming requests to a webserver, including time stamps, ip addresses and request types.

42. During a DDOS event, these logs provide essential visibility into abnormal traffic patterns, such as sudden surges from specific regions or repeated access to targeted resources.

43. Server log files are a critical asset in detecting and responding to DDOS attacks.

44. By analyzing these logs, security teams can quicky identify the nature and source of the attack, distinguish malicious traffic from legitimate users and coordinate an effective response.

45. Moreover, server logs support post-incident forensics, compliance reporting, and legal investigations, making them indispensable for operational resilience and strategic risk management.

46. The Log files of the Casetagram Protected Computers during the relevant time period show pre-established testing of the Casetagram Protected Computers.

47. The log files from the DDoS attack confirm the use of a pre-arranged intentional programmatic DDoS attack scheduled to follow shortly after the specific and precise timing of the known Ijaz embargo lift date and publication of the Nelson video – other prongs of the multi prong attacks (discussed below) (See e.g. ¶¶ 190-636).

48. The log files demonstrate that the volume of internet traffic was artificially generated with hundreds of thousands of requests emanating from a limited set of ip addresses

at speed and volumes inconsistent with normal human activity indicating an automated or computer scripted attack behavior.

49. The log files from the DDoS attack evidence and confirm that the DDoS attack programmatically increased and increased in intensity and frequency until the Casetagram Protected Computer went down on Black Friday, one of the biggest shopping days of the year and, as discussed below, the specific chosen date Ijaz, Nelson and dbrand selected for the lift of the embargo and the launch of their multi-pronged attacks.

50. The log files evidence a point in time when the pre-planned, programmatic, DDoS attack hit and caused the Casetagram protected computers to go down.

51. The other attacks that comprise the multi-pronged attacks on Casetagram discussed below provide additional context for the timing of the DDoS attack and assist in identifying Ijaz, Nelson and dbrand as the initiators and coordinators of the DDoS attack. Those additional prongs of the unlawful attacks on Casetagram comprise separate causes of action from the causes of action pertaining to the DDoS attack.

**The Programmed and Intentional Traffic Spike**

52. On November 22, 2023, Casetagram server logs recorded a typical traffic pattern of 45,588 connection requests per minute to its website.

53. This volume was consistent with the platform's usual activity reflecting standard user engagement and system performance under normal operating conditions during the holiday shopping season.

54. However, on November 23, 2023, Casetagram Protected Computers experienced a massive and highly abnormal surge in traffic due to a malicious Distributed Denial of Service (DDoS) attack.

55. During the attack, requests skyrocketed to 1,089,715,962 (over a billion) total connection requests within just a five-hour time window (from 1 pm to 6 pm UTC).

56. The attack was global in scope with malicious programmed traffic originating from over 40 countries and reached a peak of 39,500,206 requests at 4:30 pm UTC which represented an astounding increase 8,670% compared to the previous days' average baseline traffic.

57. During this same five (5) hour period, the log files revealed that the attack emanated from 221,018 internet protocol (ip) addresses which made on average more than 5 requests per second, each of which represented an addressable location on the global internet. This type of traffic pattern is inconsistent with normal human internet behavior and is consistent with what one would see during a DDoS attack.

58. Of these ip addresses research has determined that 119,889 of these have been flagged by security researchers and companies as being compromised by hackers and used for malicious activity.

59. The scale and coordination of the attack far exceeded normal traffic patterns, overwhelming Casetagram's security infrastructure and severely disrupting its services.

60. Analysis shows that traffic of this volume is more likely than not caused by a pre-coordinated malicious DDoS attack orchestrated by using tools that are licensed or

160

purchased from cyber criminals or by cyber criminals, and not solely an increase in connection requests due to the Nelson viewership going to Casetagram's website following the release of his I've been Robbed video.

61. Consistent with DDoS attacks of this nature observed by leading cyber security experts, this DDoS attack was propagated using a multi-pronged approach which included release by Nelson of a damaging video, outreach to press, coordination with loyal clientele and followers and the extraordinary horsepower of leveraging a bot net to flood the Casetagram website with millions of requests.

**The Initiators and Coordinators of the Multi-Pronged Attack**

62. dbrand, and Ijaz, and their co-conspirator Zack Nelson (described below), have motivation, intent and financial incentive alone and within the conspiracy (defined below) to weaponize a DDoS attack on the Casetagram Protected Computers and protected internet enabled systems to serve their respective and joint commercial interests.

**dbrand, inc. and owners Ijaz and Svatek**

63. dbrand, on information and belief, is a privately held Canadian company headquartered, on information and belief, in Mississauga, Ontario. dbrand initiated the Amended Complaint and original (now dismissed Complaint) in this District.

64. On information and belief, dbrand's business is in the direct-to-consumer online sales of laminated decals, which dbrand call, "skins," (hereinafter "sticker") that must be applied by the consumer to a product for electronic devices such as a cellphone or cellphone case.

161

65. The sticker can be purchased as a stand-alone sticker or in a package with a sticker and blank cell phone cover case for some limited models of cellphones. Either type of purchase requires the sticker to be attached by the consumer.

66. dbrand's Chief Executive Officer ("CEO") Adam Ijaz considers Casetagram a competitor.

67. On information and belief, during the relevant time-period for this dispute, dbrand did not sell device covers for each of the "device categories" in the 32 counts of its Amended Complaint.

68. dbrand represents in the Amended Complaint that it was founded on November 11, 2011 or 11-11-11. A date of incorporation is not within the definition of CMI under 17 USC §1203(c).

69. dbrand's Amended Complaint alleges the existence of hundreds of unauthorized representational scans of hundreds of third-party devices alleged to have been made by dbrand with uncopyrightable de minimis additions, for virtually every device on the market. These acts evidence dbrand's intent to monopolize this device accessory market segment. (See, allegations of Affirmative Defense No. 1-2, incorporated herein by reference as if fully restated herein).

70. Although disputed, dbrand, inc alleges in their Amended Complaint that dbrand, inc is the owner and author of certain images known as "teardowns."

71. dbrand has confirmed in response to requests to admit that Zack Nelson is not an author or owner of any of the designs or any claimed copyright rights. Exhibit 1, dbrand Response to Requests to Admit.

162

72. Canadian copyright laws do not grant to any owner the exclusive right to make derivative works. This is a significant difference between Canadian copyright law and United States copyright law.

73. dbrand and its CEO have clear knowledge and experience with taking commercial advantage of competitors when their websites are crashed. See, e.g. dbrand "Wicked Case Study" written by dbrand's drupal hosting provider Pantheon (described below).



74. Quoting dbrand CEO Adam Ijaz in the "Wicked Case Study":

*Had the site gone down in speed or completely offline, it would have resulted in a catastrophic loss in revenue. As it was, our competitor's site went down and we were able to capitalize.*

**Adam Ijaz**

75. Ijaz is the CEO of dbrand and its majority and controlling owner and the individual quoted in the Wicked Case Study.

76. Ijaz has clear knowledge of the catastrophic damage a DDoS attack would cause on Casetagram, and admits to having capitalized on competitors website crashes in the past.

4912-5164-1674, v. 3

77. Ijaz is the ring leader and the controller of the timing of the launch of the multi-pronged attacks and financially benefitted from the attacks.

78. On information and belief, Ijaz has held the CEO position since November, 2011.  On information and belief, Ijaz has a personal relationship with Zack Nelson in his personal capacity, and as part of a conspiracy to commit the tortious acts described herein.

79. Ijaz personally directed and engaged in the acts in paragraphs 55-636 which are incorporated herein by reference as if fully restated herein.

80. Ijaz was also involved in tortiously sending letters to Casetagram's former employees defaming Casetagram with a link to Nelson's false video, and Ijaz was also fraudulently misrepresenting the applicability of Judge Valdez's Agreed Confidentiality Order as part of a coordinated scheme with dbrand ████ to induce the former employees of Casetagram to disclose non-public information about Casetagram internal business operations. Exhibit 6.

**Markus Svatek**

81. Markus Svatek ("Svatek"), upon information and belief, resides in Austria.

82. Svatek is another ████ of dbrand which markets and distributes goods throughout the United States, including Illinois.

83. Svatek's title, as shown on LinkedIn, is the Chief Technology Officer ("CTO") for

84. dbrand, a role he has held since April 2014.

████████████████████

164

█████████████ in connection with the operation of dbrand and its various online activity.

86. On information and belief, Svatek is part of dbrand's core leadership group working with the CEO, CFO/COO and VP of Customer Experience to set the strategic direction of dbrand.

87. Svatek's expertise in technology plays critical roles at dbrand.

88. Working with Ijaz and others they hold a collective aim to advance dbrand's position as the global leader in device customization and impact protection.

89. On information and belief, Svatek's uses the email bird@dbrand.com for professional communications.

90. On information and belief, Svatek has, since approximately April 2014, been active in the Drupal community, Drupal.org, and goes by the name "Bird-Kid" within that organization.



165

91. Drupal.org has published materials accessible to members like Svatek that educate

92. participants like Svatek and dbrand about DDoS attacks-what a DDoS attack is and

how DDoS attacks are accomplished.

93. Drupal.org has published materials that educate participants like Svatek of the

following:

"A Distributed Denial of Service (DDoS) incident aims to overwhelm a target–be it a server, network, or service–by flooding it with excessive traffic from multiple sources. This deluge renders the target unable to respond to legitimate requests, resulting in a complete service outage."

94. Drupal.org has published materials that educate participants like Svatek about the

severe damages that can be caused to a company that suffers a DDoS attack,

including but not limited to:

"A successful flood of malicious traffic can lead to substantial financial losses. According to a report from the Ponemon Institute, the average cost of downtime for businesses is $5,600 per minute. A prolonged outage during peak traffic could easily amount to losses in the hundreds of thousands."

"The operational impact is significant; businesses may experience severe disruptions and strained resources. IT teams often find themselves scrambling to restore services, diverting attention from strategic initiatives and critical projects."

"Moreover, reputational damage can have long-lasting effects. Customers anticipate reliable service, and a failure to meet this expectation can lead to decreased trust. A survey by Kaspersky indicates that 75% of customers would switch to a competitor after experiencing a major outage."

"Data theft is another pressing concern. Cybercriminals may leverage the chaos to infiltrate systems and extract sensitive information. In 2023, the average cost of a data breach reached $3.86 million, underscoring the potential fallout from such events."

"Mitigation tools and solutions add to operational costs. Organizations must allocate budgets for prevention systems and recovery measures. According to Gartner,

worldwide spending on cybersecurity will exceed $150 billion in 2024, reflecting heightened concerns over potential attacks."

"Deploying security experts can be a significant expense as well. If considering an outsourcing approach, you can hire phonegap developers to bolster your security measures."

"Finally, regulatory implications may arise in sectors that handle sensitive data. Non-compliance with data protection regulations can lead to hefty fines and penalties, amplifying the financial repercussions of an attack."

95. Drupal.org also has materials about how to test websites to determine their vulnerabilities to a DDoS attack and/or how cyber criminals can test in order to surpass measures put into place to safeguard against such attacks.

96. On information and belief, and as a reasonable opportunity for discovery will show, dbrand's hosting provider Pantheon has also provided dbrand with information about how to test and determine a website's vulnerabilities to a DDoS attack.

97. On information and belief and as a reasonable opportunity for discovery will show

98. Ijaz and his business ███ Svatek of Austria, and Pantheon are aware of organizations who can carry out an orchestrated DDoS attacks on a website.

**Pantheon, dbrand's hosting provider**

99. Pantheon is a website operations company with a website Pantheon.io.

100.    On information and belief, Pantheon helps organizations like dbrand build, host, and manage high performance websites using Drupal, among other platforms.

101.    Pantheon uses @getpantheon as the name under which it makes social media posts.

167

102.    dbrand refers to Pantheon as its "Hosting Provider."

103.    Pantheon touts its knowledge of how "Traffic Spikes" impact websites, and the

104.    "Catastrophic Damage" it can cause when a website goes down. See, e.g. Wicked Case Study Post.

105.    On information and belief and a reasonable opportunity for discovery will show, companies like dbrand and Pantheon can test a website's ability to handle certain levels of traffic, using software with high capability to send traffic to the site and monitor the responses based on error code, etc. which can identify for them the threshold at which the website begins to fail.

106.    Pantheon is the author of the "wicked case study" posted by dbrand (referenced in Paragraph 73 above) and has reposted the case study using the @getpantheon moniker and the quote from Ijaz that says:

> Had the site gone down in speed or completely offline, it would have resulted in a catastrophic loss in revenue. As it was, our competitor's site went down and we were able to capitalize.

107.    Pantheon has showcased dbrand as a case study highlighting how to manage a massive traffic spike resulting in a "Million Dollar Day" for dbrand using Pantheon's Drupal Hosting Platform.

108.    On information and belief and as a reasonable opportunity for discovery will show, Pantheon's involvement with dbrand and others in the November 2023 DDoS attack on Casetagram's Protected Computers and other coordinated attacks on Casetagram, is demonstrated in their data and in the celebratory social media posts,

168

including social media posts conspicuously timed with the DDoS attack on Casetagram's website.

109.  By way of example, at 10:02 AM on November 24, 2023, shortly after the intentional DDoS attack on Casetagram, Pantheon reposted the "wicked case study" under a new Post "Boost Your #Black Friday success like dbrand did!"



110.  On information and belief, and a reasonable opportunity for discovery will show, Pantheon, dbrand, Ijaz and Svatek have additional material, data, financial records and documents and communications around the time of the DDoS attack on Casetagram's protected computers, and protected internet enabled systems.  A preservation request was made so the evidence in their possession is to be preserved.

**Zack Nelson and Jerry Rig Everything**

111.  **Exhibit 4** are financial records of dbrand that reflect date, timing and general categorization of payments made by dbrand to Nelson.

169

112.    Nelson received a payment from dbrand labeled "other payment" in the amount of $███████ in November 2023 (the month of the November 2023 DDoS attack on the Casetagram website). **Exhibit 4**.

113.    As reflected in the royalty reports, **Exhibit 4**, this $███████ payment is an outlier for Nelson, as one of the single largest payments Nelson has ever received from dbrand and was in addition to royalty payments for product sales.

114.    On information and belief, and a reasonable opportunity for discovery will show, Nelson has additional material, data, financial records and documents and communications around the time of the DDoS attack on Casetagram's protected computers, and protected internet enabled systems.  A preservation request was made to dbrand's counsel so the evidence in Nelson's possession is to be preserved.

115.    Nelson resides in the State of Utah, on information and belief at ███████ ██████████ and has an office for a Wheelchair Foundation at ██████ ████████████ with himself, his son ██████████ and wife ███████ listed as Officers with an address of ████████████████ ██████████████. Nelson's various agreements and web of corporate entities reflect a myriad of other Utah addresses.

116.    Nelson operates his own online "Influencer" businesses worldwide using the mails and wires of platforms such as YouTube, X, Facebook, Instagram, Reddit, TikTok, Telegram, and his own website, www.jerryrigeverything.com.

117.    All of Nelson's posts and videos are available to be viewed and interacted with worldwide, including in Illinois and this District. Nelson boasts tens of millions of

online subscribers and followers across all platforms including, upon information and belief, in this District.

118.     Nelson describes himself as: "My whole job is literally posting on social media" and as a "professional social media-ist" familiar with the "algorithms" and how poisonous they can be with respect to posts. Nelson boasts about his "size" of command, reach, exposure, control, and monopoly power in how smartphones are repaired ("I'm the single largest source of information on the planet").

119.     Examples of various Nelson posts describing himself are shown in A-C below.



120.     As an individual dependent on on-line connectivity to generate revenue as part of his job, Nelson clearly knows and understands the catastrophic damage a DDoS attack would have on Casetagram's Protected Computers.

121.    dbrand also boasts about Nelson's market power in the social media space and calls Nelson a "Partner."  In paragraph 2 of the Amended Complaint dbrand states: Nelson "posts videos under the username JerryRigEverything ("JRE"), and who currently has over nine million subscribers." dbrand calls Nelson "famous."

122.    As a recipient of royalties and "other payments" from dbrand, Nelson had financial incentive to take commercial advantage of a website crash of Casetagram Protected Computers on a major shopping day like Black Friday. See **Exhibit 4**, Payments to Nelson.

123.    On information and belief, and a reasonable opportunity for discovery will show, Nelson knows how to use his market power and social media algorithms to create massive exposure to his various videos and posts and to drive traffic to specific websites like dbrand's website.

124.    Nelson's reach and engagement metrics demonstrate the likely devastating impact of a post over the wires, especially if the post contains false or misleading representations, incites followers or is followed by harmful actions.  Nelson and dbrand are aware of the impact of Nelson's reach and engagement and utilize it as co-conspirators.

125.    As a professional influencer of his self-asserted stature Nelson knows he has the power to manipulate consumers and, for money, to manipulate consumers and incite viewers as a means to drive traffic specific websites, especially when it benefits the objectives of the conspiracy (as defined below), dbrand, whom Nelson has certain exclusivity arrangements, Nelson's personal bank account, and/or to inflict harm to or obtain an unlawful competitive advantage over dbrand's competition.

172

126.     Nelson makes money in many different ways through his social media posts, including but not limited to, from payments from the platforms he uses to drive traffic to his posts (see e.g. Exhibit 3 monies paid monetizing on You Tube during the relevant time period), from lucrative private royalty deals and payments by companies like dbrand which obligate him and pay him to make posts (see Exhibit 4 Royalty reports with dbrand), and from undisclosed "side deals" and "side agreements" discovery will likely show.

127.     Nelson, and the brands he represents, including dbrand, have affirmative obligations not to makes false, deceitful or misleading representations in the content they provide under Federal Trade Commission ("FTC") regulations and under State Consumer Fraud and Deceptive Trade Practices Acts (also known as "little FTC acts" which allow private causes of action), including the Illinois Consumer Fraud and Deceptive Trade Practices Act.  dbrand is also responsible (and liable) for Nelson's actions.

128.     dbrand's Amended Complaint alleges that Casetagram's website is accessible in Illinois and this District, and thus the harm from the intentional deliberate DDoS attack taking the Casetify.com website offline on November 23, 2023, was inevitably directed to and harm was felt in this District.

129.     Nelson is not a named party to any action initiated by dbrand and has not initiated any claim against Casetagram for copyright infringement or any other claim, even though he falsely represents otherwise in commercial advertising accessible in this District.

130.     Nelson engaged in the tortious acts in paragraphs ¶¶20-636 which are incorporated herein by reference as if fully restated herein.

173

131.     Nelson has also engaged in acts of misconduct specific to and directed to this District in many other ways between February 2024 and December 2024.

132.     On or about February 13, 2024, Nelson received an attorney solicitation letter, which he then provided to dbrand through Ijaz, incentivizing them with indications of a $50,000,000 to $500,000,000 potential statutory damages recovery if Ijaz through dbrand brought copyright claim and DMCA claims in the United States. This lawsuit brought by dbrand, followed exactly three weeks later on March 6, 2024. After admitting dbrand could not proceed with their copyright claim, dbrand voluntarily dismissed the copyright claims.

133.     Nelson personally made posts in social media, such as the one below dated July 2024, soliciting sales of X-Ray products and Teardown products falsely and fraudulently representing that a purchase would support "our litigation against @Casetify" when, in reality, Nelson was not a party to any litigation and as testified to by Ijaz in his January 2025 deposition, Nelson receives a royalty from such sales yet pays nothing towards legal fees in this proceeding. Nelson's posts were intended to cause consumers of his social media in this forum to act or forebear from acting, thereby creating a contact with the Northern District of Illinois.

134.     Nelson is part of a coordinated scheme to make fraudulent misrepresentations on dbrand's attorney's behalf, to induce the former employees of Casetagram to disclose non-public information about Casetagram's internal business operations through improper means by, for example, sending emails over the wires to Casetagram's former employees accusing Casetagram of a crime, via a link to his false video claiming he (Nelson) had been "robbed" and deceptively and misleadingly

174

representing Nelson's involvement in and financial support of this case. **Exhibit 5** (authored by Nelson) and **Exhibit 6** (authored by Ijaz).

135.    Nelson received significant payments of $▮▮▮▮▮ and $▮▮▮▮▮ labelled as "other payments" for August and September 2024, the months Nelson was contacting Casetagram former employees. See **Exhibit 4** and **Exhibit 5**.  These two payments were the second and third highest payments Nelson had ever received from dbrand, with the first highest being the month of the DDoS attack.

136.    As part of this coordinated scheme, Nelson additionally falsely represents the applicability of Judge Maria Valdez's Agreed Confidentiality Order [ECF No. 32].  In fact, Nelson, as a then non-party, was not authorized to access confidential information under the Agreed Confidentiality Order.  See also paragraphs 339 - 364 for fraudulent misrepresentation which are incorporated herein by reference as if fully restated herein.

137.    This Court has personal jurisdiction over Nelson and venue is proper in this District.

138.    Paragraphs 2, 3, 6, 65, 70 and 75 of the Plaintiff's Amended Complaint establish that jurisdiction is proper over Nelson and venue is appropriate in this District. Since 2017, dbrand has had a relationship with Nelson. Videos published by Nelson promoting dbrand's products, including Teardowns, have received tens of millions of views on YouTube. Some of the purported "Easter Eggs" included on dbrand's Teardowns are inside jokes between Nelson and his viewers and thus not copyright management information.  Exhibit 1, dbrand's Response to Request to Admit.

139.    Given the above contacts, jurisdiction and venue are proper in this District over Nelson.

**The Conspiracy**

140.    Under Illinois law, a conspiracy is an agreement between two or more persons for accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and at least one tortious act by one of the co-conspirators in furtherance of the agreement that causes injury to Casetagram.

141.    Ijaz describes his relationship with Nelson as:

████████████████████████████████████████
████████████████████████████████████████
████████████████ jaz Dep. p. 105.

142.    Ijaz's description of his relationship with Nelson is the definition of an "association in fact" enterprise and is within the definition of a conspiracy.

143.    The association in fact Enterprise/Conspiracy commenced in 2019 or earlier for the common purpose of unlawfully using the "idea" of a teardown and exclusive agreements with Nelson's influencer market power to attempt to monopolize a specific market segment of a device accessory market which affects interstate and foreign commerce.

144.    The multi-pronged attacks on Casetagram are tortious acts as is the DDoS attack. See, ¶¶ 4-354.

145.    The conspiracy and the individuals therein have engaged in at least two predicate acts of mail fraud that are related and continuous. See, also, timeline. ¶¶4-354.

146.     There is no question that prior to the events set forth herein, dbrand, Ijaz, Svatak (dbrand's co-owner and VP of Customer engagement),  Pantheon (dbrand's hosting provider), and Nelson, all knew that causing the Casetify.com website to go down on a major shopping day like Black Friday 2023 would cause catastrophic damage to the Casetagram Protected Computers and to Casetagram's business, prospective business and reputation. See e.g. ¶¶ 75, 106, 299-300, 302-303 postings of dbrand and Pantheon.

147.     Ijaz concedes that it is common knowledge that damage to an ecommerce company occurs when their website goes down.

**Teardowns**

148.     dbrand explicitly makes representations in its advertisements that its Teardown skins are scans - not photographs - guaranteed to be 99% accurate representations of the device's internals. **__Exhibit 2__**.

149.     On dbrand's official Teardown product webpage during the relevant time period, the company states: "Every single Teardown skin is guaranteed to be a 99% accurate representation of your device's internals" and reiterates this claim in its product description, highlighting the use of advanced scanning technology to achieve this level of detail (emphasis added).  **__Exhibit 2__**.

150.     This 99% guaranteed accuracy claim is a central feature of dbrand's marketing for the Teardown line, appearing consistently across their website and in influencer and third-party coverage of the product.  **__Exhibit 2__**.

**Background of dbrand's Now Voluntary Dismissed Copyright Claims**

151.    dbrand does not have a United States copyright registration required to commence a copyright action in the United States.

152.    dbrand originally alleged it was exempt from the United States copyright registration requirements, an allegation dbrand knew was factually and legally incorrect. dbrand has since conceded that it is not exempt from the United States registration requirement.

153.    The United States Copyright Office has a publication called the Compendium, providing notice to would be copyright applicants like dbrand about what may or may not be copyrightable.

154.    To avoid scrutiny by the United States Copyright Office, dbrand has not applied for registration of a US copyright, which is required to commence a copyright action in the United States.

155.    By statute 17 USC §409(9), an application for registration would require dbrand to identify what dbrand allegedly contributed to the scans at issue, something it has yet to do in this litigation.

156.    Rather than make that required statutory disclosure to try to obtain a United States copyright registration, dbrand instead abruptly voluntarily dismissed all of its Copyright infringement claims. Dkt 113 ("plaintiff has basically just admitted that they can't pursue the claim"). Dkt 113 ("leave to amend to drop the claim, which is effectively a voluntary dismissal by the plaintiff of that claim.").

178

**Teardown Images Are Not Copyrightable under United States Copyright Law and the Copyright Office's Compendium**

157.     The allegations of Affirmative Defense No. 1 are incorporated herein by reference as if fully restated herein.

158.     The idea of a teardown is not copyrightable.

159.     The merger doctrine prevents the use of copyright to protect an idea or procedure.

160.     If an idea or procedure can be expressed in only a few ways, it is easy to copyright every form in which the idea can be expressed, indirectly protecting the idea itself. 4 NIMMER ON COPYRIGHT § 13.03[B][3]; see also Morrissey v. Procter & Gamble Co., 379 F.2d 675, 678–79 (1st Cir. 1967).

161.     To guard against this kind of overprotection, when an idea can be expressed in only limited ways, courts say that the expression "merges" into the idea and cannot receive copyright protection. Lexington Homes, 858 F.3d at 1102.

162.     The concept of  a tear down image is not protectable because it is an  "idea." 17 U. S. C.  Section 102( b) ; see Golan v.  Holder,  565 U. S.  302, 328 ( 2012) (discussing the " idea/ expression dichotomy) " and to the extent dbrand's designs mimic   the interiors of phones,  they " have ' merged'  with the idea itself"  and cannot  be protected without  effectively protecting the idea.   Altai,  982 F. 2d at 708; see Design Basics,  994 F. 3d at 889 (discussing the merger doctrine).

163.     dbrand's CEO confirmed at his January 9-10, 2025, deposition that he did not get authorization from the third-party device manufacturers to make scans of the interior of their products. dbrand's unauthorized copying of the device manufacturer's

work is not copyrightable to dbrand. 17 USC §103. See also, Compendium 313.4(A). (a work that is a mere copy of another work of authorship is not copyrightable).

164.    dbrand claims to have made unauthorized representational scans of hundreds of third-party device interiors, which are not, as a matter of law, copyrightable to dbrand. 17 USC §103. See also, Compendium 313.4(A). (a work that is a mere copy of another work of authorship is not copyrightable).

165.    dbrand's website, Exhibit C, represents each image is "guaranteed to be 99% accurate" depiction of the third-party device. Exhibit 2.

166.    Describing himself, untruthfully, as an author, by using "we" Nelson describes in commercial advertising the process to create dbrand's images as:

> We first scan the phone in ultra-high 2400 dpi resolution, giving us an image up to about 41 thousand pixels wide by 30 thousand pixels tall — enough detail to print out on a billboard.
>
> Then it takes about ten hours worth of editing a first draft in Photoshop before producing prototypes, making adjustments, and getting it ready for mass production.

167.    The dbrand Amended Complaint alleging the scanned images are photographs, is misrepresentative.

168.    With the admission that the images are scans and are "guaranteed" to be 99% accurate to the third-party device, dbrand, at best, concedes it made a 1% or a de minimis contribution, which is not, as a matter of law, copyrightable.   Copyright Office Compendium 314.(B). (de minimis changes are not copyrightable). See

180

Exhibit 2, Plaintiff's website Exhibit C image is "guaranteed to be 99% accurate" depiction of the third-party device.

169.    In its Amended Complaint, dbrand generally alleges that dbrand uses a computer program to touch up the representational scan, and in commercial advertising they describe the computer program as Photoshop.

170.    Mere variations of coloring are not copyrightable and "The Office cannot register mere variations in coloring, regardless of whether the variations are made by hand, by Computer or by other processes, 37 CFR 202.1(a) ("If the author merely added or changed a few colors that appear in a pre-existing work of authorship or merely added, changed or combined expected or familiar sets or pairs of colors, the Office may communicate with the applicant or may refuse to register the claim."). Compendium 313.4(K).

171.    dbrand alleges in its Amended Complaint that it added certain "Easter Eggs" to each of the representational scan images.

172.    The Code of Federal Regulations, 37 CFR § 202.1, titled "Material not subject to copyright," states: "The following are examples of works not subject to copyright and applications for registration of such works cannot be entertained: (a) Words and short phrases such as names, titles, and slogans; familiar symbols or designs; mere variations of typographic ornamentation, lettering or coloring; mere listing of ingredients or contents."

173.    Words and short phrases are not copyrightable. Compendium 313.4(C).

174.    "Catchwords, catch phrase, mottos, slogans, or other short expressions" are,

181

likewise, not copyrightable. Compendium 313.4(C).

175.    Facts are not copyrightable.  17 USC §102.

176.    Numbers are not copyrightable. Familiar symbols and designs (such as numbers, i.e., the number 11) are not copyrightable. See Compendium 313.4(J).

177.    The name of a business organization, name of a product or service, domain name or URL are not copyrightable. Compendium 313.4(C) (emphasis added).

178.    The addition of the non-copyrightable "Easter Eggs" to each of the non-copyrightable unauthorized scans of third-party devices, does not create copyrightable subject matter for dbrand or otherwise turn a non-copyrightable scan into copyrightable subject matter.

179.    Dbrand's CEO testified that ████████████████████████████ ████████████████████. Thus, the QR code is not an original creation of dbrand, but instead a creation of ████████████ program.

180.    The QR code is functional and thus not copyrightable. 17 USC §102.

181.    The QR code is not dbrand's originality.

182.    dbrand holds no protectable copyright rights in the images applicable to each of the Amended Complaint Counts 1-32 and which are being used by the Enterprise/Conspiracy to try to monopolize a category of device accessory market.

183.    dbrand's own website content, far from informing a reader that a specific image is copyrighted - the purpose of CMI, publicly admits the images themselves are not protectable subject matter through its 99% guarantee. Exhibit 2.

184. Copyright law strikes a practical balance between the intellectual-property rights of authors and the public interest in preserving the free flow of ideas and information and encouraging creative expression, all in furtherance of the constitutional purpose to "promote the Progress of Science and useful Arts." U.S. CONST. art. 1, § 8, cl. 8.

185. "Not all copying … is copyright infringement," *Feist*, 499 U.S. at 361. (a case where access and copying were admitted).

186. All copying is not wrongful copying under the United States and Seventh Circuit copyright law, and, under Canadian law, a copyright owner holds no exclusive right to derivative works.

187. Before asserting claims of infringement based on unprotectable elements, dbrand has an affirmative obligation to consider the unprotectable elements of the work and not seek to assert the unprotected elements as infringing.

188. The conspiracy's assertion of copyright beyond its scope and based on unprotectable elements constitutes tortious interference with Casetagram's perspective business or economic advantage.

**Conspiracy Attempt to Monopolize**

189. The doctrine of Copyright Misuse prevents copyright holders from leveraging their limited monopoly to control areas outside the scope of their copyright.

190. Copyright misuse is a form of unclean hands. It is an act of copyright misuse to assert rights beyond the scope of the copyright rights owned and to do so in a manner that impacts Casetify branded products that have nothing to do with teardowns

183

especially with the conspiracy member's intent to monopolize the teardown device accessory category.

191.    The multi-pronged attacks are an example of widescale copyright misuse intended to assert rights beyond the limited scope of copyright and are tortious acts.

192.    The 2019 Conspiracy's combination of Nelson's social media reach and engagement metrics and false claims coupled with hundreds of unauthorized representational scans of third party devices allegedly made by dbrand with uncopyrightable de minimis additions, shows a specific intent to monopolize, and the acts herein show market power and anticompetitive conduct to effectuate a monopoly over non-protectable aspects of a teardown or the idea of a teardown and an intent to eliminate a perceived competitor through unlawful means, all over the wires.  See ¶¶ 1-191 incorporated herein by reference.

193.    The items dbrand claims are copyrightable are not copyrightable under United States Copyright Law. See ¶¶ 148 - 188 and Affirmative Defense No. 1 incorporated herein by reference as is fully restated herein. Claiming protection broader that what the copyright law allows in order to try to monopolize a market and prevent competition is a form of copyright misuse.

194.    Copyright misuse prevents the enforcement of copyright and DMCA claims until the misuse ceases.  It has not ceased.

195.    The Conspiracy members have and continue to engage in egregious acts of anticompetitive behavior in an attempt to monopolize.  Their acts justify a denial of enforcement of the copyrights and the DMCA claims in this case, and for this Court to exercise discretion not to award statutory damages under 17 USC §1203(b)(3).

196.     The Conspiracy members have engaged in at least two or more related and continuous predicate acts over the wires, and they participate in the Conspiracy affairs through a pattern of acts.

197.     The activities of the Conspiracy and the individuals involved therewith affect interstate and foreign commerce. The predicate acts over the wires commenced in the summer of 2023 and are continuing through today as set forth below.

**Conspiracy to Engage in Multi-Pronged Attacks on Casetagram**

198.     Nelson, Ijaz and dbrand as members of the Conspiracy, have several exclusivity arrangements in written and unwritten form with each other and/or their companies.

199.     Although legally untrue as evidenced by their written agreements, when opportunistic to do so (i.e., for a scam or to elicit sympathy in Nelson's online community and with his followers), both Ijaz and Nelson each hold themselves out to the public as "Partners" and Ijaz says that "Partner" is a fair characterization of his relationship with Nelson.

200.     There are written agreements between their companies which state the companies are not a ███████████████████.

201.     Despite written agreements expressly stating that there is no partnership or joint venture, Nelson also opportunistically has expressly, and deceptively described, worldwide, his relationship with dbrand in one of his commercial advertising video posts sent over the wires, knowing it to be false:

"Keep in mind that this is a true partnership between dbrand and I; we share profits like partners, and we're constantly growing the product line and figuring out which devices to support next. Since that launch in December of '19, we've supported over 100

185

devices with Teardown skins, and we'll keep going as long as you support us or until Apple stops making an iPhone — whichever comes first."

202.     Nelson, in furtherance of his role in the Conspiracy, and during the months of August/September 2024 where Nelson is paid "other payments" of $███████ and $███████ (Exhibit 4) has also been using the Judge Valdez Agreed Confidentiality Order [ECF No. 32], and his self-described "famous" personality and social media market power, and the descriptor of "our case," to defame Casetagram, fraudulently induce Casetagram former employees in breach of their employment agreements and confidentiality obligations, to disclose non-public internal business operations of Casetagram, a competitor. See **Exhibits 7-8** and see example below.



203.     Nelson has both written and unwritten agreements under which he receives substantial compensation to make posts in the Teardown market segment exclusively for dbrand.

186

204.     One thing Nelson is not - he is not an author or owner of any of the alleged copyright rights being asserted in dbrand's litigation against Casetagram.  **Exhibit 1** dbrand's Responses to Requests for Admission.  Thus, when Nelson states that "Casetify" robbed Nelson, it is a literally false statement, as well as deceptive and misleading false advertising under the Lanham Act and related State and common laws.

205.     Instead, as disclosed for the first time in January 2025, dbrand has a contractual arrangement with Nelson in which, in the words of Ijaz, ██████████████████ ███████████████████████████████ (emphasis added).

206.     One of Nelson's agreements with dbrand states under Section 1.1.1:

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

207.     The contracts with dbrand require Nelson to act exclusively for dbrand for teardowns, with few exceptions.

208.     On information and belief, Nelson is obligated to create content that promotes dbrand products and to use dbrand's "irreverent" style.

209.     Ijaz describes the dbrand "irreverent" marketing style as ones where the marketing statements "████████████████████████████████".

210.     According to Ijaz himself, Ijaz does not believe dbrand has to ████████████ ██████████████.

**Creation Of False Nelson Video as part of a Multi-pronged Coordinated Plan to Attack Casetagram on Black Friday 2023**

211.     The illicit and malicious November 23, 2023 DDoS attack was but one component of a multipronged attack on Casetagram.

212.     Ijaz, CEO of dbrand describes a click bait video as a marketing tactic.

213.     Ijaz uses the following to describe "Click Bait":



and

214.     Ijaz also states:

215.     Between the summer of 2023 and November 23, 2023, Nelson, Ijaz and dbrand devised and executed a multi-pronged plan to engage in a multi-faceted coordinated, specifically timed series of on-line malicious and illicit attacks on Casetagram's entire business and, as the log files on Casetagram's protected computers demonstrate, to harm Casetagram's protected computer with a DDoS attack.

216.     Knowing that Nelson is not an author or owner of any of the alleged copyright rights being asserted in dbrand's litigation against Casetagram, (Exhibit 1, dbrand's Responses to Requests for Admission), one fraudulent and deceitful aspect of the online staged pre-planned malicious and illicit attack, was to purposefully create, click bait style, a video to falsely claim and publicize Nelson as a victim of a crime.

217.    This marketing component of the unlawful plan was code named internally among the co-conspirators as ██████████ and was done so with the specific intent to incite online viewers and Nelson's "loyal followers" with this deceitful and false representation.

218.    Another aspect of the multifaceted online staged pre-planned malicious attack was to make sure Nelson, dbrand, Pantheon, and others would make money for themselves as they harmed Casetagram's Protected Computers. The code name for this was set forth in co-conspirator Pantheon's November 24, 2023, post just after the successful DDoS attack "Boost Your #Black Friday success like dbrand did!" (See e.g. ¶106 incorporated herein by reference as if fully restated herein).

219.    A still further component of the coordinated attacks on Casetagram and the Casetagram Protected Computers included pre-arranged media aspects with ██ ████████ media outlet ████████ at the ████ See Exhibit 9.

220.    As part of the online pre-planned malicious illicit attack, co-conspirators agreed to make a commercial advertising a Black Friday introduction of a new product line (the X-Ray product) using false and misleading representations tied to Nelson being "robbed."

**Idea and Creation of the Script for the Click Bait Video**

221.    According to Ijaz, Nelson came up with the idea to create a video about dbrand's dispute with Casetagram. Nelson would distribute it over the wires in "click bait" fashion.

189

222.     Ijaz and Nelson's intent from the beginning was to mislead consumers into falsely believing that Casetagram did something to Nelson, when both knew that to be literally false and a false or misleading description of fact.

223.     Based on Ijaz representation, and on this information and belief, sometime in the summer of 2023 Ijaz had his friend ███████ make a clandestine purchase of Casetagram products for Ijaz. ████ is believed to be a tech You Tuber operating under the name ██████ who has collaborated with dbrand. These items are now "missing" and were not produced by dbrand.

224.     In between Aug 2023 and Oct 2023 Ijaz, dbrand and Nelson, and Matthew Nyman and Nyman's company commissioned by Ijaz and paid for by dbrand, each personally participated in the creation of the click bait video.  See Ijaz Dep. pp. 146-147.

█████████████████████████████████████████████████

225.     Ijaz confirmed that he sent the items to Nelson over the wires, i.e., digitally over ███████, in furtherance of the preparation of the click bait video.

226.     Internal documents associated with the creation of the click bait video using the descriptor ███████████ clearly show the co-conspirators Nelson, Ijaz and dbrand's intent to create the false and fraudulent representation in the marketplace that Nelson, who is not the owner or author of the works, was the victim of a crime committed by Casetagram, which is both legally and factually false and/or materially misleading. See, e.g. **Exhibit 8.**

190

227.    Ijaz in his individual capacity and as a dbrand representative, provided content and talking points and paid for and used his retained contractor to edit the click bait video.  Ijaz also confessed to seeing the video before it was launched and thus knew of its contents before it was disseminated. Ijaz's attempt to paint the video as an independent Zack creation is false.

**Writing of the Script**

228.    According to Ijaz, Nelson alone wrote the script for the video, which contains knowingly, and materially false representations intended to deceive, commit copyright misuse, and distribute over the wires false and misleading representations along with a false monetization scheme, all which were eventually sent over the wire.

229.    Nelson's statements are representations that are "likely to deceive reasonable consumers" and mislead "a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances[.]"  See, e.g. ¶¶  223-246.

230.    Based on the comments to the video, viewers and consumers were actually deceived and misled and many were "incited."

231.    Nelson is not an author or owner of the alleged copyrights (See dbrand's Responses to Requests to Admit), nor of the scans purportedly "stolen." Nelson before this counterclaim was not a party to any lawsuit concerning any alleged "robbery" or "theft" of these images from Nelson. Click Bait style, Nelson made the below false, fraudulent and deceitful misrepresentation:



Got something a little bit different for you today; a video I never thought I'd have to make. There's a company, a company you've all heard of, and a company worth probably close to a billion dollars that's stealing my stuff. And today, we're going to fight back the way Uncle Sam intended — with a lawsuit.

It's CASETiFY.

CASETiFY is stealing my stuff, and the story of how I found out is rather fascinating.

232.     This Nelson set of representations are the definition of consumer fraud (trying to get a purchase from consumers under false pre-text), and contains false and misleading statements of fact and/or descriptions of fact  and/or is a misuse of a trademark.

233.     As confirmed by Ijaz, Nelson pays nothing toward the fees and expenses for dbrand's lawsuit and Nelson conceals and does not disclose in the video that Nelson actually receives payment of monies under the label ▮▮▮▮▮ for the sale of the X-Ray products being peddled. (The royalty payment is over and above the $▮▮▮▮▮ ▮▮▮▮▮ payment Exhibit 4 conspicuously timed with the DDoS attack).  The "other payment" was not disclosed in the video.

234.     In other words, Nelson was intending to line his own pocket with royalties from the X-Ray line through the script he wrote for dbrand and used for the advertisement "I've Been Robbed" video and the video itself. Royalty statements **Exhibit 4.**

192

235.    Additionally, and with an intent to deceive and mislead the consumer, Nelson

tells consumers in the video:

"Lawsuits aren't cheap, though, and normally I would say if you want to help us
thwart thievery, you could just buy a Teardown skin. But I imagine most of you
watching this probably already have one, so dbrand and I created something a little
special instead: an all-new X-ray skin."

and

"If you want to support the channel and our fight against an unprincipled behemoth or
just want the coolest-looking device on the planet, I'll leave a link for these x-ray
skins down in the video description. And thanks to ton for watching; I'll see you
around."

236.    Nelson also made reference in the video to obtaining a share of proceeds from a

litigation he was not a party to and for which he held no rights.  This is also deceitful,

false and misleading statements or representations of fact.

237.    To further manipulate and mislead consumers and to fabricate sympathy, Nelson

included the following representation about his wheelchair manufacturing facility into

the click bait video in order to generate sympathy and mislead consumers while

concealing the fact that he, Nelson, was personally obtaining payments from dbrand

for each sale of the X-Ray line.  Exhibit 4. Quoting Nelson for this false and

misleading representation:

"I'll turn CASETiFY's thievery into furnishing my wheelchair manufacturing facility
with laser cutters, CNC mandrel benders, and just give away wheelchairs for free as
long as I can.

For the past three years, I've thrown every extra penny I have at my wheelchair
manufacturing business, and if we win anything, I'll continue to do just that."
Emphasis added.

238.     The representations in this Nelson video are literally false, misleading and or are likely to mislead consumers as well as directly harm and damage Casetagram, its brand, and Casetagram's protected computers. Based on comments left under the video, consumers were actually deceived and misled by the statements made in Nelson's video.

239.     Finally, Nelson placed in the "I've Been Robbed" script the following representation:

"Keep in mind that this is a true partnership between dbrand and I; we share profits like partners" (emphasis added).

240.     Yet the ██████████████████████████████████:

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

241.     Both Nelson and Ijaz reviewed the script before it was used for the video and allowed each of these knowingly false, deceitful, and misleading statements to remain.

242.     The FTC is the federal government agency in the United States that regulates general advertising and marketing activities. In that vein, the FTC also regulates social media influencer content by enforcing truth-in-advertising standards. The FTC has noted that anyone who "work[s] with brands to recommend or endorse products" must comply with the law when making a recommendation or endorsement.

243.     In this context, an influencer is essentially anyone a celebrity, expert, or ordinary consumer who shares content that could influence others' purchasing decisions. The rules apply regardless of the person's level of fame or follower count.

244.     The FTC requires that both brands and influencers share responsibility for ensuring disclosures are made correctly.

245.     Outside of the United States, the European Union has classified influencers as "anyone making money through creating social media content."

246.     More specifically, they have described influencers as "content creators who often advertise or sell products on a regular basis.

247.     National Advertising Division ("NAD") of the BBB National Programs is a non-governmental, industry-regulatory body that oversees advertising disputes among member companies. The NAD has rejected celebrities' arguments that no disclosure is required where their followers are likely aware of their connections to brands due to long-standing and public endorsements. Thus, even where a celebrity has a high-profile status and extensive promotional activities for brands, NAD has found that a significant minority of the audience for an endorsement might not understand or expect the connection or would evaluate it differently knowing that the endorsement was motivated by a material connection.

248.     In this regard, NAD has noted that consumers might have varying levels of engagement with brands and celebrity endorsements, some viewers might not have seen prior promotions, and others might only be familiar with the brand through other influencers and advertising. Even where celebrities have millions of followers and promote their brand partnerships elsewhere, the NAD found that the celebrity must, nevertheless, provide a clear and conspicuous disclosure of the connection and sponsorship.

249.     The provisions on deceptive marketing practices in Canada's Competition Act apply to influencers. The Competition Bureau, an independent law enforcement agency protecting consumers, has issued guidance on how influencers can comply with these legal requirements when promoting a product or service.

250.     This guidance discusses when to disclose material connections, best practices on the disclosures, and guidance on making accurate claims. What counts as a "material connection" is broad: receiving payment in money or commission, free products or services, discounts, free trips or tickets, and any personal or family relationship all would require a disclosure. (emphasis added). Disclosures themselves must be as visible as possible, as well as clear and contextually appropriate. Emphasis added.

251.     At a high level, the Competition Bureau applies the same principles as the FTC.

252.     Social media influencers like Nelson have their own fame and influence beyond promoting the company brand.

253.     It is important for the parties to such a relationship (i.e., influencer Nelson and brand dbrand) to understand that the public may confuse the influencer with the brand and/or the products.

254.     Both the influencer - Nelson - and the brand - dbrand - have an affirmative

255.     obligation not to make false or misleading representations in the content that is posted or reposted by them.  See e.g 15 USC 1125(a).

**Speaker and Use of Nelson Influencer Persona**

256.     Nelson was the influencer who spoke the words on the click bait video, which he, Ijaz and dbrand knew was intended and destined to be distributed over the wires

196

through Nelson's You Tube Channel "Jerry Rig Everything" as part of a multi-pronged coordinated attack.

257.　　According to Ijaz, Nelson himself picked the click bait title "I've Been Robbed," even though Nelson does not own any of the copyright rights nor any of the images.

**Review and Editing of the Recording of the "I've Been Robbed" Click Bait Video**

258.　　Nelson recorded the "I've Been Robbed" video and/or had it recorded on his behalf while he was speaking.

259.　　Nelson made the "I've Been Robbed" video containing the false and misleading representations available to Ijaz to view before it was released. Ijaz admits to reviewing the "I've Been Robbed" click bait video before it had been released.

260.　　Nelson provided the click bait video to Ijaz contractor to edit the "I've Been Robbed" click bait video.

261.　　dbrand paid the invoices for the editing of the "I've Been Robbed" click bait video.

**The Embargo and Coordination with Other Attacks**

262.　　The individuals involved in the Conspiracy placed the click bait video in a holding que to coordinate the release of the "I've Been Robbed" advertising video at a certain specific designated time on Black Friday November 23, 2023, when Ijaz lifted the embargo and had coordinated other attacks to occur at the same time.

197

**The Embargo and the DDoS ATTACK**

263.     It is common knowledge with dbrand, Nelson, dbrand's hosting provider

Pantheon, and its co-conspirators that an outage on an e-commerce website on a

major shopping day like Black Friday would cause "catastrophic damage" to

Casetagram and its protected computer.

264.     On Black Friday 2023, while dbrand, Ijaz and Nelson, with other co-conspirators

and Nelson's "loyal followers" launched a premeditated, planned, coordinated,

precisely timed embargoed attack on Casetagram from the marketing and media and

social media angles, the log files and forensic evidence also shows, there was a pre-

established planned intentional hacking attack arranged for the Casetagram Protected

Computers.

265.     The pre-established, planned intentional hacking attack was done with specific

knowledge and intent to harm Casetagram and its Protected Computers, and without

authorization, to damage, i.e., impair the availability of data, program, systems, or

information, the Casetagram Protected Computers on a major shopping day.

266.     Casetagram's website falls withing the definition of Protected Computers as

defined in 18 USC §1030(a)(5)(A) of the Computer Fraud and Abuse Act (CFAA).

267.     The Protected Computers are used in or affect interstate or foreign commerce,

including a computer located outside the United States that is used in a manner that

affects interstate or foreign commerce or communication of the United States. dbrand

concedes this in its Amended Complaint.

268.    The CFAA also supports vicarious liability claims where the defendant directly induced another party to violation 18 U.S.C. §1030.

269.    On information and belief and a reasonable opportunity for additional discovery will show, members of the Conspiracy are initiators and coordinators and had an active role in the malicious hacking attack by directing, encouraging, or inducing a CFAA violation.

270.    On November 23, 2023, Black Friday, an intentional, programmatic DDoS attack occurred that caused the Casetagram protected computers to be damaged in an amount greater than the jurisdictional minimum amount of $5,000 due to lost sales, the resources used to address and get the website up and running after the attack, as well as reputational damages.

**Timeline of Events Leading Up to the Deliberate Preplanned Intentional DDoS Attack**

271.    As the log files related to the DDoS attack reflect, the DDoS attack was pre-established, and the testing of the Protected Computers and balancers by the attackers was undertaken during the embargoed time period to determine what the Casetagram Protected Computer could and could not tolerate.

272.    All aspects of the pre-planned online staged malicious illicit attacks were held under the Ijaz imposed ████████ to be unleashed at a precise pre-planned time coordinated with the pre-established, preplanned intentional DDoS attack.

273.    On or before November 10, 2023, Ijaz contacted an individual named ████ ████ of the media outlet the ████ who asked for a copy of the video and imagery and made an introduction to ████████████ of the ████

199

274.    Through the wires, on November 10, 2023, Ijaz wrote:



275.    Ijaz expressly stated that anything in the shared folder was "fair game" except it must be kept confidential until the embargo set by Ijaz was lifted.

276.    On November 12, 2023, Ijaz provided additional information to Roth through the wires, and again states:

███████████████████████████████████████████████████████████

277.    On Monday November 13, 2023, Emma Roth confirmed through the wires that she accessed the video through the wires in the ███████████████."

278.    On Monday November 13, 2023, Ijaz represented that this is just a ██████ ███████ matter and, that he did not contact Casetify.

279.    Not contacting a suspected intellectual property violator to make a request to take down items is not typical. Indeed, dbrand has had other companies it believed infringed its rights and did not engage in the same online malicious illicit attacks against them as it did against Casetagram.

280.    On November 13, 2023, ████ of the █████ agreed to use the information provided over the wires by Ijaz to prepare for further distribution from ████ under the guise of an independent news article.

200

281.     On November 13, 2023, Ijaz told ███ the "██████████████" has been

extended.

282.     On November 17, 2023, ████ wrote to Ijaz asking when the ████████████

would be lifted.

283.     On November 17, 2023, Ijaz wrote to ████:



284.     On November 17, 2023, Roth confirmed the embargo lifting dates and times

identified by Ijaz and asked for the video to be sent to her and she and Ijaz continued

the honor the embargo.

285.     On November 22, 2023, through the wires Ijaz sent the following to ████

providing through the wires access to the "I've Been Robbed" click bait video

containing false and misleading representations and confirmed the coordinated time

between other co-conspirators Nelson and Ijaz and identifying an additional

participant, ██████████████).  Quoting Ijaz:



286.    On information and belief and as a reasonable opportunity for discovery will

show, ▮▮▮▮▮ is the senior editor and founding member of the ▮▮▮▮

287.    ▮▮▮ confirmed that the redistribution of materials sent by Ijaz was ready to go

on the ▮▮▮▮ lift date, Black Friday November 23, 2023.

288.    With co-conspirators Nelson and ▮▮▮ in agreement with Ijaz and dbrand on the

date and time for the coordinated attack, on information and belief and discovery will

show the conspiracy, dbrand and Ijaz made further preparations to further the attack

on Casetagram and Casetagram Protected Computers.

289.    In furtherance of the scheme, Ijaz, using the wires on a pre-arranged coordinated

embargo lift date and time, prepared to disseminate links to the Nelson "I've Been

Robbed" video containing false and misleading representations.  Ijaz estimates at

least ▮ such communications were sent by him alone through the wires. **Exhibit 9**.

290.    As the "teaser" leading up to Ijaz' specifically timed lifting of the embargo and

release of the embargoed coordinated set of attacks on the Casetify brand and the

Protected Computers, dbrand posted, nine hours before the pre-arranged Nelson

video's release, the following statement:



294. Log files for Casetagram's protected computers show, shortly before the lift of

the embargo and the pre-planned timed release of the Nelson video at 9am ET, as part

of the pre-established DDoS attack, the attacker's testing of the Casetagram Protected

Computers commenced.

295. Pre-established testing of the Casetagram Protected Computers evidences pre-

establishment of and pre-planned nature of the attack, and is done to see how much

traffic the protected computer can tolerate before the protected computers will crash.

**The False Nelson Video Launch**

296. As planned by the Conspiracy, Nelson's "I've Been Robbed" video containing

the false representations and plea for consumers to purchase unrelated X-Ray

products under the false pretext to help their fight against "Casetify" was launched on

the pre-arranged, planned ███████ lift date and time on You Tube.

297. Exhibit 3 shows Jerry Rig Everything's' platform views were in the multiple

millions higher than his normal traffic. For example:

| Date | Subscribers | | Views Increase | Views | Estimated Earnings |
|------|------|------|------|------|------|
| 11/19/2023 | -- | 8.16M | 723,836 | 1,872,118,345 | $181 - $2.9K |
| 11/20/2023 | -- | 8.16M | 1,269,415 | 1,873,387,760 | $317 - $5.1K |
| 11/21/2023 | -- | 8.16M | -- | 1,873,387,760 | $0 - $0 |
| 11/22/2023 | -- | 8.16M | 1,628,732 | 1,875,016,492 | $407 - $6.5K |
| 11/23/2023 | 20K | 8.18M | 2,411,137 | 1,877,427,629 | $603 - $9.6K |
| 11/24/2023 | 20K | 8.2M | -- | 1,877,427,629 | $0 - $0 |
| 11/25/2023 | 10K | 8.21M | 2,509,041 | 1,879,936,670 | $627 - $10K |
| 11/26/2023 | 10K | 8.22M | 3,509,704 | 1,883,446,374 | $877 - $14K |
| 11/27/2023 | -- | 8.22M | -- | 1,883,446,374 | $0 - $0 |
| 11/28/2023 | 10K | 8.23M | 1,114,156 | 1,884,560,530 | $279 - $4.5K |
| 11/29/2023 | -- | 8.23M | 1,981,892 | 1,886,542,422 | $495 - $7.9K |
| 11/30/2023 | -- | 8.23M | 1,320,853 | 1,887,863,275 | $330 - $5.3K |
| 12/1/2023 | 10K | 8.24M | 1,043,182 | 1,888,906,457 | $261 - $4.2K |
| 12/2/2023 | -- | 8.24M | -- | 1,888,906,457 | $0 - $0 |
| 12/3/2023 | -- | 8.24M | 2,594,438 | 1,891,500,895 | $649 - $10K |
| 12/4/2023 | 10K | 8.25M | 1,950,423 | 1,893,451,318 | $488 - $7.8K |
| 12/5/2023 | -- | 8.25M | -- | 1,893,451,318 | $0 - $0 |
| 12/6/2023 | -- | 8.25M | 1,787,347 | 1,895,238,665 | $447 - $7.1K |
| 12/7/2023 | -- | 8.25M | 676,500 | 1,895,915,165 | $169 - $2.7K |

12/8/2023   10K   8.26M 668,125       1,896,583,290 $167 - $2.7K

298.    As part of the pre-arranged and pre-planned attacks, links to the Nelson video were made by Ijaz and Nelson to be included on posts to ZacksJerryRig and dbrand twitter accounts and postings of the prepared link to the video were made by Nelson and dbrand at several locations.

299.    As part of the planned coordinated attack, links to the video and the twitter posts of Nelson and dbrand were made by Ijaz, for inclusion in Ijaz' personal email campaign.

300.    As shown by the log files of the Casetagram protected computers, the testing of the Casetagram Protected Computers continued.

301.    As part of the planned multi-pronged on-line malicious illicit attacks and to increase dissemination of the pre-planned attack materials on or around the pre-arranged "███████," dbrand followed with posts about the Nelson video as if it was "independent" of dbrand's own conduct, knowing it was not independent.



302.    As shown by the log files pre-established testing of the Casetagram protected computers continued.

303.    As part of the pre-planned online malicious and illicit attack, Ijaz commenced distribution of his prepared standard email with the pre-made links to YouTube and

twitter posts of the Nelson video, that Ijaz prepared to send to over ▪ members of the press.



See additional at **Exhibit 7**.

304.    Log files show pre-established testing of the Casetagram Protected Computer continued.

305.    The log files from the DDoS attack confirm the use of a pre-arranged intentional programmatic DDoS attack scheduled to follow shortly after the specific and precise timing of the known Ijaz embargo lift date and publication of the Nelson video.  The log files demonstrate that the volume of internet traffic was artificially generated with hundreds of thousands of requests emanating from a limited set of IP addresses at speed and volumes inconsistent with normal human activity indicating an automated or computer scripted attack behavior.

206

306. The log files from the DDoS attack evidence and confirm that the DDoS attack programmatically increased and increased in intensity and frequency until the Casetagram Protected Computers went down on Black Friday, one of the biggest shopping days of the year and the specific chosen date Ijaz, Nelson and dbrand chose for the lift of the embargo.

307. The log files evidence a point in time when the pre-planned, programmatic, DDoS attack hit and caused the Casetagram Protected Computers to go down.

308. Not so co-incidentally, Nelson's X posts also show Nelson was conveniently on-line and posting about Casetagram when the Casetagram protected computers went down "about two minutes ago."

309. The log files show that the attack on Casetagram's protected computers was an intentional, programmatic, deliberate, DDoS attack tied to the intentional, deliberate, timed lifting of the embargo by Ijaz, and pre-arranged timed release of Nelson's video by Nelson.

310. Like arsonists who set fire to a building and return to the scene to watch the building burn, Nelson, Pantheon, dbrand and Ijaz made conspicuously timed and damning social media posts evidencing both their expectation and knowledge that the DDoS attack was to occur and celebration that it had occurred.

311. Nelson's monitoring the Casetagram protected computers at the time of the DDoS attack and making a post stating "the site went down two minutes ago" is evidence supporting his knowledge and participation.

312.     Nelson also made the following post on his X, formerly known as Twitter,

account, behavior indicative of a participant with a DDoS attack.



313.     As shown in Exhibit 4, Nelson received an almost $▮▮▮▮▮ "other payment"

from dbrand in November 2023 the time period of the DDoS attack.

314.     dbrand's other co-conspirator Pantheon, again not so co-incidentally, likewise

made a November 24th post reminding everyone to "boost their #BlackFriday success

like dbrand did!"



315.     Pantheon also provided a link to the "wicked case study" to remind everyone of

Adam Ijaz' quote:

`` 

*Had the site gone down in speed or completely*
*offline, it would have resulted in a catastrophic*
*loss in revenue. As it was, our competitor's site*
*went down and we were able to capitalize.*

316.     On the aforementioned information, including log files, and other information
and belief, and as a reasonable opportunity for discovery of the materials requested to
be preserved, including expert discovery will show, dbrand, Nelson, Ijaz and their
conspirators directly or directly induced another party to violate 18 U.S.C. §1030
and/or took an active role in the CFAA violator's conduct' by directing, encouraging
or inducing a CFAA violation.

317.     Casetagram's protected computer was down and Casetagram was damaged in an
amount well over the minimum threshold jurisdictional amount of $5,000 and on
information and belief damages substantially more than this amount.

318.     dbrand, Ijaz and Nelson and/or others in or working with the Conspiracy are
directly and/or vicariously liable for the violation of the CFAA.

319.     After the DDoS attack, both Nelson and Ijaz continued to misrepresent to the
consuming public that a purchase of an X-Ray product would help fund the fight
against Casetagram, when both knew those representations to be false and both knew
it was a scheme to drum up royalty payments to Nelson.

320.     After the issue of the DDoS attack was raised with dbrand, on January 23, 2025,
dbrand, with the assistance of an attorney at the Workman Nydegger firm, filed an
application to register the trademark "DDoS" with the US Trademark Office.

321.     Discovery will likely show numerous additional distributions of the link to the

322.    video containing the false representation that a purchase of the Xray product will help support the fight against Casetagram.

**Acts related to dbrand's use of RIP_CTFY and CASTIFKD on product and in commercial advertising**

323.    In or around December 2023 dbrand began using in connection with its goods (products) RIP_CTFY and CASTIFKD on its products and in commercial advertising over the wires (social media posts and website).

324.    CTFY and CASTI are references to the Casetify brand and trademark.

325.    These uses have been done by dbrand without authorization and are likely to cause confusion and deception.

326.    RIP_CTFY and CASTIFKD are also false representations of fact, and/or false or misleading descriptions of fact.

327.    dbrand's use of RIP_CTFY and CASTIFKD is likely to cause confusion, or to cause mistake, or to deceive as to the commercial activities of Casetagram.

328.    dbrand's use of RIP_CTFY and CASTIFKD in commercial advertising and promotion misrepresents the nature, characteristics, qualities, CASETIFY branded goods, services, or Casetagram's commercial activities.

329.    Consumers have been misled and/or are likely to be mistaken and/or deceived about the commercial activities of Casetagram.

330.    Casetagram is likely to be and has been harmed by dbrand's acts.

331. The Casetagram mark is likely to be and has been harmed by dbrand's acts and Westside is the Seller on Amazon for Casetify branded products, and thus the acts also harm Westside.

332. dbrand and its social media influencer Nelson have been unjustly enriched.

**False, deceptive and misleading July solicitation for sales to support "our legal battle"**

333. In July 2024, Nelson, who is not a party to any lawsuit against Casetagram continued to make false and fraudulent posts using the "Casetify" brand this time soliciting consumers to "supporting our legal battle against @Casetify just got more affordable" and again peddling the X-Ray and skins and Teardown skins.

334. An example of such posts is shown below:



335. Consumers are likely to be deceived and were actually misled by these posts, as reflected in the comments of the posts.

211

336.     The proceeds of these sales did not go to support the legal battle but instead generated ███ payments for Nelson, an individual who is not a party to the lawsuit, and does not hold any rights at issue in the lawsuits. Exhibit 1.  The existence of Nelson's participation in litigation was used as a scam by Nelson and dbrand in commercial advertising and as part of acts of tortious interference with Casetagram perspective business.

337.     Nelson is not a party to the litigation against Casetagram so the "our legal battle" is literally false. The representation that the sale will be used for the legal battle when it is untrue and Nelson is pocketing lucrative ███ payments is an act of fraud and consumer fraud and deceptive trade practices.

338.     The fact that dbrand voluntarily dismissed its copyright claims and the post seeking "support" for the legal battle remains unchanged and continues to solicit today, is a false and misleading representation.

**August 2024 to January 2025 And False Statements To Casetagram Former Employees About Judge Valdez's Agreed Confidentiality Order [ECF No. 32]**

339.     Nelson received from dbrand significant payments of $ ███ and $ ███ labelled as " ███ " for August and September 2024, the months Nelson was used as a front for dbrand's attorneys contacting Casetagram former employees. See Exhibit 6 and Exhibit 4.

340.     During this time Nelson and Ijaz sent, over the wires by email, communications to Casetagram former employees that constitutes fraudulent misrepresentations with an intent to deceive the recipients and tortious interference with Casetagram

212

prospective business in the design community. Nelson and Ijaz also used these communications to harm Casetagram's reputation in the design community.

341. For the communications in **Exhibits 5 & 6**, Nelson, Ijaz and dbrand improperly concealed their attorneys' involvement in these communications. *See* Exhibit 5 at pp. 22-23.

342. Attorneys are prohibited from using false pretenses to arrange an interview with former employees of their opponent, and Nelson and his "fame" and Ijaz cannot be used as a fake front for the attorneys contact.

343. A number of fraudulent representations were made in these communications. See **Exhibit 6 and 7**.

344. The communication links to a video falsely accusing Casetagram of a crime and/or engaging in a criminal act against Nelson.

345. The video references a Canadian civil action but the attorneys behind the fraudulent emails are not involved in the Canadian action and the inquiries were for a different action.

346. The reference to and description of Magistrate Judge Vandez's Agreed Confidentiality Order is also false and deceitful. Nelson is not entitled to access to confidential information under that order.

347. As a misleading form of intimidation, Nelson and Ijaz state they do not have an intention to sue the former employee. Yet Nelson and Ijaz had no cognizable claim to initiate a lawsuit against them. Many contacted by Nelson and Ijaz were not even at the company nor were involved in the products at issue.

348.    Nelson and Ijaz concealed from the recipient dbrand's attorneys' involvement in

the background with the drafting of the email and failing to disclose to the former

employees dbrand's attorneys as potential recipients of the information solicited by

improper means.

349.    Nelson and Ijaz sent their emails separately, with both publishing the Nelson

video by including a link to the defamatory Nelson video containing false

representations and making comparisons of unprotectable elements of images in the

body of the email, and sent them on dates between August 2024 to December 2024,

the date reflected on the emails. **Exhibit 5** and **Exhibit 6**.

350.    Reflecting their knowledge that they were soliciting non-public information, in

making the email representations, Nelson and Ijaz expressly represented: ████

████████████████████████████████████

████████  Nelson again called the litigation pending in this District "████████" when

he is neither a named party nor an author or owner of the rights being asserted in the

litigation in this District. **Exhibit 5** and **Exhibit 6**. See also Exhibit 1, dbrand's

Response to Casetagram's Requests to Admit.

351.    Nelson and Ijaz also made express representations about the applicability of a

protective order governing confidentiality issued by Judge Valdez in this District and

for this specific case by including in their emails to former Casetagram employees:

████████████████████████████████████

████████████████  which indicates both that the writer knew it was soliciting

confidential information, and that there was likely some obligation (whether

contractual or legal) not to disclose the information and that Nelson and Ijaz intended

214

the recipient to disclose non-public confidential information. **Exhibit 5** and **Exhibit 6**.

352.    Nelson wrote this to many individuals even though he himself is not authorized to receive access to confidential information pursuant to the Agreed Confidentiality Order [ECF No. 32]. **Exhibit 5** and **Exhibit 6**.

353.    Nelson and Ijaz also distributes via the emails a link to Nelson's video titled "I've been Robbed" which falsely states that Nelson is the individual who has been "robbed," which is plainly false and makes comparisons of unprotectable elements of images. This video and the representations made therein by Nelson are literally false and/or deceptive and are intended to deceive and mislead.   **Exhibit 5** and **Exhibit 6**.

354.    With respect to Nelson and Ijaz, each email sent from August 2024 to January 2025 constitutes a separate act of tortious interference with Casetagram's business expectancy in the design community. **Exhibit 5** and **Exhibit 6**.

355.    On information and belief and a reasonable opportunity for discovery will show, dbrand's counsel had knowledge of the Nelson and Ijaz emails, and as agents for dbrand participated in part in disseminating the link via these Ijaz and Nelson emails. **Exhibit 5** and **Exhibit 6**.

356.    Evidencing their acting as agents of dbrand at the time as well, Nelson and Ijaz made offers on behalf of dbrand to pay the ▮▮▮▮▮▮▮▮ of Casetagram's former employees. **Exhibit 5** and **Exhibit 6**.

357.    Nelson and Ijaz falsely represent that they have no intention of taking legal action against "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" which they also know is literally

false as dbrand and the attorneys who are hiding behind the scenes of these emails are making "alter ego" claims.

358.     Here is an example:



See, also Exhibit 5 and Exhibit 6 for similar emails from Nelson and Ijaz.

359.     Nelson, Ijaz, dbrand individually and as agents for dbrand and its counsel (hiding in the shadows), were committing a tort of fraudulent misrepresentation intending to and actually harming Casetagram.

360.     On information and belief and a reasonable opportunity for discovery will show Nelson never read the Agreed Confidentiality Order and Nelson was setting up the individuals to be questioned by dbrand's attorneys without full disclosure of that fact or without disclosure of their respective rights.

361.　　Ijaz admitted at his deposition in his January 2025 deposition that he never read the Agreed Confidentiality Order before sending out the emails.

362.　　One of the individuals that Ijaz and Nelson contacted in the December 2024 - January 2025 timeframe was Ruben Rodriguez ("Rodriguez"), an executive at Casetagram who recently left his position.  Exhibit 10.  Rodriguez had a signed employment agreement and express confidentiality obligations thereunder owed to Casetagram.

363.　　Ijaz could not meet Rodriguez at the upcoming conference because he was sitting for his deposition in Chicago.  On information and belief, Nelson was informed of Ijaz's contact with Rodriguez, Nelson then met with Rodriguez at the trade show, and Nelson reported back to Ijaz as part of the planned scheme to induce Rodriguez to disclose non-public confidential or privileged work/product information.

364.　　Nelson confirmed he observed Rodriguez connect to an outside server to show Nelson non-public information of his former employer Casetagram concerning a potential response to dbrand's filing of the Canadian lawsuit.  dbrand and its agents are misusing the information obtained by improper means in questioning witnesses.

**January dbrand drops all of its Copyright Claims**

365.　　In January 2025 dbrand sought to amend its complaint and "omit" all copyright claims.  The Court made a record that dbrand admitted it could not continue with their copyright claims and has held that dbrand's dropping of the copyright claim is the equivalent of a voluntary dismissal of the copyright claims.

**April 2025 dbrand allowed to drop claims**

366.  In April 2025, dbrand was allowed to file its amended complaint omitting all claims for copyright infringement with the Court holding that it is the equivalent of a voluntary dismissal of the Copyright claims. dbrand was also allowed to add a new party.

367.  Westside is entitled to an award of its attorneys' fees and costs for the dismissed copyright counterclaims under 17 USC §505 because it is the prevailing party on those claims.

Respectfully Submitted,

By /s/ Kara E. F. Cenar
Kara E.F. Cenar (IL #6198864)
KCenar@ubglaw.com
Angela Kalsi (IL #6309372)
AKalsi@ubglaw.com
S. Patrick McKey (IL #6201588)
PMcKey@ubglaw.com
Susan Meyer (IL #6226450)
SMeyer@ubglaw.com
Rachael Rodman (OH # 0073872)
RRodman@ubglaw.com
Mary Ann Wymore (MO # 44061)
MWymore@ubglaw.com
Brett Geschke (IL # 6337873)
BGeschke@ubglaw.com
UB Greensfelder LLP
200 W. Madison Street, Suite 3300
Chicago, IL 60606
(312) 658-6500

*Attorneys for Defendant Westside Lab, Inc.*

218

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2025, a copy of the foregoing was filed electronically with this Court.  Notice of this filing will be sent by operation of the Court's CM/ECF electronic filing system to all parties indicated on the electronic filing receipt.


/s/ Brett. J. Geschke

4912-5164-1674, v. 3