IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DBRAND, INC., a Canadian Corporation, Plaintiff, v. CASETAGRAM LIMITED, et al., Defendants.

Case No. 24-cv-01919

Chicago, Illinois
March 31, 2026
3:11 p.m.

TRANSCRIPT OF TELEPHONIC PROCEEDINGS - RULING
BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiff: WORKMAN NYDEGGER PC
BY: MR. COLLIN HANSEN
840 S. Northwest Highway, Suite 10
Barrington, Illinois 60010

WORKMAN NYDEGGER PC
BY: MR. KENNETH J. DYER
MR. RYAN C. MORRIS
60 E. South Temple Street, Suite 1000
Salt Lake City, Utah 84111

For the Defendants: UB GREENSFELDER LLP
BY: MS. KARA E. F. CENAR
MR. BRETT J. GESCHKE
MR. PATRICK S. McKEY
MS. SUSAN MEYER
200 W. Madison Street, Suite 3300
Chicago, Illinois 60606

Court Reporter: KATHLEEN M. FENNELL, CSR, RMR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 2328A
Chicago, Illinois 60604
Telephone: (312) 435-5569
Kathleen_Fennell@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard via telephone:)

(Call to order.)

THE CLERK: Calling Case No. 24-cv-1919, dbrand, Inc. v. Casetagram Limited, et al., for ruling on motion.

Counsel, please state your name for the record, starting with plaintiff.

MR. HANSEN: This is Collin Hansen for plaintiff dbrand. With me are Kenneth Dyer and Ryan Morris.

MS. CENAR: Good afternoon, Your Honor. Kara Cenar, Brett Geschke and Susan Meyer on behalf of defendants Casetagram, defendant Westside and defendant Westrock.

MR. McKEY: Patrick McKey also on behalf of defendants, Your Honor.

THE COURT: Good afternoon, everyone.

We're here for a ruling on plaintiff's motions for sanctions, which is Docket 134. I am prepared to proceed to the ruling, and so I'll proceed with it.

To clarify the format of the ruling, I am going to be ruling from the bench on this motion, and so I'll be stating my reasons and, of course, the ruling itself on the record here today, and then I'll follow up with a minute entry that just gives the bottom line.

I don't intend to issue a separate written order with the reasoning, but I will be stating all my reasoning on the record. And so if anybody needs the reasoning, you can -- or

it will be available to you on the transcript.

I'm proceeding in that format because it's just more efficient. This motion is, again, Docket 134. It's been pending since last June, June 13th of 2025. We're now at the end of March of 2026, so in a few months, in a couple months, it will be a year since this motion has been pending.

And it's -- so in that circumstance, I just think that proceeding in this format, it's more efficient, and I can give you all my reasons on the record, and it makes sense to just get you a ruling.

Because I will be explaining my reasoning, I thank the parties in advance for your patience while I walk through the reasoning.

Let me first just tell you the ruling upfront, and then I'll explain the background and the reasoning.

So the motion, which is Docket 134, dbrand's motion for sanctions, I'm granting the motion in part and denying it without prejudice to renewal in part.

So it is granted as to defendant Casetagram Limited, and it is denied without prejudice to renewal as to defendant Westside Labs, Inc. I just gave the full names of defendants. I'll be referring to them as Casetagram and Westside, respectively.

I will be entering default judgment Casetagram on all claims in the amended complaint, which is the operative

complaint at Docket 114. I am denying the motion without prejudice as to defendant Westside, and I am also going to defer the resolution of fees and costs to a separate motion.

So I guess as a formal matter, I'm going to deny the motion without prejudice to the extent that it requests fees and costs because I would benefit from more focused briefing on that particular aspect of the requested relief.

Okay. So to turn to the background, dbrand is a Canadian corporation. Casetagram is a Hong Kong limited company, and Westside is a California corporation.

dbrand produces a line of phone and device cases called the "Teardown" collection. The cases have images applied to the back of them, to the back of the cases, depicting the internal hardware, whichever type of device the case was designed for. An example of one of dbrand's Teardown images, together with or alongside a scan of the corresponding phone's internals, is available at paragraph 67 of the amended complaint, which is Docket 114.

In that image, the scan of the corresponding phone's internals is on the left, and then dbrand's Teardown image of that phone's internals is on the right.

Casetagram makes a similar line of phone and device cases, and that line is called the "Inside Out" collection.

Casetagram's Inside Out collection also depicts the corresponding device's internal hardware. dbrand designed and

produced its Teardown cases first, and it claims that Casetagram copied dbrand's Teardown images to produce Casetagram's Inside Out images. And this is an allegation in the amended complaint, Docket 114, paragraph 10.

In the amended complaint, dbrand brings claims against defendants under the Digital Millennium Copyright Act, or DMCA, specifically the provisions of the DMCA that protect Copyright Management Information, or CMI.

Parenthetically, dbrand's amended complaint also names, besides the two defendants that I've already mentioned, a third defendant, Westrock Services (Wholesale), Inc., alleging that Westrock is an alter ego of Casetagram and Westside. The current motion for sanctions that I'm addressing today does not seek sanctions against Westrock, the third defendant.

Returning to the allegations of the amended complaint, again, dbrand brings claims against the two defendants I already mentioned, Casetagram and Westside, under the DMCA, and specifically the DMCA's provisions protecting Copyright Management Information, or CMI. CMI is broadly defined to include identifying "information conveyed in connection with copies ... of a work, including in digital form," such as the work's title, author's name, or "[i}dentifying numbers or symbols." 17 U.S.C. Section 1202(c)(1)-(2) and (7).

In dbrand's complaint, dbrand identifies various

Inside Out images -- the "Accused Works" -- and alleges that -- dbrand alleges that defendants, in producing the images, falsified and removed CMI on dbrand's Teardown images in violation of 17 U.S.C. Section 1202(a) and (b).

In this motion for sanctions, dbrand seeks default judgment against both Casetagram and Westside for discovery violations. Overall, dbrand argues that defendants began identifying and deleting electronically stored information, or ESI, critical to the case as soon as they became aware of dbrand's lawsuit.

Before addressing the alleged violations, I will briefly discuss the events that led up to the filing of this lawsuit.

All findings are made based on a preponderance of the evidence. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 781 (7th Cir. 2016) (which notes that "in civil cases, the facts underlying a district court's decision to dismiss the suit or enter a default judgment as a sanction under Rule 37 or the court's inherent authority need only be established by a preponderance of the evidence.")

First, the first topic I would like to discuss as part of the background is the creation of the Accused Works.

Here, I would note that there is a set of Casetagram's internal Slack messages from the summer of 2023. See Docket 237-1 and Docket 237-2. These messages are helpful in

piecing together the timeline. They involve numerous Casetagram employees presumably working in Hong Kong, and they cover the period from the inception of the Inside Out collection in May 2023 until the release of the product line in July 2023.

These messages were produced late in discovery.

So turning to some of the content or some of the key content of those Slack messages, on May 16, 2023, Casetagram's CEO, Wes Ng, asked the design department to "come up with our own 'teardown' case collection." Docket 237-2 at 6.

He sent screenshots of dbrand's images, and he told the designers they could "literally ... right click [and] download" but they would "need to tweak" the designs. *Id.* at 6 and 25.

Annabelle Li told Ng that they would "make it happen." *Id.* at 9. She then delegated the task to Mandy Lau and Jackie Chan, who worked on the images over the next several days. *Id.* at 43-44, 49-46; Docket 237-1 at 85-87, 92-96.

The results of this process were a set of images that dbrand calls the" Exact Matches." That's a term that dbrand uses to refer to this set of images that came from the process I just described reflected in the Slack messages from May 2023.

So these Exact Matches, the reason dbrand refers to them as the Exact Matches is that dbrand claims that they are one-to-one matches for its own images "except for CMI removed

and falsified." Docket 135 at 16.

And also just parenthetically when dbrand refers to CMI being removed and falsified, at least one type of a CMI that dbrand's referring to is the QR code. And that's something that dbrand clarified at the oral argument on the motion for sanctions.

Casetagram originally intended the Exact Matches to be its final product. By the end of May, the Exact Matches were finalized and sent to Ng for approval. Docket 237-2 at 61 and 65. Soon after, Casetagram began printing the images onto device cases that would be sold. *Id.* at 77-80, 86, 92, 109-12.

Around that time, however, numerous Casetagram employees began expressing concerns that the Exact Matches were too similar to dbrand's Teardown images. And so Casetagram employees began expressing concerns the Exact Matches were too similar to dbrand's Teardown images and potentially constituted copyright infringement. Docket 232 -2 at 27-29, 33 and 38. Many messages were exchanged on this topic, and this is again referring to the Slack messages.

The messages include, and I'm going to paraphrase to some degree, but these messages include, for example, a June 28, 2023 message from Jackie Chan where she says, I'm in deep S word, and she was using -- again, this is not an exact quote, it's a paraphrase, but it is saying that she used the assets that Mandy shared with her online for Teardown and now

apparently those images are not how those parts look inside the phone and she refers to her, Jackie, mentioning that she did mention about copyright issues because she basically used people's assets online but added our logo. Again, that's a paraphrase, but it's referring to the concept of Teardown and copyright issues and using assets online and adding our logo. And so that's Docket 232-2 at 27.

And also throughout this entire discussion, when I cite a page, that's the CM/ECF page number that's stamped at the top of the page, so Docket 232 at 27.

Another example comes from a Casetagram employee on July 6, 2023, and that is at Docket 237-2 at 116, and again this is a paraphrase, I'm not doing an exact quotation, but it's referring to the design team may think it's done by scanner, but it's dbrand's interpretation of Teardown. We cannot just copy and paste and get away with it; huge PR crisis coming.

So those are, again, not exact quote, but it's a paraphrase of these concepts that are popping up in the Casetagram employees' Slack message on July 6, 2023. So these messages in general are in the late June and early July 2023 time frame.

Another example is from a Casetagram employee on July 7, 2023. This is Docket 237-1 at page 3. Again, not exact quote, paraphrasing, but it's saying along the lines just

spoke with PDF and Annabelle, apparently it's a potential copyright infringement issue on Teardown collection. I am thinking of a way to get out of this. So, again, referring to possible copyright infringement and to Teardown.

Another message is from Annabelle Li on July 7, 2023, Docket 237-2 at 93. Once again, this is paraphrasing, not exact quote, and ellipses or omitting some language, but the concepts that she's discussing are that she's disappointed in our own team and how we handled it. I have some fault, too, but Jackie and Mandy also should have said something.

So, again, referring apparently to potential copyright issues.

Casetagram employees also circulated presentation slides in Slack that contrasted the Exact Matches with both an actual Teardown image, so an actual scan of a phone internals as well as dbrand's Teardown image. So this would have been a screenshot from a presentation where Casetagram was showing on the one hand the actual phone internals and then comparing that with Casetagram's Exact Match image, as well as dbrand's image, dbrand's Teardown image, and that is Docket 237-1 at 7 and 19.

And I'll note in that screenshot from a presentation that dbrand's Teardown image has differences from the actual scan of the internals or actual Teardown image, and then Casetagram's Exact Match image and dbrand's image are similar.

Also parenthetically, we don't have or it's never been

produced the actual complete presentation. This is a snapshot or excerpt of the presentation with this comparison, but the full presentation apparently has not been preserved, has been -- has been -- it's unavailable, so has been destroyed or is simply not -- no longer in existence, has not been produced.

We do have a couple of screenshots or slides from this presentation because they were discussed and excerpted in the Slack messages, but we don't have the full complete presentation, and that's an issue because there are numerous products or images involved, not just a couple slides.

Turning back to the Slack messages, the Slack messages show that on July 6, 2023, Casetagram held a management-level meeting where it decided not to sell products with the Exact Matches. Instead, Casetagram would revise the images in an attempt to differentiate them more from dbrand's Teardown images. Docket 237-1 at 7 and 42-53.

Following this July 6th management-level meeting, Chan -- and, again, Chan was one of the designers -- redesigned the images under Lau's supervision. *Id.* at 7 through 18. Li reported on the redesign process to other employees in the company. *Id.* at 56-60 and Docket 237-2 at 132 at 36. The result of this process was the Accused Works.

On July 17, 2023, Casetagram finally launched its Inside Out collection with the Accused Works affixed to the cases. 237-1, Docket 237-1 at 82.

An example -- and this is a graphic prepared by dbrand, as opposed to a document produced in discovery as a demonstrative, but a comparison of one of dbrand's original Teardown images as well as the corresponding exact match that was discovered by dbrand and the final accused work or final artwork by Casetify is available at Docket 135-4 at page 8.

That was a discussion of the creation of the Accused Works. I'm now proceeding to another aspect of the background discussion, so I'm still giving relevant background but now going to change the focus to the laptop ESI.

So a few months passed after Casetagram launched the Inside Out collection. As I just mentioned, that launch was on July 17th, 2023. So a few months passed after that launch.

Then on November 22, 2023, dbrand sued Casetagram for copyright infringement in a Canadian court. Docket 134-1 at 2 and 4.

Two days later, so again this is November 2023, Casetagram announced that it was conducting an internal investigation into the copyright allegations. *Id.* at 109. The investigation was led by Casetagram's general counsel, Edith Lam, who reported to Casetagram's managing director, Ronald Yeung. 135-1, Docket 135-1 at 254-55, 289 and 299-300.

In the following months, Li, Chan and Lau, so these were all employees involved in the design, so in the following months after this November 22nd, 2023 Canadian lawsuit, Li,

Chan and Lau each left Casetagram. The company's technical support archive indicates that Chan's employee account was deactivated on January 3rd, 2024 and Li's on February 14, 2024. Docket 237-1 at 131 and 133.

Defendants report that Mandy Lau left the company on March 19, 2024. Docket 242 at 30.

After these employees left, so the three employees Li, Chan and Lau, each of who were employed in the design of the Accused Works, Casetagram factory reset the laptops they had used while they were at the company. Docket 184 at 12; Docket 242 at 30.

The record is not entirely clear about when these resets occurred. However, first of all, we know that it was after November 22nd, 2023, because all these employees left after that date, and the factory resets occurred after the employees left. And in addition, a forensic image was eventually made of Chan's laptop, revealing that it had been reset "sometime on or before March 13, 2024," and then on March 14 assigned to another employee. Docket 135-5 at 32. Li's computer had surpassed its warranty, and it was sent to a recycling center on March 20, 2024. Docket 184 at 12, Docket 237-1 at 135.

It's not exactly clear when Lau's computer was reset, but she left the company on March 19, 2024, and so it's likely that the reset occurred on that date or later, more likely than

not.

Meanwhile, on March 6, 2024, dbrand filed this lawsuit against Casetagram and Westside.

Parenthetically, I'll note that dbrand alleges that Westside is an alter ego of Casetagram. Defendants dispute this.

Okay. So turning from the laptop ESI to another topic within the background discussion, which is just certain events during discovery.

Discovery began in May 2024. dbrand sent its first set of interrogatories, one of which asked for the identities of the "persons involved" in "the process of conceiving, designing, and creating each Accused Work." Docket 17. See also Docket 135-2 at 2. dbrand also requested production of "all documents concerning the Accused Works." Docket 134-3 at 36.

On July 8, 2024, Casetagram and Westside jointly responded providing dbrand a list of email addresses, none of which belonged to Li, Chan or Lau. Docket 135-2 at 16 to 17. Defendants also produced five documents, none of which were the Exact Matches. Docket 134-3 at 36.

On October 21, 2024, Casetagram provided a supplemental response to dbrand's interrogatory that identified Li and Chan, but not Lau. Docket 134-5 at 43. Defendants also had previously identified Li, but not Chan or Lau in a

supplemental response sent on July 26, 2024. Docket 134-5 at 9-10.

Casetagram stated in the October 21, 2024 response that "investigation continues as to whether there were any other designers, although as presently understood, these are the individuals involved." *Id.*

Casetagram never supplemented its response to identify Lau, and dbrand only learned of her involvement from reviewing the Slack messages, which were acquired in the latter half of discovery. Docket 237 at 3 and 17-18.

As for the Exact Matches, dbrand eventually discovered these through metadata associated with the Accused Works. Docket 135 at 16. So just to be clear, Casetagram never produced the Exact Matches in any other format other than as metadata, as part of the metadata associated with the Accused Works.

Within that metadata, which Casetagram had produced to dbrand, dbrand found hyperlinks that, when the hyperlinks were put into an Internet browser, led dbrand to the Exact Matches. Docket 135 at 16; see Docket 135-1 at 759. At that time, the Exact Matches were still hosted on Casetagram's server. Docket 135 at 16; see Docket 135-1 at 756-75.

Later at a Rule 30(b)(6) deposition, Casetagram designated Terence Fung, its technology support manager, to testify regarding Casetagram's efforts to collect documents for

production in discovery. Docket 135-1 at 617-18 and 737-38. Fung testified that he did not know why the Exact Matches had not been produced independently of the metadata, nor could he "say for sure" whether anyone in Casetagram knew why. *Id.* at 775-76.

On June -- on June 13, 2025, dbrand filed the current motion for sanctions against Casetagram and Westside. And, again, that's Docket 134. dbrand's principal request is that default judgment be entered against defendants for spoliating ESI in violation of Rule 37(e). Docket 135 at 9-15.

dbrand also argues that defendants committed perjury by making false statements in their discovery responses and failed to properly supplement those responses to identify Mandy Lau and to produce the Exact Matches. *Id.* at 15-22; Docket 237 at 17-20.

Turning next to the legal standard, there are a couple different Rules of Civil Procedure that are relevant here, beginning with Rule 37(e). That rule provides curative measures and sanctions when "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery."

If these threshold requirements are met, "the court must determine if the party seeking the ESI has suffered

prejudice, or if the party with possession, custody or control of the ESI intended to deprive the seeking party of the ESI." *Segerdahl Corporation v. Ferruzza*, No. 17-cv-3015, 2022 WL 21295096, at *1 (N.D. Ill. September 20, 2022.) (Quotation omitted).

As I explained in that case, to issue sanctions under Rule 37(e), five threshold findings must be made: "(1) the information must be ESI; (2) there must have been anticipated or actual litigation that triggers the duty to preserve ESI; (3) the relevant ESI should have been preserved at the time ... the litigation was anticipated or ongoing; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI cannot be restored or replaced through additional discovery."

As I further explained in that case, and I'm omitting quotations here, if any of these requirements are not met, then curative measures and sanctions are unavailable under Rule 37(e). If all these threshold requirements are met, then the court must determine if the party seeking the ESI has suffered prejudice, or if the party with possession, custody, or control of the ESI intended to deprive the seeking party of the ESI. If prejudice but not intent exists, then the court can impose curative measures. If intent, which presumes prejudice exists, then the court can impose sanctions, including presuming that the information was unfavorable,

instructing the jury to presume the information was unfavorable, or entering dismissal or default. Again, that's from *Segerdahl* at *1 and quoting another case. I'm omitting the quotations. Generally, these requirements must be established by a preponderance of the evidence.

Turning next to Rule 26(e).

Rule 26(e) requires parties responding to discovery requests to "supplement or correct" those responses "in a timely manner if the party learns that in some material respect, the disclosure or response is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." And that's from Rule 26(e)(1)(A).

Rule 37(c)(1) imposes sanctions for violations of Rule 26(e), such as requiring the offender to pay the other side's fees and costs. Rule 37(c)(1)(A). However, sanctions may not be imposed if the failure to supplement "was substantially justified or is harmless." Rule 37(c)(1).

Turning to the discussion, sanctions are warranted for Casetagram's spoliation of the laptop ESI. In its brief, Casetagram admits that with respect to the laptop ESI, all five of Rule 37(e)'s threshold factors have been met. Docket 184 at 23. And see the factors that again I quoted in *Segerdahl*, 2022 WL 21295096 at *1 and, again, omitting the quotation there, but

it's quoting the five factors.

The parties, however, dispute whether Casetagram reset the computers with intent to deprive dbrand "of the information's use in the litigation." And that's under Rule 37(e)(2). Casetagram claims it acted in good faith and merely reset the computers in accordance with its standard protocol for offboarding departing employees. Docket 184 at 24.

There are a variety of factors that lead me to conclude that there is intent by a preponderance of the evidence.

And so, first of all, Terence Fung, Casetagram's technology support manager, testified about Casetagram's standard offboarding protocol. Fung said that when the tech support team receives the computer of a former employee, the team "will ask for instructions from the relevant department head. If there is no specific instruction from that department head, then we will as soon as possible ... factory reset [] [the employee's computer]." Docket 135-1 at 659.

Mr. Fung explained that both Annabelle Li's and Jackie Chan's computers were reset under this protocol and that no backups were made of the ESI on the laptops. *Id.* at 694-95 and 698. Fung did not discuss Mandy Lau's computer in his deposition because Mandy Lau was not known to dbrand at the time of his deposition because the Slack messages that revealed Mandy Lau's involvement were produced so late. But defendants

indicate in their brief that Mandy Lau's computer was also reset per the standard protocol. Docket 232 at 30.

However, Casetagram failed to explain why no one in the company issued a "specific instruction" per its standard protocol to exempt the laptop ESI. "[A] hands-off implementation of an ordinary corporate destruction policy is not a silver bullet" to prove that one did not intend to spoliate evidence. *Skanska USA v. Bagelheads, Inc.*, 75 F.4th 1290, 1313 (11th Cir. 2023).

Three laptops were erased in three separate instances. If Casetagram is to be believed, its technology department on three occasions asked for a "specific instruction" regarding a designer's laptop and three times the responding individual in the company inadvertently allowed the ESI to be destroyed. Casetagram does not explain how that inadvertence occurred once, much less three times. Instead, the most logical conclusion is that Casetagram intended to hide the evidence from dbrand. *See United States v. Yonkers Board of Education* 624 F.Supp. 1276, 1294 (S.D.N.Y 1985) (citing "the general rule of evidence that when actions having a particular effect are repeated, the inference is stronger that the effect of the actions was intended.") (Citation omitted).

The timing of the spoliation is also telling. Chan left Casetagram in January 2024 and Li in February 2024. Docket 237-1 at 131, 133. But even though Fung testified that

Casetagram resets computers "as soon as possible," Docket 135-1 at 689, Casetagram did not reassign Chan's laptop to a different employee until March 14, and it waited until March 20 to recycle Li's computer. Docket 135-5 at 32; Docket 184 at 12; Docket 237-1 at 135.

And even more importantly, both of these dates, so the reassignment of Chan's laptop and the recycling of Li's computer, both of these dates were after March 6th when dbrand filed this lawsuit. The timing suggests that Casetagram's decision to reset the computers was made in response to this litigation.

Further support for an inference of intent by a preponderance comes from the totality of the circumstances, which includes missing design files from the Google Drive. So the fact that these design files are missing from the Google Drive also supports a finding of intentional spoliation.

To spell that out, there -- so design files are a file that reflects the iterations, the iterative work of the designer, beginning from the beginning of the process through the end of the process, and these design files could potentially have been maintained on the individual laptops and in, fact, dbrand presented evidence through the Slack messages that these design files, at least portions of them, resided on the individual designers' laptops. As I just described, those laptops were all spoliated. But they also, according to the

Slack messages that dbrand has presented, the design files also resided not just on the individual laptops of the designers but also on a Google Drive, a company share drive, specifically a Google Drive.

dbrand also presented evidence that design files remain on the Google Drive for other product lines, but are conspicuously missing in the folder for this particular accused product line. That -- that fact that there's selective -- selectively missing design files for this particular product line adds to an inference of intentional spoliation.

I am primarily relying on the laptop destruction as the basis for the finding of intentional spoliation, and the reason is as follows: We know that all the laptops were destroyed after November 22nd, 2023, which is when dbrand filed its Canadian lawsuit for copyright infringement. And so certainly by November 22nd, 2023, Casetagram was under a preservation obligation.

So as of November 22nd, 2023 with the filing of the Canadian lawsuit, Casetagram and the other defendants were on notice of a duty to preserve evidence. And we know that the laptops were all destroyed after that time.

With respect to the design files -- I'm sorry, one last note about the laptops. Again, we know from the Slack messages that at least some parts of the design files were saved locally on the laptop, so we know that the laptop ESI

spoliation included spoliation of design files. Separately, however, as I mentioned earlier, there are missing design files from the Google Drive for this particular product line, the Inside Out line, whereas dbrand presented evidence that there are more than 65,000 other design files maintained on the Google Drive for other Casetagram products. So it is conspicuously missing from the Google Drive, the design files for this product line.

The one -- the one reason why I'm relying primarily on the laptop destruction as opposed to the missing design files on the Google Drive is that with respect to the missing design files on the Google Drive, we don't know exactly when those files were removed or deleted.

It may have been potentially as far back as July 2023 when there was internal discussion and commotion at Casetagram as reflected in the Slack messages over the Exact Matches and, you know, pulling those files, which were about to be shipped to Best Buy, from the market.

So, you know, it's -- it's less clear that the design files that are missing from the Google Drive were deleted after November 22nd, 2023. They may have been deleted after November 22nd, 2023, but they may have also been deleted before November 22nd, 2023 and after -- you know, within or after July 2023.

And in order to find that the deletion of those design

files represents intent or intentional spoliation, I would need to be able to find that a duty to preserve arose as of July 2023 when Casetagram realized copyright issues.

I think there's actually a pretty good argument that a duty to preserve arose as of July 2023 when Casetagram realized that there were copyright issues because the recognition of the copyright issues and the references to dbrand potentially suing, I think there's a fairly strong argument that that reflects knowledge of potential litigation or likely litigation.

So I think that there is a pretty good argument that a duty to preserve arose even as far back as the withdrawal of the Exact Matches from shipment, which would be in July of 2023, but I don't think it's necessary to reach that issue definitively because at a minimum, destruction of the design files from the Google Drive between July and November of 2023 is circumstantial evidence that supports a finding of intentional spoliation as to the laptop ESI. And we know that the laptop ESI was destroyed certainly after a duty to preserve arose on November 22nd with the Canadian lawsuit.

So that's an explanation of why the totality of the circumstances, which includes the missing design files from the Google Drive, also supports intentional spoliation resting primarily on the destruction of the laptops.

Also supporting intentional spoliation is the outreach

or the request from Casetagram to the Internet archive to destroy materials from the Wayback Machine, so archived images from the website, Casetagram website, but I think the two primary pieces of evidence are the laptop destruction, as well as the destruction at an unknown time of the design files.

Similarly, there is, as I mentioned earlier, a missing PowerPoint presentation which compares the original Teardown scan with the Exact Matches and dbrand's Teardown image. I mentioned earlier that we only have snapshots or individual slides from that PowerPoint presentation. And, again, like the design files -- and we have those because of the Slack messages. But like the design files, we don't have a date for the destruction of that PowerPoint presentation, but I would add that to the totality of the circumstances that supports an intent, a finding of intent.

In short, Casetagram offers no explanation for its spoliation apart from pointing to a standard protocol, which is unconvincing, and I find by a preponderance of the evidence that Casetagram erased the laptop ESI with an intent to prevent dbrand from using the evidence in this litigation.

Because intent is present, sanctions are warranted under Rule 37(e)(2). dbrand asked the Court to enter default judgment against Casetagram on all of dbrand's claims, and that request is granted. Default judgment "is a harsh sanction that ought to be used sparingly." *Johnson v. Gudmundsson*, 35 F.3d

1104, 1117 (7th Cir. 1994). But it is appropriate in cases of "egregious" misconduct. *See Apex Colors, Inc. v. Chemworld International, Ltd.*, No. 14-cv-273, 2018 WL 4853500 at *13 (N.D. Ill. October 5, 2018). Courts assessing the appropriateness of case-terminating sanctions under Rule 37(e) may consider factors, such as (1) "the seriousness of the spoliation"; (2) "misrepresentations related to the spoliation"; (3) "the importance of the spoliated ESI"; and (4) "the need to redress the harm inflicted by the spoliation." *See Pable v. Chicago Transit Authority*, 145 F.4th 712, 722 (7th Cir. 2025).

Here, these factors weigh heavily in favor of default judgment. First, Casetagram's spoliation was extreme. On three distinct occasions, the company made the choice to erase all ESI on a laptop belonging to one of the designers of the Accused Works. Each of the three laptops' ESI was obviously and highly relevant to the litigation. As a result of Casetagram's spoliation, there are no existing iterative drafts of the Accused Works, only the Exact Matches. As explained at oral argument, as dbrand explained at oral argument, the Exact Matches are a screenshot or they are of a particular image from the drafting process. They are not the complete set of iterative drafts as the design files would have been.

Second, Casetagram never produced and thus sought to conceal from dbrand the only remaining drafts, which are the

Exact Matches. And, again, they're not the complete set of iterative drafts, but they are a snapshot and they are an important snapshot.

Casetagram argues that it disclosed the Exact Matches within the metadata of the final files. Indeed, dbrand did find the Exact Matches by following links embedded in that metadata.

Casetagram's argument might be persuasive if the Exact Matches lacked real independent significance and if there was reason to believe that, you know, they were just one of many, many drafts along the way that might have been overwritten or overlooked. But as I described earlier, the Exact Matches very much had independent significance here. They were an important step in the design process that led to the accused images or Accused Works, and the Slack messages show that they were very well known by many people in the company, the Exact Matches, that is, and so it's not a situation where some link was buried in the metadata and was inadvertently overlooked. These documents should have been independently produced.

It's true that parties can produce native files with the metadata, and they should, and if the documents are kept in that particular format, then there's a reason to produce the documents in that format, but that does not excuse in this particular situation where the Exact Matches had such independent significance and were being circulated and worked

on separately, and they were not just part of a stream of different versions and drafts. They had been printed. They were ready to ship. They got pulled back from shipment because of copyright concerns. That's a very different situation from producing a document with -- in its native form with the metadata that is a situation where that document, the Exact Matches needed to be produced independently.

Additionally, Casetagram hid from dbrand for a time at least the identities of the employees who principally worked on the drafts, the three designers. Casetagram produced the names of Chan and Li late, and Lau's name never came to light until the Slack messages were produced very late in discovery.

These were critical witnesses in a case involving the design, the designers, the people who primarily worked on the design were and are very important, and they were critical witnesses whose names should have been produced promptly.

Considering both the Exact Matches that the failure to produce the Exact Matches and the late production of two of the three designers' identities and the non-disclosure of the third designer's identity, that would be Ms. Lau, Casetagram attempted to obscure the entire design process for the Accused Works, and that process is highly relevant to and is in fact at the heart of this litigation.

Third, the spoliated ESI very likely included "critical evidence" to dbrand's claims. *Sonrai Systems v.*

*Romano*, 2021 WL 1418405 at *15 (N.D. Ill. January 20, 2021)(quotation omitted).

dbrand's claims are for falsification and removal of Copyright Management Information, or CMI, in violation of 17 U.S.C. Section 1202(a) and (b).

Critically, both types of claims have a double scienter requirement. They require both -- well, so let me just say for under subsection 1202(a), the defendant must provide false CMI "knowingly and with the intent to induce, enable, facilitate, or conceal infringement." And under subsection 1202(b), the defendant must "intentionally remove or alter" CMI while "knowing or ... having reasonable grounds to know that it will induce, enable, facilitate or conceal an infringement."

So there's a double scienter requirement for the Copyright Management Information claims.

Plaintiffs may rely on circumstantial evidence to prove double scienter. *See GC 2, Inc. v. International Game Technology*, 391 F. Supp. 3d 828, 841 (N.D. Ill. 2019). Here, the designers' iterative drafts along with associated communications, notes, and other data could have been powerful evidence of Casetagram's intent in removing or falsifying dbrand's CMI.

Through the drafts, dbrand could have traced step-by-step the process by which Casetagram altered the

images, drawing inferences about the designers' mental processes. And that's why the spoliated ESI, which is the laptop ESI which, again, included local at least excerpts from the design files very likely included critical evidence to dbrand's claims, and of course that would have also been true of the design files saved to the Google Drive.

Fourth, dbrand is significantly prejudiced by the loss of the iterative drafts, as it now has a steeper hill to climb to prove intent. dbrand cannot show the jury Casetagram's incremental process of altering the CMI, the Exact Matches do not depict this process, and the Slack messages, while they offer a high-level overview of the progression of the Inside Out project, do not detail the designers' actual or minute changes to the CMI.

So the Slack messages are not an adequate substitute for the design files themselves, but they're just -- it's commentary from the designers, but it doesn't -- it's not the primary source of the actual tracked changes essentially to the designs and to the CMI.

These factors weigh in favor of a strong sanction. Default judgment is the strongest available under Rule 37(e). I have considered whether lesser sanctions would be sufficient. *See Pable*, 145 F.4th at 722, noting that the district court in that case considered lesser sanctions but concluded that lesser sanctions would not adequately remedy the prejudice.

Here, I have concluded -- considered lesser sanctions. Instead of default judgment, the Court could enter an adverse inference instruction or presumptions under Rule 37(e)(2)(A)-(B); but here, given how crucial the lost ESI was to dbrand's case, an adverse inference instruction or presumption is not sufficient.

Moreover, this case presents a significant need for deterrence, since Casetagram's conduct was extreme involving the destruction of multiple laptops from the critical witnesses in the case. *See Pable v. Chicago Transit Authority*, 2024 WL 3688708 at *9 (N.D. Ill. August 7, 2024), which pointed out that dismissal of the complaint would help deter other litigants from engaging in similar conduct.

Thus, default judgment is warranted against Casetagram.

Additionally, as I described earlier, Casetagram failed to supplement its discovery responses to disclose either the third designer, Mandy Lau, or the Exact Matches. And so that is additional significant discovery conduct that warrants default judgment. So it's not just the laptops standing alone, but it's also, as I've explained earlier, the failure to disclose the third designer, Mandy Lau, and the Exact Matches.

It is clear from the Slack messages that Casetagram knew about both of these pieces of information before discovery began, but then withheld the information from dbrand in bad

faith. The Slack messages reveal the general clamor within the company when employees started noticing similarities between the Exact Matches and dbrand's Teardown images. They also show Lau discussing the Inside Out project with other Casetagram employees. See, for example, Docket 237-1 at 63, 79, 99. And they show Lau being asked to attend the July 6 management-level meeting to answer questions about the project. *See Id.* at 43.

Furthermore, Casetagram's internal investigation, which began within days of dbrand filing suit in Canada, very likely would have uncovered the Exact Matches and Lau's involvement in the design process. In fact, Ronald Yeung, Casetagram's managing director, testified at his deposition that he learned of Annabelle Li's and Jackie Chan's involvement with the Accused Works through the investigation. Docket 135-1 at 254-55 and 266-67.

While he did not mention Lau, again that's because dbrand had not yet learned her identity because of the late disclosure of the Slack messages, so dbrand did not ask Yeung about Lau. Casetagram does not offer convincing explanations for its failure to disclose the information. dbrand eventually located the Exact Matches through links that it found in the Accused Works metadata, as I explained earlier.

Casetagram implies that this was intentional on its part and that it chose to produce the images by providing dbrand the metadata. As I described earlier, that is not

persuasive. Had Casetagram Truly wished to disclose the images, it could and should have simply produced the images themselves.

Defendants must produce ESI in a form "in which it is ordinarily maintained or in a reasonably usable form." Rule 34(b)(2)(E)(ii).

Nothing in the record suggests that Casetagram's images are "ordinarily maintained" via links in the metadata, and the steps that dbrand had to take to uncover the images make it clear that this was not a "reasonably usable form."

As to Mandy Lau, Casetagram argues that she was not, in fact, one of the designers of the Accused Works. Docket 232 at page 30. But the Slack messages reveal that Lau was heavily involved. There are numerous messages between her and the other two designers discussing the project. She both delegated tasks to Chan, for example, 237-1 at 7, and received direction from Li, for example, Docket 237-2 at 3. See also Docket 237-1 at pages 7-18 and 118-22.

She also reported on the status of the project to other Casetagram employees. See, for example, 237-1 at 63, 79 and 99. And as mentioned before, she was asked to attend the July 6 meeting about the project. See Docket 237-1 at 43.

Parenthetically, I'll note for clarity that there are two employees named Mandy Lau in the Slack discussions. The Mandy Lau who was part of the design process uses the email

address or in the Slack messages used the email address mandy.lmh@Casetagram.com.

Based on this evidence, the Court finds that Casetagram knowingly declined to supplement its discovery responses to identify Lau or the Exact Matches. That violated Rule 26(e), which requires parties to timely supplement if they learn "that in some material respect, the disclosure or response is incomplete or incorrect." Rule 26(e)(1)(A).

Casetagram offers no believable substantial justification for its violations under Rule 37(c)(1), and neither were the violations harmless under Rule 37(c)(1). Even though dbrand eventually acquired the information, it was forced to pursue much of discovery without the benefit of having the information. *See DR Distributors*, 513 F. Supp. 3d at 973, where it notes that parties incur prejudice because they do not have the benefit of the documents while selecting deponents, taking depositions, conducting third party discovery, and preparing their trial strategy and pretrial documents.

And so, for example, knowing Mandy Lau's identity and that she was very involved in the design would have been very important to Casetagram to adequately and properly conduct discovery. So it was prejudicial not to have that information early in discovery.

Therefore, I am inclined to order Casetagram to pay

dbrand's reasonable fees and costs associated with dbrand's efforts to acquire the information under Rule 37(c)(1)(A), but as I discussed earlier, as I mentioned earlier, I'm deferring the final resolution of fees and costs to a separate motion because I would find it helpful to have focused briefing on that topic.

Finally, I mentioned earlier that as to Westside, I am denying without prejudice dbrand's motion as to Westside. That's without prejudice to dbrand's ability to refile it. Again, I would benefit from more focused briefing on that point. I -- you know, the parties discuss a lot of different issues in the current set of briefs, and as I said, I would find it helpful just to see some specific briefing on that.

So to summarize and conclude, dbrand's motion for sanctions, Docket 134, is granted as to Casetagram and it is denied without prejudice to renewal as to Westside. More specifically, I will enter default judgment in favor of dbrand on all claims against Casetagram in the amended complaint, which is Docket 114, or I will grant default judgment in favor of dbrand and against Casetagram.

I am deferring the issue of Westside and the issue of fees and costs to separate briefing so that I can consider those issues with the benefit of more focused briefing.

So the motion is denied as to those issues but with -- without prejudice to its renewal on those issues.

Also, because I am awarding default judgment as a sanction against Casetagram, but there are multiple defendants, I will not actually enter judgment at this time, but I am awarding default judgment as a sanction. In addition, there is an outstanding issue before I could enter default judgment even as to Casetagram, which is that -- it was just the issue of damages, and Casetagram requested a separate hearing on damages. And so that has yet to occur, has yet to be scheduled, has yet to be briefed or any of that.

So I'm not in a position to actually enter default judgment for dbrand against Casetagram because I don't have -- we haven't determined or undergone the process for determining the briefing and hearing for determining the amount of any damages that would be awarded pursuant to a default judgment or as part of a default judgment against Casetagram.

So for a variety of reasons, both the open issues as to damages and because Casetagram is one of multiple defendants, I won't actually enter a judgment at this time, but I am awarding default judgment as a sanction.

Okay. That concludes the ruling today. I think what I would suggest, because there are various outstanding issues, I would just suggest that the parties take some time to confer, you know, in light of this ruling, and you can file a status report in we could set it for two, two weeks from now, three weeks from now, four weeks from now, something like that, when

the parties are able to propose next steps.

I'm also aware that there is an outstanding motion about the pleadings, and that is Docket 147. It's defendants' motion for leave to file supplemental affirmative defenses to plaintiff's amended complaint and Casetagram's request to file counterclaims and third party claims.

That motion is outstanding, and I intend to rule on it likely by written ruling, as opposed to a ruling from the bench. I may be in a position to issue the written ruling fairly soon, but if anything changes -- so I will let you know. So I will either issue a written ruling on that motion, or I will -- and I may, in fact, do so relatively soon, perhaps even today or in the near future. But if anything changes and I need to change the format of that ruling, I will set a ruling from the bench by issuing a minute entry.

Let me just pause there and ask whether the parties have any requests for the timing of the joint status report. Maybe it makes sense to set that for -- I mean, just let me know what time frame works for you. It could be two weeks, three weeks, four weeks from now.

MR. HANSEN: Your Honor, this is Collin Hansen for dbrand.

April 24th would work for us. That's a little over three weeks from today.

THE COURT: Okay. Does that date work for defense?

MS. CENAR: Your Honor, this is Kara Cenar.

In theory, it does, but I don't know -- I need to brief my client on this and propose a date. I'm fine with, I guess, setting a status for the 24th and providing a report.

There's a lot of procedural issues. You know, Westrock, there needs to be an answer to Westrock's counterclaims as the separate party. So procedurally, I have to process what Your Honor's ruling is and how it implicates the various other parties that aren't subject to this.

THE COURT: Okay. I'll set the joint status report for April 24th, and if -- you know, if you have any issues that come up with that date, you can feel free to file a motion for an extension of time for that report.

MS. CENAR: Okay.

MR. HANSEN: Thank you, Your Honor.

I do have one question. So with respect to the briefing as to Westside, the core issue there is the relatedness between Westside and Casetagram, which goes to the issue of alter ego, which is something we brought to the Court's attention in the briefing on this motion and also in the motion for leave to amend, and Your Honor previously said that you had taken our requests under advisement.

So we'd just like to bring up that request, and I think it would -- I think it would be a large overlap if not the same briefing with respect to the relationship between

Westside and Westrock -- I apologize -- between Westside and Casetagram. If we could renew that motion for leave to file summary judgment as to the alter-ego issue, I think that would resolve a lot of these outstanding issues.

MS. CENAR: Your Honor, if I may be heard on that? I don't know how Westrock, who hasn't gotten a response to -- its pleadings aren't closed can move into the summary judgment phase. It's still in discovery.

THE COURT: What's the plaintiff's proposal as to the sequence of -- so of any response to Westrock's pleading relative to the alter ego -- your proposed summary judgment on alter-ego motion?

MR. HANSEN: Yeah, so I think with a motion for summary judgment on alter ego, that would resolve all of the issues as to Westside and Westrock. If they are found to be alter egos of Casetagram, then sanctions would apply to them just as to Casetagram, and there would be no need to respond to Westrock's answer, which is almost entirely duplicative with the answers to Westside and Casetagram.

So in the event that it's -- if the Court finds that they are alter egos, then there's no need to proceed with the other briefing. If the Court finds they are not alter egos, then I think we can set a schedule to respond in an appropriate time to Westrock's answer, which this Court had previously stayed the pleadings as to Westrock for these same reasons,

given the overlap of the briefing -- overlap of the pleadings and potential overlap between the parties.

THE COURT: I mean, I think what would be helpful to me is if -- first of all, I can see -- I understand, I think, you know, the parties' positions. So basically, I think, as I heard it, dbrand wants to move forward to a summary judgment motion on alter ego for both Westside and Westrock. Westrock wants an answer to its counterclaims before proceeding to the alter ego summary judgment motion.

I don't know whether there is any rule or case law or any sort of authority that, you know, supports either sequence. I mean, is there any rule that says you have to have an answer to counterclaims in before you can move to an alter ego summary judgment motion? I just -- I don't know, and the parties are both just making these arguments, and so -- but not citing authority.

So I guess I would ask that the parties at least take a look maybe before that April status report, take a look and see if you can find any authority on this issue. I mean, it may be that there just isn't any specific rule on point, in which case it's just a matter of case management and I, you know, I can just set whatever sequence is most efficient and logical.

But I would just ask the parties to please look and see if there's anything in the rules or cases that requires one

sequence or the other. And if you have any such authority, please include it in that April 24th status report.

MR. HANSEN: Okay. We can definitely do that, Your Honor.

In the meantime, Magistrate Judge Valdez, despite the overlap in the briefing and Your Honor staying the pleadings as to Westrock, did reopen discovery as to Westrock, which we're currently responding over 500 discovery requests nominally on behalf of Westrock that's largely duplicative with the discovery that was already conducted over a year ago and already incurring a lot of those costs. And given that we've already brought this to the attention of Judge Valdez, we would ask for a review of that order if we could get a stay of discovery and then add that to the status report and attempt to resolve it there so that we can have a case schedule going forward if necessary.

THE COURT: What's the -- what is the discovery that is going on now with respect to Westrock? I -- I mean, I can see in Docket 256, it says --

MR. HANSEN: Yeah, so -- go ahead. Sorry. Didn't mean to interrupt.

THE COURT: -- 227?

MR. HANSEN: Yes, so Magistrate Judge Valdez opened all discovery as to Westrock. She there was a -- she originally had stayed at least a portion of it. She then

withdrew that stay, and now discovery is wide open. So we're -- dbrand is dealing with requests from Westrock and to all of dbrand's claims and all of Westrock's claims, which overlap entirely with Casetagram's and Westside's claims and affirmative defenses and third-party claims.

THE COURT: Okay. I mean, can -- I guess the issue that I'm running into right now is I'm just -- I'm trying to read on the spot her different orders. I mean, because there's 256, there's 238, there's 227, and -- I mean, I guess I -- I don't know that right this second I am in a position to -- to figure out, you know, what's the -- what's the appropriate response to this.

I think -- because I would just need some more time to unpack this. There's multiple orders from her. There's other issues outstanding, and as I mentioned before, there's this motion pending about Casetagram's proposed supplemental affirmative defenses and requests to file counterclaims and third party claims, and I understand that that wouldn't address Westrock. But, I mean, maybe it makes sense to just get a ruling on that and then -- and then re-raise this issue before Judge Valdez or before me if that's appropriate.

MR. HANSEN: Understood, Your Honor.

In the meantime, I guess, we're dealing with, as I mentioned, over 500 requests, not including subparts, substantial cost to dbrand, which is a much smaller company

than Casetify. Maybe we could provide Your Honor with a five-page brief by the end of the week that summarizes the issues and give Casetify a chance to respond. That might alleviate some of the concerns.

MS. CENAR: Your Honor, if I may be heard.

I think the most logical thing is to file the status report, wait for your ruling on the motion for leave to file affirmative defenses and counterclaims so the parties know what issues are and are not in this case with respect to which defendants and can put forth, you know, a logical way to proceed to wind this case up, you know, determine whether there's going to be any requests for interlocutory appeal or those types of things.

So my recommendation would be that instead of additional briefing, we set forth proposals to go forward in the status report which you set for, I think, April 24th, which is just three weeks. And I think you said were you going to issue your ruling sometime before that.

THE COURT: I mean, I think that is -- well, it's true that I am hoping to issue the ruling soon on the outstanding motion by Casetagram.

I -- I guess I do think that -- and, again, the only reason I'm not ruling right now is because I would need more time to unpack what exactly went on and what are all these different orders, and I'm not comfortable making a ruling

without taking a closer look at the orders. And so that's really the only reason, but I can see or from what I can hear from what dbrand is arguing, there is extensive discovery going on, and it's repeating a lot of the same discovery that happened before with respect to Westside and Casetagram. It's just with respect to Westrock because Westrock was added.

And if that goes full speed ahead between now and the status report on April 24th, that's potentially a lot of costs. And if we wind up -- I don't know which way we're going to go on the alter ego briefing. Are we going to do the briefing first? Are we going to do the Westrock answer first? That's why I asked the parties to find authority for and put it in the status report if you have any.

But perhaps, I don't know, perhaps there is no authority. Perhaps it's just a matter of case management, and if that's the case, then, you know, maybe I wind up going directly to the alter ego motion, and in that instance, it strikes me that -- again, I don't really know the answer to these issues right now, but it strikes me that if Westrock discovery is going full speed ahead between now and the 24th while you look at whether it's -- it makes sense to do the alter ego briefing immediately or wait for the Westrock or answer to Westrock counterclaims, then that is potentially a significant expenditure that might not be efficient and might be worth cost shifting if it comes down to that.

So I guess that's my sort of preliminary view of it. I will look at what you present in the April 24th status report. I don't know that -- I don't know about doing further briefing right now, but I would ask or I would just recommend that the defense think hard about is it a good idea to pursue these -- this full bore between now and April 24th or between now and when I decide the sequencing of the alter-ego motion versus Westrock's -- or the answer to Westrock's counterclaims because it could be a real waste from what I'm hearing.

MR. HANSEN: Understood, Your Honor. Thank you.

THE COURT: Okay. All right. That concludes the hearing. Thank you, everybody, for your time and attention. Take care.

MS. CENAR: Thank you, Your Honor.

MR. HANSEN: Thank you, Your Honor.

MR. McKEY: Thank you, Your Honor.

(Concluded at 4:46 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell* — *April 7, 2026*
Kathleen M. Fennell — Date
Official Court Reporter